# EXHIBIT A

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY<br>11786 ELKWOOD DRIVE<br>FOREST PARK, OH 45240, | ) <br>) <br>) <br>) | CASE NO.<br><br>JUDGE HARRY A. HANNA |
|      Plaintiff, | ) <br>) <br>) | |
| vs. | ) <br>) <br>) | |
| AUTOLIV ASP INC (F/K/A MORTON INTERNATIONAL INC., INDIVIDUALLY AND AS SUCCESSOR TO GERSHWIN ACQUISITION CORP., L/K/A MORTON ACQUISITION CORP.)<br>C/O CORPORATION SERVICE CO.<br>50 WEST BROAD ST., STE. 1330<br>COLUMBUS, OH 43215, | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) <br>) | **C O M P L A I N T**<br>(Jury Trial Demanded) |
| DAP PRODUCTS INC.<br>C/O THE PRENTICE-HALL CORPORTION SYSTEM, INC.<br>50 WEST BROAD ST., STE. 1330<br>COLUMBUS, OH 43215, | ) <br>) <br>) <br>) <br>) <br>) | |
| DONALD MCKAY SMITH INC<br>C/O KRISTINA D. SIUPINYS<br>1300 EAST 9TH STREET, SUITE 1950<br>CLEVELAND OH 44114, | ) <br>) <br>) <br>) <br>) | |
| HONEYWELL INTERNATIONAL INC. (F/K/A ALLIED SIGNAL, INC., F/K/A ALLIED CORPORATION, SUCCESSORIN-INTEREST TO BENDIX CORPORATION)<br>C/O CORPORATION SERVICE CO.<br>50 WEST BROAD STREET, SUITE 1330<br>COLUMBUS, OH 43215, | ) <br>) <br>) <br>) <br>) <br>) <br>) | |
| KAISER-GYPSUM COMPANY, INC.,<br>C/O THREE RIVERS MANAGEMENT, INC.<br>MANOR OAK ONE, SUITE 200<br>1910 COCHRAN ROAD<br>PITTSBURGH, PA 15220, | ) <br>) <br>) <br>) <br>) | |

PFIZER INC.                                  )
C/O CT CORPORATION SYSTEM                    )
4400 EASTON COMMONS WAY, STE. 125            )
COLUMBUS, OH 43219,                          )
                                             )
PNEUMO ABEX LLC                              )
C/O CORPORATION SERVICE CORP.                )
251 LITTLE FALLS DRIVE                       )
WILMINGTON, DE 19808,                        )
                                             )
R.E. KRAMIG & CO. INC.                       )
323 S WAYNE AVE                              )
CINCINATTI, OH 45215,                        )
                                             )
RED SEAL ELECTRIC CO.                        )
C/O DANIEL STRYFFELER                        )
3835 W. 150TH STREET                         )
CLEVELAND OH 44111,                          )
                                             )
RHEEM MANUFACTURING CO.                      )
C/O CORPORATION SERVICE CO.                  )
251 LITTLE FALLS DR.                         )
WILMINGTON, DE 19808,                        )
                                             )
THE SCOTTS COMPANY LLC                       )
C/O CT CORPORATION SYSTEM                    )
4400 EASTON COMMONS WAY,                     )
SUITE 125                                    )
COLUMBUS, OH 43219,                          )
                                             )
SWENSON TECHNOLOGY INC                       )
C/O ILLINOIS CORPORATION SERVICE             )
CO.                                          )
801 ADLAI STEVENSON DRIVE                    )
SPRINGFIELD, IL 62703,                       )
                                             )
UNION CARBIDE CORPORATION                    )
C/O CT CORPORATION SYSTEM                    )
4400 EASTON COMMONS WAY,                     )
SUITE 125                                    )
COLUMBUS, OH 43219,                          )
                                             )
                                             )
                                             )
                                             )
                                             )

VANDERBILT MINERALS, LLC )
(INDIVIDUALLY AND AS SUCCESSOR )
TO GOUVERNERU TALC CO. AND R.T. )
VANDERBILT CO.) )
C/O CORPORATION SERVICE CO. )
50 WEST BROAD ST., SUITE 1330 )
COLUMBUS, OH 43215, )
)
JOHN DOES (1-10) MANUFACTURERS, )
SELLERS, SUPPLIERS, INSTALLERS, )
PROMOTERS, COMPOUNDERS, OF )
ASBESTOS AND ASBESTOS- )
CONTAINING PRODUCTS AND )
MACHINERY USED, DESIGNED, )
INSTALLED, IN CONJUNCTION WITH )
AND OR FOR THE USE OF ASBESTOS )
AND OR ASBESTOS CONTAINING )
PRODUCTS REAL NAMES AND )
ADDRESSES. )
)
Defendants. )

## FACTUAL BACKGROUND

1.      Plaintiff JOSEPH J. DOUGHERTY is a resident of the State of Ohio, who was

diagnosed with malignant mesothelioma by a pathology report dated November 23, 2021.

2.      Plaintiff was employed at the WR Grace Davison Chemical Division Plant on or

near 4775 Paddock Road in Cincinnati, Ohio from approximately 1966 until 1972. Plaintiff was

also employed at the Morton International Facility on or near 2000 West Street in Reading, Ohio

from approximately 1976 until 2005.

3.      At all relevant times while on the aforesaid premises, JOSEPH J. DOUGHERTY

continuously used, worked with and/or around others who used asbestos[1], asbestos-containing

---

[1] Unless indicated otherwise, "asbestos" is used herein, not in a limited regulatory sense, but in a broad, human health-based sense, and includes non-regulated and non-commercial forms of asbestos, all forms of elongate mineral particles, fibrous minerals, fibrous talc, cleavage fragments of amphiboles, individual fibers, bundles, fibrils and transition/transitional fibers. "Asbestiform" and "asbestos" shall also be interpreted broadly and without any single definitional limitation regarding fiber size, length, dimension, ratio, presence of multiple fibers, or geologic origin or "habit." The foregoing notwithstanding, "asbestos" also includes vermiculite and talc, whether or not known or

products and/or machinery requiring the use of asbestos and/or asbestos-containing products. The premises, products and/or machinery required use, maintenance, cleaning, repair, and/or replacement by the Plaintiff and/or individuals who worked in close proximity to the Plaintiff.

4. Plaintiff JOSEPH J. DOUGHERTY used and/or was exposed to asbestos-containing products while he and/or others in his close proximity engaged in the maintenance, construction, renovation, repair, refurbishment and/or caretaking of personal property.

5. Defendant, DONALD MCKAY SMITH INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

6. Defendant, R.E. KRAMIG & CO. INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

7. Defendant, RED SEAL ELECTRIC CO., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

8. Defendant, THE SCOTTS COMPANY LLC, or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

9. Defendant corporations and companies or their predecessors-in-interest (hereinafter collectively, "Defendants"), or their predecessors-in-interest reside in this County,

---

acknowledged by defendant(s) to contain asbestiform minerals or other elongate mineral particles. *See, e.g.,* Egilman, et al., Health Effects of Censored Elongated Mineral Particles: A Critical Review, *Detection Limits in Air Quality and Environmental Measurements* (STP 1618, 2019; doi: 10.1520/STP161820180080) (**Exhibit A**)

and/or maintain offices in this County, and/or have agents in this County, and/or have done and are doing business in this County and/or State.

10.     Defendants at all times relevant and pertinent hereto, were or are miners, millers, manufacturers, fabricators, designers, formulators, creators, makers, processors, distributors, importers, converters, compounders, or merchants of asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for the purpose of protecting workers exposed to asbestos.

11.     Defendants, acting through their servants, employees, agents, and representatives, caused asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products be placed in the stream of commerce to which Plaintiff JOSEPH J. DOUGHERTY was exposed.

12.     Plaintiff JOSEPH J. DOUGHERTY continuously used, worked with and/or worked around others and was exposed to the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products mined, manufactured, processed, imported, converted, compounded or sold by Defendants.

13.     During the course of his employment and also during his use of asbestos-containing products, Plaintiff JOSEPH J. DOUGHERTY was exposed to Defendants' asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for protection from asbestos-containing products, which exposure directly and proximately caused Plaintiff JOSEPH J. DOUGHERTY to contract mesothelioma.

## **COUNT I**

14.     Plaintiff re-alleges paragraphs 1 through 13 above as if fully rewritten herein.

15.     Defendants negligently produced, sold or otherwise put into the stream of commerce asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products, which the Defendants knew or in the exercise of ordinary care, ought to have known, were deleterious and highly harmful to Plaintiff JOSEPH J. DOUGHERTY's health.

16.     As the designer, developer, manufacturer, distributor and seller of the above-described asbestos and asbestos-containing products, and/or machinery requiring the use of asbestos and/or asbestos-containing products, Defendants owed a duty to foreseeable users and handlers of said products, to use ordinary care in designing, manufacturing, marketing and selling said products in such a manner as to render them safe for their intended and foreseeable users.

17.     Defendants negligently gave inadequate warning or instruction during and after the time of marketing in that Defendants knew or in the exercise of reasonable care should have known about the risks associated with its products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

18.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has suffered and continues to suffer the injuries and damages as set forth herein.

### **COUNT II**

19.     Plaintiff re-alleges paragraphs 1 through 18 above as if fully rewritten herein.

20.     Although Defendants knew or in the exercise of ordinary care ought to have known that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos

and/or asbestos-containing products were deleterious, and highly harmful to Plaintiff JOSEPH J.

DOUGHERTY's health, Defendants nonetheless:

      a)     Failed to advise or warn Plaintiff JOSEPH J. DOUGHERTY of the dangerous characteristics of their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

      b)     Failed to provide Plaintiff JOSEPH J. DOUGHERTY with the knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if any, to protect Plaintiff from being harmed by exposure to asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

      c)     Failed to place any warnings on containers of said asbestos and asbestos-containing products alerting Plaintiff JOSEPH J. DOUGHERTY of the dangers to health caused by contact with asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and

      d)     Failed to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan and/or a safe method of handling and installing asbestos and asbestos-containing products, or utilizing the machinery requiring the use of asbestos and/or asbestos-containing products in a safe manner.

21.    Defendants' products were defective due to inadequate warning or instruction during and after the time of marketing in that Defendants knew, or in the exercise of reasonable care, should have known about the risks associated with their products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

22.    Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and Plaintiff has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for its failure to warn at common law and pursuant to R.C. 2307.71 et seq.

## COUNT III

23.     Plaintiff re-alleges paragraphs 1 through 22 above as if fully rewritten herein.

24.     Defendants failed to design, manufacture, market, distribute, and sell asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable uses.  By way of example and not limitation, Defendants:

> a)     Failed to design, develop, manufacture and test the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable users, when Defendants knew or should have known that the foreseeable use or intended purpose of its products was by persons, specifically Plaintiff JOSEPH J. DOUGHERTY, who worked with and around said products;

> b)     Marketed and sold said products while the same was in an inherently and unreasonably dangerous and defective condition, presenting an ultra-hazardous risk to Plaintiff JOSEPH J. DOUGHERTY's well-being;

> c)     Failed to recall or attempt to repair the defective products when Defendants were and had been aware of the propensity of said products to injure Plaintiff JOSEPH J. DOUGHERTY; and

> d)     Failed to properly test said products to ensure that they were reasonably safe for use throughout their product lifetime.

25.     Defendants violated the requirements of §402(A) of the Restatement of Torts, 2d, as adopted by the Supreme Court of the State of Ohio, all of which proximately resulted in Plaintiff JOSEPH J. DOUGHERTY's asbestos-related disease.

26.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for defective design and manufacture and/or marketing, distributing and selling a defective product at common law and pursuant to R.C. 2307.71 et seq.

## COUNT IV

27.    Plaintiff re-alleges paragraphs 1 through 26 above as if fully rewritten herein.

28.    Defendants impliedly warranted that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of good and merchantable quality and fit for the ordinary purposes for which the products are used.

29.    Plaintiff JOSEPH J. DOUGHERTY used and/or worked in close proximity to the asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products of the Defendants, and Plaintiff JOSEPH J. DOUGHERTY's presence was known, or ought to have reasonably been anticipated by the Defendants.

30.    The implied warranty made by the Defendants that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of merchantable quality and fit for their particular intended use was breached in that certain harmful matter was given off into the atmosphere where Plaintiff JOSEPH J. DOUGHERTY worked and/or used the aforesaid products.

31.    Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT V

32.    Plaintiff re-alleges paragraphs 1 through 31 above as if fully rewritten herein.

33.    Defendants, since 1929 have possessed medical and scientific data which clearly indicates that asbestos fibers and asbestos-containing products are hazardous to one's health. Defendants, prompted by pecuniary motives, individually and collectively, ignored and intentionally failed to act upon said medical and scientific data and conspired with other asbestos

manufacturers, miners, distributors and sellers to deprive the public, and particularly the users of their products, including Plaintiff JOSEPH J. DOUGHERTY of said medical and scientific data, and therefore deprived Plaintiff of the opportunity of free choice as to whether or not to expose himself to Defendants' asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and further, Defendants willfully, intentionally and wantonly failed to warn Plaintiff of the serious bodily harm which would result from the inhalation of the asbestos fibers and the dust from their products.

34.     Plaintiff JOSEPH J. DOUGHERTY reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the Defendants regarding the nature of their asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products.

35.     The award for this Count should be in such an amount as would act as a deterrent to Defendants and others from the future commission of like offenses and wrongs.

36.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VI

37.     Plaintiff re-alleges paragraphs 1 through 36 above as if fully rewritten herein.

38.     Defendants' actions, as stated herein, constitute a flagrant disregard for the rights and safety of Plaintiff JOSEPH J. DOUGHERTY and by engaging in such actions, Defendants acted with fraud, recklessness, willfulness, wantonness and/or malice and should be held liable in punitive and exemplary damages to Plaintiff.

39.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## **COUNT VII**

40.     Plaintiff re-alleges paragraphs 1 through 39 above, as if fully rewritten herein.

41.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY incurred expenses for medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined.

42.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY suffered lost wages, a progressive loss of earning capacity, and other economic damages during his lifetime.

43.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## **COUNT VIII**

44.     Plaintiff re-alleges paragraphs 1 through 431 above, as if fully rewritten herein.

45.     Plaintiff JOSEPH J. DOUGHERTY worked at the premises owned by Defendant AUTOLIV ASP INC (F/K/A MORTON INTERNATIONAL INC.) ("Premises Defendant") from approximately 1976 through 2005, including, but not limited to the Morton International Facility plant on or near 2000 West Street in Reading, Ohio, at which he was exposed to asbestos products and dust from asbestos products; all of which were within the care, custody and control of the Premises Defendant.

46.     At all times mentioned herein, the Premises Defendant, owned, leased, maintained, managed and controlled the premises when Plaintiff was present.

47.     While present at premises owned and/or operated by the above Premises Defendant, Plaintiff JOSEPH J. DOUGHERTY was continuously exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by Premises Defendant, who had the responsibility for such, and further, the exposure to the Plaintiff regularly exceeded the threshold limit values adopted by this State and that the Premises Defendant allowed that condition to persist in violation of safety standards.

48.     Plaintiff's injuries, illness, and disabilities were the result of intentional acts and omissions and negligence and gross negligence in the use of asbestos at premises owned by Premise Defendants. The Premise Defendants failed to properly remove and abate said asbestos at these facilities and/or provide adequate and reasonable safeguards during asbestos abatement at the time Plaintiff JOSEPH J. DOUGHERTY was working there.

49.     Premises Defendant was negligent, grossly negligent, and committed certain intentional acts, all of which were the proximate cause of the disease and injuries resulting in Plaintiff JOSEPH J. DOUGHERTY's mesothelioma from exposure to asbestos.

50.     In particular, Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff, and that such intentional acts and omissions proximately caused Plaintiff's asbestos-related injuries and disabilities.

51.     Specific intentional acts and acts constituting negligence and gross negligence committed by Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities include:

(a)    Failing to timely and adequately warn Plaintiff of the dangerous characteristics and serious health hazards associated with exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(b)    Failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Plaintiff from being harmed and disabled by exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(c)    Requiring Plaintiff JOSEPH J. DOUGHERTY to work in close proximity to and/or with, install, cut, fit, manipulate, remove, and/or clean debris released by asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products in the workplace without taking adequate precautions for the protection of Plaintiff, workers in the vicinity of such work activities performed by others, and/or on the premises generally;

(d)    Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)    Failure to provide safe equipment for Plaintiff to use;

(f)    Failure to provide adequate safety measures and protection against deadly and life-threatening asbestos dust, all despite Premises Defendant's knowledge of the extreme risk of harm inherent to asbestos exposure;

(g)    Failure to adequately warn Plaintiff of the inherent dangers of asbestos contamination;

(h)    Failure to provide Plaintiff a safe place to work by failing to maintain the ambient and environmental conditions of Defendant's premises in proper and safe condition;

(i)    Failure to follow and adhere to various state and U.S. Governmental statutes, regulations and guidelines pertaining to asbestos and the exposure to asbestos of employees and others. Such failure constituted negligence *per se* at a minimum. Plaintiff is not making claims for damages under Federal Law.

52.    Premises Defendant intentionally, knowingly, and due to negligence and gross negligence, failed to ensure that individuals such as Plaintiff were protected from the inhalation of

asbestos and asbestos fibers. Such actions proximately caused Plaintiff JOSEPH J. DOUGHERTY's asbestos-related injuries and disabilities.

53.     Additionally, specific actions or omissions on the part of Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities were:

(a)     Attempting to remove asbestos dust in the workplace while Plaintiff was present and without taking adequate precautions for the protection of workers, including Plaintiff, in the vicinity of same and/or in the premises generally;

(b)     Failing to provide proper protective gear for individuals exposed to asbestos;

(c)     Failing to provide adequate ventilation to ensure that individuals in the vicinity were not exposed to asbestos;

(d)     Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)     Failing to adhere to industry safe standards and other established measures to protect workers from harm;

(f)     Failing to adequately warn of the extreme risk of danger of inherent to asbestos exposure.

54.     Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions alleged above were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff JOSEPH J. DOUGHERTY.

## COUNT IX

55.     Plaintiff re-alleges paragraphs 1 through 54 above as if fully rewritten herein.

56.     Defendants were the supplier and seller of asbestos-containing products manufactured by entities that have asserted insolvency.

57.     As prescribed by Ohio Revised Code Section 2307.78, Defendants as suppliers, sellers or distributors of asbestos-containing products manufactured by an entity that has asserted insolvency, are liable to Plaintiff JOSEPH J. DOUGHERTY based upon product liability claims

under Ohio Revised Code Sections 2307.71 to 2307.77, as if they were the manufacturer of asbestos-containing products and for negligence.

WHEREFORE, Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered and will continue to suffer great pain and severe mental anguish.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has incurred expenses for his medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined, and will continue to incur such expenses into the future.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered economic damages and will continue to suffer them throughout his lifetime.

The aforesaid acts and/or omissions of Defendants were wanton and willful and in reckless disregard of the safety of Plaintiff.

Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of Twenty-five Thousand Dollars ($25,000.00) and an amount for punitive damages, plus interest, costs and such further relief to which Plaintiff may be entitled.

A trial by jury is hereby demanded as to all counts.

Respectfully submitted,

*/s/Anthony Gallucci*
Anthony Gallucci (0066665)
Christopher J. Hickey (0065416)
Kevin E. McDermott (0027813)
**MCDERMOTT & HICKEY, LLC**
20525 Center Ridge Road, Ste. 200
Rocky River, OH 44113
Telephone: (216) 712-7452
Facsimile: (216) 916-9238
Email: ag@mesohio.com
         chip@mesohio.com
         kevin@mesohio.com

-and-

*/s/ Daniel C. LaTerra*
Daniel C. LaTerra, *pro hac vice pending*
R. Austin Taylor *pro hac vice pending*
**THE LANIER LAW FIRM, P.C.**
126 E. 56th Street, 6th Floor
New York, New York 10022
Telephone: 212-421-2800
Facsimile: 713-659-2204
Email: daniel.laterra@lanierlawfirm.com
austin.taylor@lanierlawfirm.com

***Attorneys for Plaintiff***

## CASE BROCHURE

**NAME: JOSEPH J. DOUGHERTY**

**DATE OF BIRTH:** ▮▮▮▮▮▮

**SOCIAL SECURITY NUMBER: XXX-XX-2454**

**DIAGNOSIS: MESOTHELIOMA**

**DATE OF DIAGNOSIS:    CONFIRMED BY PATHOLOGY REPORT DATED NOVEMBER 23, 2021**

**JOB SITES:  WR GRACE DAVISON CHEMICAL DIVISION PLANT (1966-1972)**
**4775 PADDOCK ROAD**
**CINCINNATI, OHIO**

**MORTON INTERNATIONAL FACILITY (1976-2005)**
**2000 WEST STREET**
**READING, OHIO**

**DISCOVERY IS ONGOING.  PLAINTIFF RESERVES THE RIGHT TO SUPPLEMENT THIS INFORMATION.**

# Exhibit A

*STP 1618, 2019 / available online at www.astm.org / doi: 10.1520/STP161820180080*

David Egilman,[1,2] Joan E. Steffen,[2] Triet Tran,[2]
Kate Clancy,[2,3] Mark Rigler,[4] and William Longo[4]

# Health Effects of Censored Elongated Mineral Particles: A Critical Review

## Citation

D. Egilman, J. E. Steffen, T. Tran, K. Clancy, M. Rigler, and W. Longo, "Health Effects of Censored Elongated Mineral Particles: A Critical Review," in *Detection Limits in Air Quality and Environmental Measurements*, ed. M. J. Brisson (West Conshohocken, PA: ASTM International, 2019), 192–239. http://doi.org/10.1520/STP161820180080[5]

## ABSTRACT

Detection limits for asbestos and elongated mineral particles (EMPs) necessarily depend on what "counts" by a given test method or procedure. Censored data in this context include both particles that fall below and *outside of* a laboratory's counting criteria. For microscopic methods, in particular, counting criteria may be based on health effects, methodological convenience, or geologic definition. For purposes of public health, data censorship for asbestos or EMPs should be predicated on the toxicity of the fibers and not on a geologic definition. Some geologic definitions of EMPs are inconsistent with existing evidence of EMP toxicity. For this study, we used systematic search techniques and grounded theory to review published studies, government records, corporate documents, and public statements. Research links asbestos health effects to fiber dimensions, fiber surface area, biopersistence, chemical composition, and surface

Manuscript received October 12, 2018; accepted for publication April 1, 2019.

[1]Brown University, Dept. of Family Medicine, Box G-A1, Providence, RI 02912, USA D. E. https://orcid.org/0000-0003-0280-163X

[2]Never Again Consulting, 8 N. Main St., Ste. 404, Attleboro, MA 02703, USA J. E. S. https://orcid.org/0000-0001-9271-7284, T. T. https://orcid.org/0000-0001-9530-4696, K. C. http://orcid.org/0000-0001-5266-0287

[3]University of Alaska–Fairbanks, College of Engineering and Mines, PO Box 755960, Fairbanks, AK 99775-5960, USA

[4]MAS, LLC, 3945 Lakefield Ct., Suwanee, GA 30024, USA M. R. https://orcid.org/0000-0002-7042-3944, W. L. https://orcid.org/0000-0001-9833-7848

[5]ASTM Symposium on *Detection Limits* on October 25–26, 2018 in Washington, DC, USA.

Copyright © 2019 by ASTM International, 100 Barr Harbor Drive, PO Box C700, West Conshohocken, PA 19428-2959.

EGILMAN ET AL., DOI: 10.1520/STP161820180080     193

properties. We review the evidence that indicate that short fibers (<5 μm long), thin fibers (<0.2 μm wide), some nonasbestos EMPs, and asbestos mineral "cleavage fragments" affect human health. Current EMP test methods allow the censorship of these fibers from reported data. We believe that a health perspective is crucial for determining what data to censor in the measurement of EMPs. Fiber-counting methods should be altered to better encompass health-relevant EMPs by employing transmission electron microscopy, eliminating the requirement for an asbestiform habit, including short fibers (<5 μm long), and removing all minimum fiber width criteria. EMP test methods should explicitly call for counting talc and erionite fibers.

**Keywords**

asbestos, elongate mineral particles, cleavage fragments, short fibers, thin fibers, erionite, fibrous talc, counting criteria, censored data

## Introduction

Detection limits for asbestos and elongated mineral particles (EMPs) necessarily depend on what "counts" by a given test method or procedure. Censored data in this context include both fibers that fall below and outside of a laboratory's counting criteria. For microscopic methods in particular, counting criteria may be based on health effects, methodological convenience, or geologic definition. For purposes of public health, data censorship for asbestos or EMPs should be predicated on the physiologic effects of the fibers. In this study, we compare the existing criteria for quantifying asbestos to the evidence of physiological effects of various EMPs. We selected four broad categories of EMPs for study: short fibers of asbestos minerals, thin fibers of asbestos minerals, cleavage fragments of asbestos minerals, and nonasbestos EMPs. These categories represent EMPs that are often censored by testing protocols but that share major compositional, structural, or morphological features with regulated asbestos fibers.

## Background

### HILL'S CONSIDERATIONS

Hill's considerations for identifying causal associations include strength of association, specificity, temporality, consistency, biological gradient, plausibility, coherence, experimental evidence, and analogy.[1] For an overall model of causal determination, Hill's considerations are well accepted.[2–5] These considerations were derived from efforts to demonstrate tobacco's causal association with lung cancer.[5] All of Hill's considerations are subject to criticism, and none is an essential condition for a relationship between a determinant and an outcome.[1]

Strength of association is a reflection of a suspected cause's magnitude of effect.[1] The value of this measure is limited by the interference of other cofactors.

Studies with large rate ratios are less likely to suffer from errors resulting from bias or confounding.[1,2]

Specificity requires that each cause have a single effect.[1] This is rarely a useful criterion because many causes have multiple effects.[2,3] Rothman and Greenland concluded that "the existence of one effect of an exposure does not detract from the possibility that another effect exists."[3]

Temporality requires that the cause precede the effect.[1] However, as Weed stated, "It is interesting to note that, in general terms, causality need not require antecedence. Counter examples include simultaneous cause-effect relationships."[6]

Consistency requires that a proposed effect be observed repeatedly among different populations and under different circumstances.[1] Nonetheless, causation in some cases may depend on specific complementary component causes that occur only under unusual or specific circumstances.[2,3] Rothman and Greenland judged that "consistency serves only to rule out hypotheses that the association is attributable to some factor that varies across studies."[3]

Biologic gradient is the existence of a dose-response relationship for the proposed cause-effect combination.[1] There are many forms of dose response, including nonlinear relationships like saturation phenomenon, J-shaped curves, and exponential relationships.[3,7–10] Misclassification of exposure can obscure dose-response relationships and lead to a rate ratio of one.[10,11]

Plausibility asks whether the theory of causation fits known biological mechanisms of effect causation.[1] Although this is an important consideration, plausibility may be difficult to judge because of limitations of current scientific knowledge and reliance on prior beliefs.[2,3]

Coherence asks whether the theory is consistent with current understandings of the effect or outcome.[1] Experimental evidence can consist of laboratory studies (in vitro and animal studies), controlled clinical trials, or observational studies.[1,3]

Analogy asks whether a comparable cause-and-effect relationship is known.[1] Rothman and Greenland observed that "[a]t best, analogy provides a source of more elaborate hypotheses about the associations under study; absence of such analogies only reflects lack of imagination or experience, not falsity of the hypothesis."[3]

Hill's considerations for determining causality are far from fixed, deductive, or definitive rules of evidence, but they are frequently misconstrued as "criteria."[4,5,12] Hill noted, "none of my nine viewpoints can bring indisputable evidence for or against the cause and effect hypothesis, and none can be required as a sine qua non."[1] He recognized that decisions have to be made in the absence of perfect data:

> All scientific work is incomplete–whether it be observational or experimental. All scientific work is liable to be upset or modified by advancing knowledge. That does not confer upon us a freedom to ignore the knowledge we already have, or to postpone the action that it appears to demand at a given time.[1]

Hill's final emphasis placed responsibility on scientists for making causal judgments with available known facts.[1]

EGILMAN ET AL., DOI: 10.1520/STP161820180080     195

## MECHANISMS OF ASBESTOS TOXICITY

Asbestos toxicity is determined by five main characteristics:[13–16]

- fiber dimensions,
- fiber surface area,
- biopersistence at the site of the tumor or scarring,
- chemical composition, and
- surface properties.

Although the exact mechanism is not known, three main processes are thought to explain asbestos carcinogenicity:[13,14,17]

- direct interaction with cellular macromolecules (proteins, DNA, RNA),
- production of reactive oxygen species (ROS), and
- cell-mediated mechanisms, such as inflammation.

Evidence of asbestos' direct interaction with cellular macromolecules derives from in vitro tests,[18–25] studies of human cohorts,[26–30] and animal studies.[31–41] Researchers have identified asbestos-induced unscheduled DNA synthesis, DNA breakage, chromosomal aberrations, chromatin breaks, and sister chromatid exchanges.[18–41] Research has characterized the pattern of asbestos-induced genetic mutations, revealing significant asbestos-associated mutations to BAP1, NF2, TP53, SETD2, DDX3X, ULK2, RYR2, CFAP45, SETDB1, DDX5 SF3B1, TRAF7, and p53.[42–44] These changes are likely related to the ability of asbestos fibers to attach to cellular macromolecules and cell proteins.[45–48] Interactions between asbestos and cellular macromolecules relate to fiber surface charges.[47–49]

Experimental evidence supports the mutagenic role of ROS (including hydrogen peroxide and superoxide radical anion) released by asbestos-activated phagocytes.[25,49–62] Through the Haber–Weiss reaction, these ROS transform into potent hydroxyl radicals in the body.[63] Downstream effects of asbestos-induced ROS production include lipid peroxidation,[61,62,64] cytotoxicity,[56–58,65,66] cell proliferation,[67,68] genotoxicity,[25,59,60,69–71] and apoptosis.[72,73] In the case of ROS production, chemical composition, fiber shape (surface area), and fiber surface charge contribute to toxicity.[16]

Asbestos is thought to influence cell-mediated responses, such as inflammation, cell proliferation, and apoptosis; these cell-mediated effects may in fact be a secondary effect caused by direct interactions between asbestos and cellular macromolecules or by asbestos-induced ROS production.[68]

Asbestos fibers induce cell-mediated inflammation and cell proliferation through several signaling cascades, including Nuclear Factor κB (NFκB) and mitogen-activated protein kinase (MAPK), both involved in regulating activator protein-1 (AP-1), a transcription factor involved in cell proliferation, tumor production, and inflammation.[68,74–80] Asbestos fibers are thought to induce a cell-mediated inflammatory response by activating alveolar macrophages to release tumor necrosis factor-alpha (TNF-α) through the NFκB cascade.[68,81,82] Asbestos has been shown to induce apoptosis in human and rabbit pleural mesothelial cells and in human and rat alveolar epithelial cells;[73,83,84] asbestos-derived ROS likely play a critical role in this process.[73,85]

## Methods

We used systematic search techniques and grounded theory to review published studies, government records, corporate documents and public statements. Talc-related documents, government archives, and medical databases were initially searched for EMP-related terms such as "cleavage fragment," "short fiber," "thin fiber," "erionite," and "fibrous talc." The authors conducted additional searches, focusing on terms associated with our findings, such as "fiber length," "fiber width," "taconite," "transition fiber," and "asbestiform." Findings were categorized and evaluated in accordance with Hill's considerations.

## Results

### CLEAVAGE FRAGMENTS

#### Description

Some varieties of asbestiform silicates have non-asbestiform analogs of the same material; cleavage fragments are commonly recognized as elongated particles not originating from an asbestiform growth habit.[86] The geologic definition limits "asbestos" to minerals with a fibrous structure that form in the asbestiform growth habit.[87] Both nonasbestiform minerals and asbestiform minerals divide on planes of weakness. Amphibole cleavage fragments cleave on planes of weakness in the prismatic crystal structure, whereas fibers split or "part" along planes of weakness in a fibrous crystal structure.

In 1988, Skinner et al. described an asbestos fiber as a stacking of I-beams, a basic amphibole structural unit, on each other.[88] These I-beams are bonded to each other by weak ionic bonds (O — $R^{+2}$ — O or O — $R^{+3}$ — O). These weak ionic bonds are "the bonds broken during cleavage" because "there is a lower density of bonds between I-beams in the crystallographic directions."[88] The ionic bonds are similar to the bonds between fibers in a fibrous crystal structure.[88]

Laboratory preparations and processing during mining operations may change fiber dimensions and other indicators of habit. These processes can break up asbestos fiber bundles.[89–92] Rohl and Langer remarked that their "rub out" procedure for transmission electron microscopy (TEM) preparation "breaks apart the fiber bundles of chrysotile, already greatly comminuted by triple air jet-milling and sonification, into unit fibrils or into small fiber bundles."[89] Once crushed during milling, non-asbestiform minerals of the same composition also cleave into prismatic particles along crystallographic axes characterized as cleavage fragments, defined by ASTM as "a fragment of a crystal that is bounded in whole or in part by cleavage faces."[93]

Cleavage fragments and their asbestiform counterparts differ in growth habit only. Asbestos fibers and cleavage fragments often occur in the same dimensions: mined and processed asbestos minerals, including the asbestiform and non-asbestiform varieties, show significant overlap in width and length distributions. A compilation of data sets showed that 40% of non-asbestiform grunerite and 39% non-asbestiform tremolite is classifiable as asbestos based on dimensions alone.[94]

EGILMAN ET AL., DOI: 10.1520/STP161820180080          197

In testimony to the U.S. Senate in 2007, Miller of the U.S. Public Health Service and U.S. Environmental Protection Agency (EPA) described the difficulty in distinguishing cleavage fragments from asbestos fibers:

> "Cleavage fragments," small mineral shards that are often microscopically indistinguishable from typical asbestos fibers, can be generated from the non-fibrous forms of the asbestos minerals during their handling, crushing, or processing, and these "cleavage fragments" are often microscopically indistinguishable from typical asbestos fibers of the (fibrous) minerals.[95]

An interlaboratory study by Harper et al. in 2012 found that analysts could not discriminate between asbestos fibers and cleavage fragments based on ASTM D7200-06, *Standard Practice for Sampling and Counting Airborne Fibers, Including Asbestos Fibers, in Mines and Quarries, by Phase Contrast Microscopy and Transmission Electron Microscopy.*[96]

Additionally, the cleavage fragment and asbestiform types of tremolite exist as regions along a spectrum of habits, rather than as two distinct and clearly differentiated classes. The range of the amphibole habit includes a continuum of prismatic (no outward fibrous form); acicular (coarsely fibrous); semi-asbestiform (fine, stiff fibers); and asbestiform (fine, and easily separable fibers) morphologies; these "habit-types" are "intergradational and frequently intergrown."[97] Geologic surveys of asbestos deposits have noted this intergrowth of non-fibrous and asbestiform amphiboles (figure 1).[97,98] The presence of cleavage fragments in a sample does not



FIG. 1   Image of prismatic to fibrous tremolite from USGS website (https://web.archive.org/web/20171119132402/https://usgsprobe.cr.usgs.gov/picts2.html).

rule out the presence of asbestos or vice versa; in fact, purely non-asbestiform amphibole deposits do not exist.[99,100] Thus, if EMPs of non-asbestiform morphology are found, EMPs of asbestiform habits are also present.

### Biologic Plausibility

Because cleavage fragments share the same mineral composition as their asbestiform analogs, their chemical constituents are identical to those of asbestos fibers. Schiller and Payne have found that surface charge is the same in both amphibole cleavage fragments and amphibole asbestos fibers.[101] They examined samples of asbestiform amosite, crocidolite, tremolite, and cummingtonite; massive tremolite and actinolite; acicular and riebeckite; and fibrous (but non-asbestiform) tremolite and actinolite. Their results indicated no significant difference in surface properties between cleavage fragments and fibers:

> Surface charge does not appear promising as a basis for distinguishing fibers and cleavage fragment. Nonasbestiform amphibole particles were found to have essentially the same surface charge as amphibole asbestiform fibers of the same dimensions.[101]

Schiller and Payne concluded that "[e]longated cleavage fragments from non-asbestiform amphiboles are virtually identical to asbestiform amphibole fibers in morphology, crystal structure, refractive index, and chemical composition."[101]

It has been argued that differences in tensile strength and flexibility may affect the relative toxicity of different forms asbestos, including chrysotile.[102] Actinolite, anthophyllite, and tremolite asbestos fibers, however, have relatively low tensile strength and poor flexibility but are carcinogenic (table 1).[103–105] There is no reason to postulate that "cleavage fragments" have a different potency because of low tensile strength or poor flexibility.

These findings suggest that the geological properties that differentiate cleavage fragments from asbestos have little or no effect on several of the factors considered most important in asbestos toxicity: fiber dimensions, surface properties, and chemical composition. The sole difference between asbestos and cleavage fragments—growth habit—has not been shown to significantly affect toxicity.[106]

### Animal Studies

Stanton et al. reported that two samples of tremolite primarily containing particles shorter than 4 µm and wider than 1.5 µm caused mesothelioma in almost 77% of rats; they noted that "relatively high correlations were also noted with fibers in

**TABLE 1**  Tensile strength of the six regulated asbestos fibers[103]

|  | Chrysotile | Actinolite | Amosite | Anthophyllite | Crocidolite | Tremolite |
|---|---|---|---|---|---|---|
| Tensile Strength | 80–100 × $10^3$ lb/in$^2$ | ≤1 × $10^3$ lb/in$^2$ | 16–90 × $10^3$ lb/in$^2$ | ≤4 × $10^3$ lb/in$^2$ | 100–300 × $10^3$ lb/in$^2$ | 1–8 × $10^3$ lb/in$^2$ |
| Flexibility | High | Poor | Good | Poor | Good | Poor |

other size categories having diameters up to 1.5 μm and lengths greater than 4 μm."[107] Davis et al. studied rats exposed to a variety of tremolite dusts, including some now defined as cleavage fragments (figures 2–4).[108] The tremolite cleavage fragments induced mesotheliomas in some of the rats (table 2).[108] The authors concluded, "the present study has demonstrated that all forms of the mineral tremolite have some carcinogenic potential."[108]

Stanton et al. and Davis et al. focused solely on mesotheliomas and did not study lung cancer incidence.[107,108] Far more people die from asbestos-caused lung cancer than mesothelioma. Furuya et al. estimated that asbestos was responsible for causing six lung cancers for every mesothelioma.[109,110] Additionally, there is essentially no relationship between asbestos found in the lung versus the pleura of the same exposed workers.[111–114] Thus, potency estimates based on mesothelioma do not predict (and likely underestimate) lung cancer risk.

## Human Case Reports

Finkelstein reported an association between cleavage fragments and mesothelioma.[115] He reported a husband and wife who used RT Vanderbilt (RTV) New York talc in metal casting from 1951 to 2001.[115] Both were exposed to non-asbestiform tremolite and anthophyllite cleavage fragments from the RTV NY state talc mine.[115] In 1999, the wife developed asbestosis and pleural disease. In 2009, the husband was diagnosed with biphasic malignant mesothelioma.[115–117]

**FIG. 2**  Davis et al. sample 4, Ala di Stura (Italy), number of fibers/mg of tremolite dust samples (x 10⁵) used in rat injection studies, tabulated according to fiber length and diameter.[108]



**FIG. 3**  Davis et al. sample 5, Carr Brae, Dornie, Scotland, number of fibers/mg of tremolite dust samples ($\times 10^5$) used in rat injection studies, tabulated according to fiber length and diameter.[108]



**FIG. 4**  Davis et al. sample 6, Shinness, Scotland. number of fibers/mg of tremolite dust samples ($\times 10^5$) used in rat injection studies, tabulated according to fiber length and diameter.[108]



EGILMAN ET AL., DOI: 10.1520/STP161820180080    201

**TABLE 2**  Mesothelioma rates in rats exposed to cleavage fragments in Davis et al.[108]

| Sample | # of animals | # of mesothelioma cases | Mesothelioma rate | # ($10^5$) Stanton fibers |
|---|---|---|---|---|
| #4 Ala di Stura, Italy | 36 | 24 | 66.7% | |
| #5 Dornie, Scotland | 33 | 4 | 12.1% | 0 |
| #6 Shinness, Scotland | 33 | 2 | 5.6% | 0 |

## Human Cohorts

McDonald et al. reported a 35.3 (per 100,000 subject years) rate of mesothelioma in workers at the central chrysotile mines of Thetford, Quebec.[118] Langer et al. identified tremolite "cleavage fragments" in one of these mines using TEM.[102] Although Langer and Nolan found tremolite fibers with high aspect ratios (ARs; 10:1), they stated that "the morphology of the particles found, and selected area electron diffraction characterization, showed that they were cleavage fragments, not asbestos fibres."[102] Langer and Nolan reported that, besides chrysotile, they only found tremolite "cleavage fragments" in the central chrysotile mine studies, stating "if tremolite [asbestos] is present in the ore, its concentration must be below the detection level."[102] Puffer and Germine also studied bulk ore and worker lung tissue samples from the Thetford, Quebec asbestos mines. Confirming Langer's analysis, they concluded that "most of the fibers in the lungs of Quebec mine workers and a comparator [ore] sample are cleavage or parting fragments."[119]

Ten of 809 total workers exposed to tremolite and anthophyllite cleavage fragments in the talc at an RTV talc mining and milling facility in upstate New York contracted mesothelioma between 1950 and 1989.[116,120,121] Studies of a cohort of taconite miners also showed a causal association between exposure to grunerite cleavage fragments and mesothelioma incidence.[122,123] The highest concentrations of grunerite "cleavage fragments" were 1–3 μm long and 0.2–0.5 μm wide.[124,125] Allen et al.'s study of taconite miners showed an increase in mortality from lung cancer and mesothelioma: Researchers reported a standardized mortality ratio for lung cancer of 1.16 (95% confidence interval [CI]; 1.09 to 1.23) and an SMR of 2.77 (95% CI; 1.87 to 3.96) for mesothelioma.[122] Similarly, Lambert et al. reported that mesothelioma was also associated with the number of years employed in the taconite industry (RR = 1.03, 95% CI; 1.00–1.06 per year of employment) and cumulative EMP exposure (RR = 1.10, 95% CI; 0.97–1.24 per EMP/cc year).[123] A dose-response relationship was observed: the rate of mesothelioma was about 2.25 times greater (95% CI; 1.13 to 4.50) for workers in the highest cleavage fragment exposure category (≥0.40 EMP/cc years) relative to those in the lowest (<0.40 EMP/cc years).[123]

## Hill's Considerations for Cleavage Fragments

Hill's considerations support the conclusion that some cleavage fragments (structures that do not meet a geological definition of asbestos but have AR more than

3:1 and are longer than 2 μm) of tremolite, anthophyllite, and grunerite cause mesothelioma. The data reviewed fulfill Hill's considerations for strength of association, dose response, consistency, temporality, biologic plausibility, coherence, analogy, and experiment (table 3). This review supports the conclusion that growth habit is not a factor in carcinogenicity; some cleavage fragments of other asbestos minerals in talcum products likely have a similar carcinogenic effect.

## Short Fibers

**DESCRIPTION**

Short fibers are widely defined as asbestos EMPs <5 μm in length. The 5 μm counting rule was not based on health considerations.[126,127] As Bernstein noted in 2006,

> Historically, a fiber has been defined as a particle that has a length >5 μm, a width <3 μm, and an aspect ratio > 3:1. This definition was not based upon any criteria relating to health but, rather, was related to facilitating the counting of fibers when using light microscopy, now an outdated method.[126]

In 1972, National Institute for Occupational Safety and Health (NIOSH) noted, "Fibers longer than 5 μm in length are counted in preference to counting all fibers seen in order to minimize observer/microscope resolving power variability."[127] NIOSH and Occupational Safety and Health Administration (OSHA) reaffirmed this in 1980: "The toxicity of asbestos fibers shorter than the 5-micrometer detection limit of light microscopy cannot be dismissed on the basis of current scientific information."[128]

**Biologic Plausibility**

The majority of fibers found in the pleura are shorter than 5 μm and have ARs less than 20:1.[129] Pooley and Clark found that more than 90% of the chrysotile fibers found in lung tissues are shorter than 4 μm.[130] Sebastien et al. found a greater

**TABLE 3**   Hill's considerations for tremolite and grunerite cleavage fragments and mesothelioma

| Consideration | Met? | Evidence |
| --- | --- | --- |
| Strength | YES | Human cohort studies |
| Consistency | YES | Animal studies, human cohorts |
| Specificity | NO | Linked to both lung cancer and mesothelioma |
| Temporality | YES | Exposure precedes disease |
| Biological Gradient | YES | Dose response in taconite miners |
| Plausibility | YES | Same mechanism as asbestos |
| Coherence | YES | Consistent with asbestos fiber toxicity |
| Experiment | YES | Stanton and Davis animal studies |
| Analogy | YES | Asbestos fibers |

proportion of short asbestos fibers in the pleura and a greater proportion of long fibers in the lungs of the same exposed individuals, indicating that fiber length is not the sole determination for biopersistence.[114] He determined that 84% of the chrysotile fibers found in the parietal pleura were shorter than 4 µm.[114] Bossard et al. also reported that, in lung tissue studies, the most frequent fiber length seen by light microscopy was 3–5 µm, whereas about 90% of the fibers seen by electron microscopy were shorter than 2 µm.[131] Suzuki et al. studied 92 lung tissue specimens and 89 mesothelial tissue specimens from 127 mesothelioma cases and noted that "a large majority of asbestos fibers were short and thin in dimension."[132]

In 2001, Suzuki and Yuen studied asbestos fibers in lung and mesothelial tissue from 151 human mesothelioma cases.[133] They found that the geometric mean fiber length was 0.84 µm in the lung, 0.6 µm in plaque, and 0.68 µm in the mesothelial tissue for chrysotile and 3.4 µm in the lung, 2.2 µm in the plaque, and 3.0 µm in the mesothelial tissue for amosite.[133] In 2002, Lippmann, a panelist for the Agency for Toxic Substances and Disease Registry (ATSDR), estimated that 10–20% of fibers <5 µm long with ARs greater than 3:1 (0.1–1.6 µm wide) deposit in the lungs of healthy people.[112] An ATSDR panelist reported the prevalence of short fibers in the lung tissue of six miners and four cement plant workers with a history of asbestos exposure:

> In these individuals, the majority (71%, by fiber count) of lung-retained chrysotile asbestos fibers were shorter than 5 µm, with lesser amounts (25%) of chrysotile asbestos fibers between 5 and 20 µm, and even lesser amounts (4%) of chrysotile asbestos fibers longer than 20 µm.[112]

Dodson et al. reported: "the majority of fibers in both the lung and mesothelial tissues were less than 5 µm length" and concluded as follows:

> We believe that it is difficult to exclude fibers of a particular dimension from a role in causing disease within the lung or extrapulmonary sites when one accepts that both the exposure and tissue burden have fibers of varying lengths and widths.[134]

Suzuki et al. reported on asbestos analysis of lung and mesothelial tissue specimens from 168 cases of malignant mesothelioma.[129] Only 2.3% of fibers detected fell in the Stanton range dimensions (≥8 µm in length and ≤0.25 µm in diameter), whereas 89.4% of fibers were shorter than 5 µm.[129] In 2013, Adib et al. studied asbestos fibers in the lungs of 165 Quebec workers with an asbestos-related disease.[135] They found that half of the fibers were short (< 5 µm long) and emphasized how their findings highlighted the need to consider short and fine fibers when characterizing health risks associated with asbestos inhalation.[135]

The fibers found at the site of the cancer are likely to have caused or contributed to the disease.[16] In 1977, Langer also emphasized the importance of small fibers, stating that an "environmental assessment should include some provision for

small fibres, which [Langer] considered biologically important especially in relation to mesothelioma."[136] Suzuki et al. emphasized the likely importance of short-fiber carcinogenicity:

> We may not exclude fibrogenic and carcinogenic effect of such short, thin asbestos fibers, since they are predominant asbestos fibers seen in asbestos-induced fibrotic pleura (hyaline plaque) and mesotheliomaous [*sic*] tissue.[132]

The presence of these short fibers in tissue indicates that these fibers were not all cleared by the body despite their size. Asbestos biopersistence differs in the lung and pleura.[111–114] The pleura tends to retain smaller and thinner fibers (geometric mean of 1.5 μm long and 0.09 μm wide) compared with the lungs (geometric mean 5 μm long and 0.3 μm wide).[123] Fiber size and shape causes some fibers to be cleared from the lung more readily than others: Longer fibers take longer to be removed than shorter ones while thinner fibers are more readily deposited in the body in the first place.[57,62,137–144] Aust, Cook, and Dodson have noted that, even though they may "fit" within pulmonary macrophages, short fibers occur at such large numbers relative to longer fibers that they overwhelm the body's immunological response, especially in the case of chronic exposure.[16]

Additionally, short and thin fibers have a greater surface area per unit mass compared with long and thick fibers.[145] Relative to their size, short fibers may have an increased propensity for ROS production through active iron sites on the surface and for interactions with cellular macromolecules.[145] Aust et al. concluded that "larger numbers of short fibers should reasonably offer greater overall biochemical reaction potential since their collective surface area in the lung is appreciably greater than that for longer [fibers] at any post exposure point of time."[16] Surface properties and chemical composition, which are the same for short and long asbestos fibers, both contribute to fiber toxicity.

## In Vitro Studies

Goodglick and Kane carried out in vitro experiments comparing the toxicity of short and long crocidolite fibers.[57] They found that, for an equal number of fibers, long crocidolite induced macrophage deaths much more rapidly, although short fibers induced macrophage death at a slower rate.[57] Short fibers induced greater release of hydrogen peroxide (an ROS precursor to toxic hydroxl radicals via the Haber–Weiss reaction) than long fibers.[57] Deferoxamine, a Fe(III) chelator and inhibitor of the Haber–Weiss reaction, decreased toxicity of both short and long crocidolite fibers, supporting the role of ROS production in both short- and long-fiber crocidolite toxicity.[57] Both short and long fibers caused a time-dependent disruption to macrophage mitochondrial membrane potential, which may in turn lead to cell death.[57] Goodglick and Kane determined that short crocidolite fibers are more toxic by weight and equally if not more toxic by surface area than long crocidolite fibers, although long fibers may be more potent by fiber count.[57]

EGILMAN ET AL., DOI: 10.1520/STP161820180080          205

## Animal Studies

King et al. found that long and short asbestos fibers induced different types of fibrosis in rabbit inhalation studies.[146] Pott et al. found that milled chrysotile containing 99.8% fibers shorter than 5 µm caused tumors in 30% of rats when administered by intraperitoneal injection.[147] They concluded that short fibers ($< 10$ µm) can induce tumors.[147] Stanton et al.'s animal studies found that, except for tremolite fibers, asbestos fibers between 4 and 8 µm in length were the most potent inducers of mesothelioma in animals.[107] Moalli et al. theorized that the lymphatic system cleared short fibers more quickly than long fibers.[144] Goodglick and Kane carried out a follow-up study of short-fiber cytotoxicity when the lymphatic system could not rapidly clear these fibers: They noted that daily injections of short fibers could not be readily cleared and resulted in an acute inflammatory response after three days.[57] Goodglick and Kane also observed short-fiber clusters and nearby markers of cell injury and ROS production on the diaphragm after five days.[57] They concluded that most likely "uncleared short crocidolite fibers deposit on the surface of the diaphragm and are cytotoxic."[57]

Dunnigan reviewed evidence that milling procedures meant to reduce experimental fiber length change other characteristics that control toxicity; he noted that "most original studies claiming that short fibers lack fibrogenic activity, used traumatic ball-milling preparatory steps. Studies using less-vigorous preparatory techniques, such as flotation, for instance, have yielded positive results."[148] Dunnigan's findings explain the lack of toxicity observed in some short fiber animal studies, including Stanton et al. and Gross et al.[107,148,149]

## Human Cohorts

Shorter fibers also demonstrate toxicity in human cohorts. Churg et al.'s study of fibers in lung tissue specimens from 21 chrysotile miners and millers found a negative correlation between mean fiber length and fibrosis grade; they concluded that "short fibers may be more important in the genesis of pulmonary fibrosis than is commonly believed."[150] Stayner et al. analyzed by TEM historical dust samples from asbestos textile plants in North and South Carolina; they concluded that cumulative exposures to all fiber size classes, including fibers $\leq 5$µm in length, were statistically significant predictors of lung cancer mortality among 3,072 asbestos textile workers studied.[151] Looking at 3,803 asbestos textile workers, Loomis et al. found that cumulative exposure to all fibers counted by TEM and to fibers of every length were significantly associated with lung cancer risk.[152] Although models for fibers longer than 20 µm fit their data best, "the model for the smallest fibres $\leq1.5$ mm long and $<0.25$ mm in diameter was also an exception to the overall pattern, with both better fit and a stronger association with lung cancer compared to adjacent categories."[152] Tissue analysis showed a strong association ($p = 0.010$) between lung cancer and the number of fibers $<5$ µm detected by TEM.[152] In a 2012 follow-up of 6,136 asbestos textile workers, Loomis et al. reiterated that fibers of all lengths were associated with increased lung cancer risk.[153]

206    STP 1618 On *Detection Limits*

### Hill's Considerations for Short Fibers

Hill's considerations support the conclusion that short fibers (<5 μm) of asbestos minerals cause mesothelioma and lung cancer. The data reviewed fulfill Hill's considerations for strength of association, consistency, temporality, dose response, biologic plausibility, coherence, experiment, and analogy (**table 4**). The International Agency for Research on Cancer (IARC) has concluded that *all* sizes of asbestos fibers are carcinogenic to humans:

> [T]here are still current **controversies** about the extent to which there are **potency** differences for the particular… **sizes** (i.e. long and thin fibers) [of asbestos]. However, these issues do not alter the fundamental conclusion that the epidemiological evidence indicates that **all forms and sizes of commercial asbestos fibers are carcinogenic to humans.** [Emphasis in original.][15,154]

## Thin Fibers

### DESCRIPTION

Polarized light microscopy (PLM) and phase contrast microscopy (PCM) cannot reliably detect fibers thinner than 0.20 μm (**table 5**). Rohl et al. noted this in 1976:

> [O]ur observations by transmission electron microscopy have shown that naturally occurring asbestiform minerals often lie below the working resolution capabilities of the light microscope and furthermore while massive fiber bundles

**TABLE 4**    Hill's considerations for short asbestos fiber carcinogenicity

| Consideration | Met? | Evidence |
| --- | --- | --- |
| Strength | YES | NC and SC asbestos textile worker studies |
| Consistency | YES | in vitro studies, animal studies, human cohorts |
| Specificity | NO | Linked to both lung cancer and mesothelioma |
| Temporality | YES | Exposure precedes disease |
| Biological Gradient | YES | NC and SC asbestos textile worker studies |
| Plausibility | YES | Same mechanism as asbestos |
| Coherence | YES | Consistent with asbestos fiber toxicity |
| Experiment | YES | in vitro and animal studies |
| Analogy | YES | Asbestos fibers |

**TABLE 5**    Minimum detectable fiber diameter by microscopic methods

| Testing method | Minimum detectable fiber diameter |
| --- | --- |
| Polarized light microscopy (PLM) | 0.2−0.25 μm[155,156] |
| Phase contrast microscopy (PCM) | 0.21−0.36 μm[157−159] |
| Transmission electron microscopy (TEM) | 0.03 μm[160] |

EGILMAN ET AL., DOI: 10.1520/STP161820180080          207

can often be observed by either light or electron microscopy the observation of individual fibers smaller than 0.5 by 0.2 micrometers often will require the high resolution capability of the transmission electron microscope.[155]

In one case, Rohl et al. found only mineral fragments in a sample containing more than 7% tremolite using optical microscopy; a second examination by TEM revealed that many of the submicroscopic tremolite particles were, in fact, fibrous.[155] The EPA also acknowledges that fibers <0.25 μm in diameter are too small to be resolved by PLM.[156] Other microscopy methods are similarly limited. Ashcroft found that PCM could not detect fibers thinner than 0.36 μm.[157] Hwang and Gibbs reported that PCM could detect fibers as thin as 0.21 μm.[158] NIOSH states that PCM methods will not detect fibers thinner than 0.25 μm.[159]

Block et al. reviewed methodologies to detect asbestos in talc and noted that "fibers with particle sizes below the wavelength of illumination cannot be resolved by PLM. The unresolved fibers are not counted, which may lead to false-negative results."[160] In contrast, TEM can detect fibers as thin as 0.03 μm.[160] Block et al. concluded that TEM "may be the only method with resolution high enough to routinely detect fibrils of chrysotile."[160] In 2015, Millette wrote that "low levels of thin asbestos fibers in talc may only be seen using the TEM analysis."[161]

Hwang and Wang's study of asbestos size and shape by TEM found a median true fiber diameter of 0.07–0.09 μm for crocidolite, 0.20–0.26 μm for amosite, and 0.05–0.06 μm for chrysotile.[162] In a comparative study, Hwang et al. determined that "at least 83.5% of total fibers observed by TEM escaped detection by phase contrast microscopy."[163] In their study of asbestos in talc, Paoletti et al. concluded that "about 75% of observed asbestos fibers were thinner than 0.4 μm, i.e., below the resolving power of light microscopy."[164] Shedd of the U.S. Geological Survey found that the geometric average fiber width for samples of crocidolite from Western Australia, South Africa, and Bolivia ranged from 0.06 μm to 0.20 μm, thinner than the resolving power of PLM and PCM.[165]

This paper defines thin fibers as those fibers thinner than 0.20 μm; standard PLM or PCM methods will not detect these fibers.

### Biologic Plausibility

Thin fibers are frequently found in the lungs and pleura of asbestos-exposed individuals. In a review of human and animal data, Loomis concluded that "mesothelioma is most closely associated with numbers of fibers longer than 5 μm and thinner than 0.1 μm, and that lung cancer is most closely associated with fibers longer than 10 μm and thicker than 0.15 μm."[166] In 1990, Gibbs et al. compared mineral analysis results in lung tissue from 10 cases of malignant mesotheliomas with para-occupational asbestos exposure to lung tissue from seven cases of malignant mesothelioma among asbestos gas mask workers.[167] The geometric mean width for the fibers in these cases was 0.13–0.36 μm for amosite, 0.07–0.1 μm for crocidolite, and 0.06–0.09 μm for all fibers.[167] Gibbs et al. studied lung tissue from 13 cases of diffuse pleural fibrosis with

a history of asbestos exposure and reported that 45% of fibers retained in the lung tissue were longer than 4 μm and thinner than 0.25 μm.[113] Suzuki and Yuen analyzed fibers found in the lung and mesothelial tissue of 21 mesothelioma cases.[133] They found that these fibers were generally very thin: the geometric mean width was 0.040 μm for chrysotile and 0.13–0.16 μm for amosite.[133] Among 20 lung cancer cases with a history of asbestos exposure, Dodson et al. found that the geometric mean width for asbestos fibers in lung tissue were as follows: amosite, 0.20 μm; chrysotile, 0.06 μm; tremolite, 0.37 μm; anthophyllite, 0.29 μm; actinolite, 0.29 μm; and crocidolite, 0.10 μm.[168] They showed that only 26.4% of amosite fibers, 1.2% of chrysotile fibers, 41.2% of tremolite fibers, 31.6% of actinolite fibers, 32.7% of anthophyllite fibers, and 4.1% of crocidolite fibers detected by TEM and meeting NIOSH counting criteria would be detectable by PLM.[168] Suzuki et al. found that 92.7% of asbestos fibers found in lung, mesothelial, and mesotheliomatous tissue from 168 cases of human mesothelioma were thinner than 0.25 μm.[129] Adib et al. reported that 30% of asbestos fibers found in lung tissue from 123 Quebec asbestos workers were fine fibers (length ≥5 μm, width <0.2 μm).[135]

Thin fibers are more easily inhaled deep into the lung: Wagner et al. recognized "the known aerodynamic advantage which the finer fibres have in penetrating to the periphery of the lung."[169]

## Animal Studies

In their study of mesothelioma in asbestos-exposed rats, Wagner et al. concluded that their findings "support the hypothesis that the finer fibres are the more carcinogenic."[169] Stanton et al. concluded that "the probability of pleural sarcoma [in rats] correlated best with the number of fibers that measured 0.25 μm or less in diameter and more than 8 μm in length," although they also found significant correlations for other size categories as noted previously.[107]

## Human Cohorts

Timbrell et al. attributed the higher rates of mesothelioma among crocidolite miners on the northwestern Cape of South Africa to the smaller mean fiber diameter in these deposits (0.073 μm) compared with others studied (0.212 μm and 0.243 μm).[170] Stayner et al. analyzed historical dust samples from asbestos textile mills in North and South Carolina and found that "both lung cancer and asbestosis were most strongly associated with exposure to thin fibres (<0.25 μm)" among the 3,072 workers studied.[151] Loomis et al. studied fiber exposures in 3,803 asbestos textile workers in North Carolina and found evidence of an association between the smallest fibers (≤1.5 μm long and <0.25 μm in diameter) and lung cancer.[152]

## Hill's Considerations for Thin Fibers

Hill's considerations support the conclusion that thin fibers (<0.2 μm) of asbestos minerals cause mesothelioma and lung cancer. The data reviewed fulfill Hill's considerations for strength of association, consistency, temporality, dose response,

EGILMAN ET AL., DOI: 10.1520/STP161820180080        209

biologic plausibility, coherence, experiment, and analogy (**table 6**). IARC has concluded that all sizes of asbestos fibers are carcinogenic to humans.[15,154]

# Nonasbestos Mineral EMP: Erionite

**DESCRIPTION**

Zeolites are a group of aluminosilicate minerals, each of which have unique crystal structures and are known for their ability to exchange ions and to filter and absorb materials. Erionite crystal structures have morphologies that are characteristic of asbestiform fibers. This includes fibrous erionite, an unregulated asbestiform mineral. "Woolly" erionite is the more abundant variety of fibrous zeolites and has morphological variants.[171] Erionite can be found in (but is not restricted to) volcanic tuff deposits and sedimentary deposits of limestone, mudstones, and soils. Erionite "is composed of single fibers, bundles of fibers, and radiating bundles of fibers. The fibers' size generally ranges from less than 0.2 to 10 µm in diameter and have lengths that range from 2 µm to over 200 µm."[172] Fibrous erionite shares morphology and key aspects of chemical composition with asbestos minerals. There is no evidence that single erionite fibers originate from an asbestiform habit.

**Biologic Plausibility**

Erionite fibers are thought to be toxic because of their surface charge and chemical composition. An erionite fiber has a hexagonal physical structure with an internal surface area approximately 200 times larger than that of crocidolite. Because of this, erionite can absorb small molecules and has significant catalytic activity.[173] Pacella et al. stated "considering that the Fe ion-exchanged and/or accumulated on the fiber surface may be responsible for carcinogenic activity promoting the formation of reactive oxygen species via Fenton reaction, it is possible that the different erionite species are all potentially carcinogenic."[174] Attanoos et al. proposed that erionite "primes and activates the NLRP3 inflammasome, which, in turn, triggers an

**TABLE 6**   Hill's considerations for thin asbestos fiber carcinogenicity

| Consideration | Met? | Evidence |
|---|---|---|
| Strength | YES | NC and SC asbestos textile worker studies |
| Consistency | YES | Animal studies, human cohorts |
| Specificity | NO | Linked to both lung cancer and mesothelioma |
| Temporality | YES | Exposure precedes disease |
| Biological Gradient | YES | NC and SC asbestos textile worker studies |
| Plausibility | YES | Same mechanism as asbestos |
| Coherence | YES | Consistent with asbestos fiber toxicity |
| Experiment | YES | Animal studies |
| Analogy | YES | Asbestos fibers |

autocrine feedback loop in mesothelial cells. This feedback loop is modulated by the interleukin-1 receptor, causing the production of malignant mesotheliomas."[175]

Erionite fibers have been found in the lungs of exposed individuals. Dumortier et al. found erionite fibers in the bronchoalveolar lavage fluid of 16 residents of the Cappadocian region of Turkey considered to have environmental erionite exposure; in nine of these cases, the concentration of erionite fibers exceeded 300 fibers/mL.[176] They also detected ferruginous bodies in 12 subjects.[176] Jasani and Gibbs reported that "erionite fibers have been found in bronchoalveolar lavage fluids and lung tissues of individuals with [malignant mesothelioma] as well as those of the animals resident" in Cappadocian villages in Turkey.[177]

### In Vitro Experiments

An in vitro study of human blood cells exposed to zeolites by Korkina et al. showed an increase in chromatid breaks and a statistically significant increase in aberrant cells compared with unexposed controls.[25] In the same study, zeolites were found to induce chromatid breaks and aberrant cells at about the same rate as chrysotile asbestos.[25]

Both asbestos and erionite increase levels of the c-*fos* and c-*jun* mRNA in rat pleural mesothelial cells;[178–179] c-*fos* and c-*jun* mRNA are components of the AP-1 transcription factor thought to play a role in asbestos-induced cell proliferation and tumor development.[68,75,76] Poole et al. reported that erionite has "*in vitro* genotoxic properties associated with many conventional carcinogens," such as increased morphological transformation and unscheduled DNA repair synthesis.[180] They concluded that "it is therefore suggested that exposure to fibrous erionite alone may be sufficient to cause the high incidence of pleural tumours observed in Turkey."[180]

### Animal Studies

An in vivo study by Spurny determined that fibrous erionite produces mesotheliomas in the stomachs of mice.[181] Suzuki and Kohyama reported that "tumors developed in 93 of 394 animals (23.6%) treated with asbestos or fibrous erionite seven months or more after administration. All of the induced peritoneal tumors were intimately associated with marked peritoneal fibrosis, in which asbestos or erionite fibers were regularly detected."[182] Maltoni et al. similarly identified pleural mesotheliomas in 9 of 10 animals intrapleurally injected with erionite fibers.[183] Ozesmi et al. reported that after erionite injection, "Malignant tumours were found in 84 (41 mesotheliomas, 31 lymphomas, 1 peripheral epidermoid carcinoma, and 11 lymphomas and mesotheliomas together) of the 321 animals which died spontaneously within 9 to 32 months."[184]

### Human Cohorts

The association between erionite and pulmonary cancers was first noted among inhabitants of Turkey's Cappadocia region. Simonato et al. recorded 108 cases of

EGILMAN ET AL., DOI: 10.1520/STP161820180080    211

pleural mesothelioma occurring from 1970–1987 among 604 inhabitants of three villages in the Cappadocia region in Turkey.[185] Artvinli and Baris attributed these cancers to environmental erionite exposure from soil, road dust, and building stones.[186] Baris et al. reported an outbreak of "120 cases of malignant pleural mesothelioma and 64 cases of malignant peritoneal mesothelioma" among 519 deaths in the same three villages.[187] In a follow-up study of two of the Cappadocian villages, Baris and Grandjean calculated that 44.5% of all deaths from 1979 to 2003 were due to malignant mesothelioma.[188] They found that the pleural mesothelioma incidence in the two exposed villages 20 to 70 times greater than in the unexposed control village.[188] Jasani and Gibbs reported "Several epidemiologic studies of these Cappadocian villages have shown rates of [malignant mesothelioma] of about 1,000-fold the normal rate."[177]

Metintas et al. followed a group of 100 immigrants who had moved from Cappadocian Turkey to Sweden; they found that 78% (14/18) of recorded deaths were due to histopathologically confirmed malignant mesothelioma.[189] The mesothelioma standardized incidence ratios among the Cappadocian men and women was 265 and 1,992 times higher, respectively, than the general Swedish population.[189]

Erionite carcinogenicity has been observed in Mexico. In 2015, Ortega-Guerrero et al. reported that the standard mortality rates per thousand for lung cancer and malignant mesothelioma among rural villagers in central Mexico with environmental fibrous erionite exposure were 7.09 and 2.48 for males, and 4.75 and 1.05 for females, respectively.[190]

## Hill's Considerations for Erionite

Hill's considerations support the conclusion that fibrous erionite causes mesothelioma and lung cancer. The data reviewed fulfill Hill's considerations for strength of association, consistency, temporality, plausibility, coherence, analogy, and experiment (table 6). IARC concluded that there is sufficient evidence of erionite carcinogenicity in humans and animals and have classified erionite as a group 1 mesothelial carcinogen.[191]

TABLE 7    Hill's Considerations for erionite carcinogenicity

| Consideration | Met? | Evidence |
|---|---|---|
| Strength | YES | Human cohort studies |
| Consistency | YES | in vitro studies, animal studies, human cohorts |
| Specificity | NO | Linked to both lung cancer and mesothelioma |
| Temporality | YES | Exposure precedes disease |
| Biological Gradient | NO | Dose-response relationship not shown |
| Plausibility | YES | Same mechanism as asbestos |
| Coherence | YES | Consistent with asbestos fiber toxicity |
| Experiment | YES | in vitro and animal studies |
| Analogy | YES | Asbestos fibers |

# Nonasbestos Mineral EMP: Fibrous Talc

**DESCRIPTION**

Talc occurs in a variety of morphologies, including platy, massive, acicular, and fibrous.[192] Wylie has noted that fibrous talc may be intergrown with amphiboles and other chain silicates on an "extremely fine" scale and that fibrous talc "may be asbestiform, in that it can form in bundles of parallel fibers of narrow diameter and high AR, or it may be acicular."[193] IARC also notes that fibrous talc has an asbestiform habit.[14,154,194]

Fibrous talc can transition from anthophyllite or tremolite.[16,195–197] Tremolite and anthophyllite are found in talc deposits, and transformation of amphiboles into fibrous talc have been reported.[195] If the transformation from talc to amphibole fiber or vice versa is not complete, then the EMP is called a transition fiber. A transition fiber may be chemically "more consistent" with amphibole asbestos at one part and more consistent with talc at another.[16] These transition fibers pose an analytical problem, as researchers could categorize a fiber as either talc or asbestos depending on the part of the EMP examined.

## Biologic Plausibility

Mine Safety and Health Administration (MSHA) and OSHA regulate fibrous talc by the same standards as asbestos. In 1972, OSHA published talc exposure standards and directed readers to "use asbestos limit" for fibrous talc.[198] A 1974 note in the Federal Register related to asbestos health and safety standard reiterated that fibrous talc was subject to the asbestos threshold limit value (TLV).[199] In 1979, MSHA issued a citation to the Eastern Magnesia Talc Company operation in Johnson, VT, for airborne fibrous talc in excess of the TLV for a "harmful fiber": 2 talc fibers/cc.[200] In 1989, OSHA again recognized the occurrence of fibrous talc, but it did not make any determinations about the possible health consequences of fibrous talc exposure.[201] OSHA still uses the asbestos limit for fibrous talc exposures.[104]

IARC treats asbestiform (fibrous) talc as carcinogenic because of its similarity to asbestos. In 2010, IARC published the following clarification for their evaluation of talc carcinogenicity:

> The review of talc in Supplement 7 led to evaluations for two agents: talc containing asbestiform fibres and talc not containing asbestiform fibres. **The term "asbestiform fibre" has been mistaken as a synonym for "asbestos fibre" when it should be understood to mean any mineral, including talc, when it grows in an asbestiform habit.** To avoid confusion over the term "asbestiform fibre," the present Working Group decided that it is scientifically more precise to call the agent "talc not containing asbestos or asbestiform fibres," and this evaluation supersedes the earlier review of talc not containing asbestiform fibres. **The present Working Group also decided to expand the name of the Group-1 agent from "talc containing asbestiform fibres" to "talc containing asbestos**

**or other asbestiform fibres."** The present Working Group reviewed the earlier Monograph on talc containing asbestiform fibres and determined that the expanded name is consistent with what had been evaluated in Supplement 7. No update was undertaken for this Group-1 agent. [Emphasis added.][194]

In 2012, IARC reiterated their position, clarifying again that "talc containing asbestiform fibres" includes asbestiform (fibrous) talc:

> **Talc may also form true mineral fibres that are asbestiform in habit.** In some talc deposits, tremolite, anthophyllite, and actinolite may occur. Talc containing asbestiform fibres is a term that has been used inconsistently in the literature. In some contexts, it applies to talc containing asbestiform fibres of talc or talc intergrown on a nanoscale with other minerals, usually anthophyllite. In other contexts, **the term asbestiform talc has erroneously been used for talc products that contain asbestos.** Similarly, the term asbestiform talc has erroneously been used for talc products that contain elongated mineral fragments that are not asbestiform. [Emphasis added.][154]

Ghio and Roggli argued that talc should not be used for pleurodesis in nonmalignant cases because of the risk of cancer caused by fibrous talc.[202]

### In Vitro Experiments

Ghio et al. found that in vitro talc exposure "significantly increased iron importation and concentrations of the storage protein ferritin, … was associated with a time-dependent and concentration-dependent generation of oxidants in both cell types," and increased the expression of proinflammatory mediators.[203] They determined that "exposure to talc disrupts iron homeostasis, is associated with oxidative stress, and results in a biological effect (i.e., a fibro-inflammatory response)."[203] Ghio et al. did not detect talc fibers in their specimens by scanning electron microscopy (SEM), but one of the authors (Roggli) has found a large number of talc fibers in a lung cancer case and attributes the cancer to fibrous talc exposure.[204] Roggli et al. also found talc fibers in the lungs of mesothelioma patients.[205] Talc fibers have been detected in pharmaceutical and cosmetic-grade talc and in the lungs of individuals and animals exposed to cosmetic, pharmaceutical, and industrial-grade talc.[155,164,205–211]

### Animal Studies

The National Toxicology Program (NTP) studied the effects of processed talc inhalation exposure in rats and mice and found some evidence of carcinogenic activity in male rats, clear evidence of carcinogenic activity in female rats, and no evidence of carcinogenic activity in mice of either sex.[212] The NTP did not characterize the fibrous talc content of the processed talc used in the study but found talc fibers in the lungs of some exposed rats.[206,212] The NTP observed that, at necropsy, "the lungs of exposed rats had multiple small, round, pale white lesions visible through

the visceral pleura" and that "these lesions were generally larger and more extensive in rats exposed to 18 mg/m$^3$ than in those exposed to 6 mg/m$^3$" talc.[212] Talc exposure was significantly correlated with four of six types of lung lesions ($p \leq 0.01$) for exposed male rats and female rats exposed to 6 mg/m$^3$ talc; talc exposure was significantly correlated with *all* types of lung lesions ($p \leq 0.01$) for female rats exposed to 18mg/m$^3$ talc.[212]

The NTP detected talc fibers in the lungs of the exposed animals and found that these fibers were associated with chronic inflammation. Dr. Boorman's draft paper based on the NTP animal study referred to finding "talc fibers" in the lungs of exposed rats:

> Ten female rats were selected randomly from the control 6 and 18 mg/m$^3$ exposure groups and the histological slides containing the lungs and ovaries were examined under polarized light for the presence of anisotropic material consistent with **talc fibers**. The lungs from the controls were negative for anisotropic materials but **talc fibers were easily identified from the lungs of the exposed animals**. **The fibers were present in the alveolar macrophages in areas associated with chronic inflammation in the lungs.** There was no material consistent with talc found in the ovaries or ovarian bursa from any rats from any group. [Emphasis added.][206]

Dr. Gettings, the Cosmetics Toiletries and Fragrance Association's director of toxicology, sent a letter to Dr. Boorman disputing his use of the term "talc fiber": "Our industry is concerned about perpetuation of the term talc 'fibers' (I also note that you used the same term in your minutes of our meeting at NIEHS, so I hope we can clear this up in your manuscript if possible."[213] A few weeks later, Ashton of Johnson & Johnson also complained to Dr. Gettings:

> As we have cautioned before, TALC FIBERS is not only wrong, but has the most uncomfortable connotations which continue to keep the talc/asbestos controversy alive in the wrong circles.

> Please make another effort to have Dr. Boorman delete FIBERS

> Hoping it is not too late. [Emphasis in original.][214]

It was not too late to change the published paper. Boorman, an employee of the National Institutes of Environmental Health Sciences (NIEHS) changed "fibers" to "particles" in the published version[215] The NTP study reported a statistically significant ($p \leq 0.05$) association in female rats between the highest level of talc exposure (18 mg/m$^3$ talc) and all types of lung cancers (**table 8**).[212]

## Human Case Reports

Fibrous talc has been found in the tissue of patients with mesothelioma and lung cancers. Gibbs et al. performed mineral analysis on lung tissue and surgical biopsy material from 17 cases with pathological lung lesions likely to have been caused by talc inhalation.[207] They reported asbestos fibers in only seven of these cases, but

EGILMAN ET AL., DOI: 10.1520/STP161820180080     215

**TABLE 8**   Lung cancer rates in female rats in the NTP talc animal study[212]

| Cancer | Controls | Total exposure: 6 mg/m$^3$ talc | Total exposure: 18 mg/m$^3$ talc |
|---|---|---|---|
| Lung (alveolar/bronchiolar adenoma) | 1/50 (2%) | 0/48 (0%) | 9/50 (18%) |
| | $P < 0.001$ | $P = 0.503$ | $P = 0.010$ |
| Lung (alveolar/bronchiolar carcinoma) | 0/50 (0%) | 0/48 (0%) | 5/50 (10%) |
| | $P = 0.003$ | — | $P = 0.028$ |
| Lung (alveolar/bronchiolar adenoma OR carcinoma) | 1/50 (2%) | 0/48 (0%) | 13/50 (26%) |
| | $P < 0.001$ | $P = 0.503$ | $P < 0.001$ |

they found fibrous talc in all but one case.[207] Dodson et al. reported the case of a 59-year-old man diagnosed with moderately to poorly differentiated adenocarcinoma.[208] Despite a known history of both asbestos and talc exposure, the number of ferruginous bodies (FB) formed on fibrous talc greatly outnumbered those formed on asbestos fibers in the lung parenchyma (7,500 FB/g versus 1,600 FB/g dry).[208] Fujiwara et al. reported finding platy talc, fibrous talc, and actinolite asbestos in the lung parenchyma and pericardial tumor tissue of a patient with pericardial mesothelioma who was exposed to talc while sharpening talc-containing pencils.[209] Roggli testified that he found 200 talc fibers in seven SEM fields in lung tissue from a man with lung cancer and that these fibers closely resembled "noncommercial amphibole fibers."[204] He concluded that these talc fibers had caused the lung cancer.[204]

Talc pleurodesis has induced biologic changes that may predispose to cancer. Ghio et al studied surgical tissue specimens collected from six patients who had undergone talc pleurodesis and compared these with tissue specimens from controls.[203] They found that the tissue of talc-exposed patients "demonstrated an accumulation of iron and increased expression of iron-related proteins, including ferritin, the importer divalent metal transport–1 and the exporter ferroportin-1" and concluded that "exposure to talc disrupts iron homeostasis, is associated with oxidative stress, and results in a biological effect (i.e., a fibro-inflammatory response)."[203] In 2017, Faynberg et al. reported a case of a mesothelioid reaction attributed to talc pleurodesis seven years after treatment.[216] They concluded that "mesothelioid reaction should be included in the differential diagnosis in patients with pleural thickening/pleural plaque formation who have previously been treated with talc pleurodesis."[216]

## Human Cohorts

Roggli et al. performed fiber analysis on lung tissue specimens from 312 mesothelioma cases and found fibrous talc in 193 (62%) of these cases.[205] By contrast, tremolite was identified in 166 cases (53%) and chrysotile in 32 cases (10%).[205] In the 193 cases in which Roggli et al. detected fibrous talc, the median fiber count was 3,910 (range: 280–138,000 fibers) compared with a median fiber count of <600 (range: 210–10,200 fibers) among controls.[205]

### Hill's Considerations

Hill's considerations support the conclusion that fibrous talc exposure causes mesothelioma and lung cancer. The data reviewed fulfill Hill's considerations for strength, consistency, temporality, biological gradient, plausibility, coherence, analogy, and experiment (table 9). IARC concluded that "there is *sufficient evidence* in humans for the carcinogenicity of talc containing asbestiform fibres. Talc containing asbestiform fibres causes cancer of the lung and mesothelioma."[154] IARC classifies talc containing asbestiform fibers, including fibrous talc, as a group 1 human carcinogen.[154]

## What Is Counted by Current Methods

ASTM asbestos fiber-counting criteria are listed in table 10, including minimum fiber length, maximum fiber width, minimum detectable fiber width (based on the microscopic methods employed), minimum AR, and any other counting requirements. The methods requiring an asbestiform habit or morphology (ASTM D7200-12; ASTM D7201-06(2011), *Standard Practice for Sampling and Counting Airborne Fibers, Including Asbestos Fibers, in the Workplace, by Phase Contrast Microscopy (with an Option of Transmission Electron Microscopy)* aim to exclude cleavage fragments from procedural fiber counts, although the effectiveness of this differentiation is doubtful.[217–219] ASTM D7200-12 and ASTM D7201-06(2011) exclude short fibers by requiring all counted fibers to be longer than 5 μm.[217–219] PLM and PCM methods (ASTM D7200-12; ASTM D7201-06(2011); ASTM D7521-16, *Standard Test Method for Determination of Asbestos in Soil*) cannot detect thin asbestos fibers (<0.2 μm wide).[217–219] Although erionite and talc fibers meeting the counting criteria are to be recorded by these methods, it is unclear how these results would be reported or understood because these methods refer only to asbestos fibers.[93,217–222]

The Cosmetic, Toiletry, and Fragrance Association (CTFA), EPA, the International Organization for Standardization (ISO), NIOSH, OSHA, and U.S. Pharmacopeia (USP) counting criteria for asbestos fibers are listed in table 11, including

**TABLE 9**  Hill's Considerations for fibrous talc carcinogenicity

| Consideration | Met? | Evidence |
|---|---|---|
| Strength | YES | NTP animal study |
| Consistency | YES | Animal studies, in vitro studies, human case reports and cohorts |
| Specificity | NO | Linked to both lung cancer and mesothelioma |
| Temporality | YES | Exposure precedes disease |
| Biological Gradient | YES | NTP animal study |
| Plausibility | YES | Same mechanism as asbestos |
| Coherence | YES | Consistent with asbestos fiber toxicity |
| Experiment | YES | NTP animal study |
| Analogy | YES | Asbestos fibers |

**TABLE 10** Asbestos fiber-counting criteria for proposed and existing ASTM methods

| ASTM method | Type | Min Fiber Length | Max Fiber Width | Min width detectable[155–160] | Min AR | Other requirements |
|---|---|---|---|---|---|---|
| ASTM D5755-09(2014)e1[217,222] | TEM | 0.5 μm | N/A | 0.03 μm | 5:1 | Substantially parallel sides |
| ASTM D6281-15[93,217] | TEM | 0.5 μm | N/A | 0.03 μm | 5:1 | Parallel or stepped sides |
| ASTM D6480-05(2010)[217–221] | TEM | 0.5 μm | N/A | 0.03 μm | 5:1 | Parallel or stepped sides |
| ASTM D7200-12[217,218] | PCM TEM | 5 μm | 3.0 μm | 0.21−0.36 μm (PCM) 0.03 μm (TEM) | 3:1 | Asbestiform habit |
| ASTM D7201-06(2011)[217,219] | PCM TEM | 5 μm | 3.0 μm | 0.21−0.36 μm (PCM) 0.03 μm (TEM) | 3:1 | Asbestiform habit |
| ASTM D7521-16[220] | PLM TEM | 0.5 μm | N/A | 0.2−0.25 μm (PLM) 0.03 μm (TEM) | 5:1 | Substantially parallel sides |

**TABLE 11**   CTFA, EPA, NIOSH, OSHA, and USP asbestos fiber-counting criteria by microscopic methods

| Method | Type | Min fiber length | Max fiber width | Min width detectable[155–160] | Min AR | Other requirements |
|---|---|---|---|---|---|---|
| CTFA J4-1[227] | PLM | N/A | 3µm | 0.2–0.25 µm | 5:1 | Max. length 20µm |
| EPA AHERA[229] | TEM | 0.5 µm | N/A | 0.03 µm | 5:1 | Substantially parallel sides |
| EPA 100.1[230] | TEM | 0.5 µm | N/A | 0.03 µm | 3:1 | Parallel or stepped sides |
| EPA 100.2[226] | TEM | 10 µm | N/A | 0.03 µm | 3:1 | Substantially parallel sides |
| EPA/600/R-93/116[156] | PLM | 5 µm avg. | "usually"0.5µm | 0.2–0.25 µm | 20:1 avg. | Asbestiform morphology |
| ISO 10312[231] | TEM | 0.5 µm | N/A | 0.03 µm | 5:1 | Parallel or stepped sides |
| ISO 13794[232] | TEM | 0.5 µm | N/A | 0.03µm | 5:1 | Parallel or stepped sides |
| NIOSH 7400[159] | PCM | 5 µm | N/A | 0.21–0.36 µm | 3:1 | N/A |
| NIOSH 7402[225] | TEM | 5 µm | N/A | 0.03 µm | 3:1 | Min. fiber width: 0.25µm |
| OSHA ID-160[224] | PCM | 5 µm | N/A | 0.21–0.36 µm | 3:1 | N/A |
| OSHA ID-191[223] | PLM | 5 µm | N/A | 0.2–0.25 µm | 3:1 | Asbestos growth habit |
| USP Talc Monograph[228] | PLM | 5 µm avg. | N/A | 0.2–0.25 µm | 20:1 avg. | Asbestiform morphology |

minimum fiber length, maximum fiber width, minimum detectable fiber width (based on the microscopic methods employed), minimum AR, and any other counting requirements. The methods requiring an asbestiform habit or morphology (EPA/600/R-93/116 and OSHA ID-191) were crafted to exclude cleavage fragments from asbestos fiber counts.[156,223] Methods with a minimum required fiber length of 5 μm exclude short fibers (NIOSH 7400, NIOSH 7402, OSHA ID-160, and OSHA ID-191).[159,223–225] The EPA 100.2 method excluded all fibers shorter than 10 μm.[226] PLM and PCM methods (CTFA J4-1, EPA/600/R-93/116, NIOSH 7400, OSHA ID-160, OSHA ID-191, and USP) cannot detect thin asbestos fibers (<0.2 μm wide) and NIOSH 7402 explicitly excludes fibers thinner than 0.25 μm even if they are detected.[156,159,223–225,227,228] As previously discussed, OSHA regulates fibrous talc per the asbestos limit. The OSHA ID-191 method, however, only lists talc as a possible interference and neither method makes reference to counting talc fibers.[104,198,199,223,224] Otherwise, these methods do not explicitly mention erionite and talc fibers.[156,159,223–232] It is unclear how a microscopist should interpret findings of fibrous talc or erionite in these cases.

Most methods that require asbestiform morphology or growth habit rely on the following definition, first noted in method EPA/600/R-93/116:

Asbestiform (morphology) - Said of a mineral that is like asbestos, i.e., crystallized with the habit of asbestos. Some asbestiform minerals may lack the properties which make asbestos commercially valuable, such as long fiber length and high tensile strength. With the light microscope, the asbestiform habit is generally recognized by the following characteristics:
- Mean aspect ratios ranging from 20:1 to 100:1 or higher for fibers longer than 5 μm. Aspect ratios should be determined for fibers, not bundles.
- Very thin fibrils, usually less than 0.5 micrometers in width, and
- Two or more of the following:
  ◦ Parallel fibers occurring in bundles,
  ◦ Fiber bundles displaying splayed ends,
  ◦ Matted masses of individual fibers, and/or
  ◦ Fibers showing curvature

These characteristics refer to the population of fibers as observed in a bulk sample. It is not unusual to observe occasional particles having aspect ratios of 10:1 or less, but it is unlikely that the asbestos component(s) would be dominated by particles (individual fibers) having aspect ratios of <20:1 for fibers longer than 5μm. If a sample contains a fibrous component of which most of the fibers have aspect ratios of <20:1 and that do not display the additional asbestiform characteristics, by definition the component should not be considered asbestos.[156]

The requirement for asbestiform habit is intended to preclude cleavage fragments from asbestos fiber counts.[156] Methods that use TEM, do not require an asbestiform habit, include short fibers (>0.5 μm), and do not specify a minimum fiber width are best suited to detect cleavage fragments, short fibers, and thin fibers;

these methods were ASTM D5755-09(2014)e1, *Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Surface Loading*; ASTM D6281-15, *Standard Test Method for Airborne Asbestos Concentration in Ambient and Indoor Atmospheres as Determined by Transmission Electron Microscopy Direct Transfer (TEM)*; ASTM D6480-05(2010), *Standard Test Method for Wipe Sampling of Surfaces, Indirect Preparation, and Analysis for Asbestos Structure Number Surface Loading by Transmission Electron* Microscopy; ASTM D7521-16, *Standard Test Method for Determination of Asbestos in Soil*; AHERA (EPA), EPA 100.1; ISO 10312; and ISO 13794.[93,217,220–222,229–232] OSHA standards call for talc fibers to be regulated per the asbestos limit, but OSHA methods only mentioned talc fibers as a possible interference (OSHA ID-191).[104,198,199,223,224] None of the methods reviewed explicitly called for counting erionite or talc fibers.[93,156,159,217,232] Although all fibers are to be recorded regardless of chemical composition, reporting of erionite and talc fibers is left to an analyst's discretion.[93,156,159,217,232]

## Discussion

EMP fiber-counting criteria should be predicated on health effects. At a 1977 symposium on asbestos, Langer argued that "environmental assessment of asbestos fibres should be based on parameters that were important biologically."[136] Unfortunately, many existing criteria overlook or exclude toxic EMPs. The resolving power of PLM and PCM microscopes is too low to detect thin asbestos fibers ($<0.02$ μm wide) (table 5).[155–159] Second, some unregulated mineral fibers (including erionite, winchite, richterite and talc) are carcinogenic, but their designation is left to the discretion of the analyst. Finally, adoption of a geologic definition of asbestos ignores many health-relevant EMPs.

Block et al. remark that low resolution may lead to false negative results when thin asbestos fibers are missed.[160] Hwang et al. and Paoletti et al. both found that fine fibers unseen by PLM or PCM could be detected by TEM.[162–164] TEM can detect fibers as thin as 0.03 μm and should be used in place of PLM and PCM to detect these fine carcinogenic fibers.[160,161]

Also problematic is the fact that test methods focus on regulatory fibers based on the commercial term "asbestos" and exclude fibrous talc, erionite, and other recognized or probable carcinogenic EMPs. Although OSHA standards call for fibrous talc to be regulated per the asbestos limit, none of the test methods reviewed explicitly include talc fibers. IARC has concluded that both erionite and asbestiform talc are known human carcinogens, but these fiber types are not addressed in asbestos test methods.[154,191,194] Additionally, asbestos standards disregard fibers of unregulated amphibole asbestos types that have the same morphology as asbestos and thus are likely to be carcinogenic; these include antigorite, lizardite, cummingtonite, fluoro-edentie, magnesio-hornblende, winchite, richterite, carlosturite, balangeroite, wollastonite, mordenite, palygorskite, sepiolite, arfvedsonite, clinojimthompsonite,

jimthompsonite, and chesterite.[233–238] In one case, the test method did not address regulated chrysotile asbestos fibers: The CTFA J4-1 method is intended to detect only amphibole asbestos.[227]

EPA/600/R-93/116 outlines a geologic definition of an asbestiform habit at odds with the known characteristics of carcinogenic EMPs.[156] The requirement of an asbestiform habit has been adopted by several subsequent standards, representing an adoption of a geologic, rather than physiologic, characterization of asbestos.[156,217,223] In 2009, Meeker of the USGS objected to the attempt by the geologic community to create a "geologic" definition of a fiber.[239] He noted that the definition should be based on a toxicologic evaluation of risk to health and not geologic properties per se:

> The job of Earth scientists is not to decide what is toxic; our job is to assist the health community and regulators by carefully describing the physical and chemical properties of natural materials, understanding their occurrence, and providing scientifically rigorous terminology when needed.[239]

The exclusion of non-asbestiform EMPs is based on geologic, not toxicologic, considerations. Case argued that the those who seek to differentiate cleavage fragments from asbestos fibers "tergiversate" (use subterfuge) "in their attempt to get non-asbestos tremolite off the hook."[106] Case, a physician and pathologist, criticized the alleged safety of fibers with aspect ratios less than 20:1.[106] He noted that the answers to three "vital questions" establish the theory that non-asbestiform fibers are safe are not substantiated:

> Firstly, can "non-asbestiform" fibres, by mineralogical definition, be unambiguously identified to the satisfaction of experts and regulators? Secondly, if they can be identified, are they present to the exclusion of "asbestiform" fibres in the same mix? Thirdly, if both of the previous conditions can be satisfied, do they inform as to the biological effects of long, thin, durable fibres that do not meet the crystallographic growth characteristics for asbestiform nature required by some experts?

> The answer to all three questions—without tergiversation—is no.[106]

The parameters laid out in EPA/600/R-93/116 are also not effective at differentiating cleavage fragments from asbestos fibers.[94–96] Harper et al.'s interlaboratory study found that ASTM D7200-06 criteria could not adequately differentiate between asbestiform fibers and cleavage fragments.[96] Other analysts have concurred that some asbestos fibers and cleavage fragments are microscopically indistinguishable.[94,95]

EPA/600/R-93/116 calls for a *mean* aspect ratio of greater than 20:1 for a population of fibers, but it does not define "population" or explain which fibers are to be averaged.[156] Furthermore, the definition demands that if "most" (more than half) of the fibers have aspect ratios $< 20:1$ and do not display the "additional asbestiform characteristic, by definition the [fibrous] component should not be considered asbestos."[156] If followed as written, a set of fibers with asbestiform characteristics

with a mean aspect ratio greater than 20:1 should be reported as asbestos-free or nondetect if 51% of the counted fibers have aspect ratios less than 20:1.[156] No health data support such a distinction. EPA/600/R-93/116 also states, self-contradictorily, that the typical AR for all types of regulated asbestos (chrysotile, amosite, crocidolite, anthophyllite, tremolite, and actinolite) is >10:1, while excluding fibers with an average AR <20:1 from counting rules.[156] In her 1984 paper, Wylie measured amosite asbestos fibers longer than 5 μm and their corresponding aspect ratios.[240] In one specimen, only 32% of airborne asbestos fibers in the bagging area had an aspect ratio greater than 17:1, meaning at least 68% asbestos fibers had an aspect ratio less than 20:1 and the entire sample would be categorized as non-asbestiform under EPA/600/R-93/116.[240] Likewise, Churg found that, if all tremolite fibers detectable by electron microscopy in the lungs of Quebec chrysotile workers are counted regardless of length, width, or AR, the geometric mean length is less than 2μm and the geometric mean aspect ratio is 8–10:1.[241]

Following the requirement to only count a population with a "mean aspect ratio ranging from 20:1 to 100:1" will result in an asbestos-free or non-detect report for some commercial asbestos products, such as Union Carbide Calidria. Pinkerton et al. measured the size distribution of chrysotile in air samples from the Coalinga mine (used in Union Carbide Calidria).[242] Pinkerton et al. reported that 60.06% chrysotile fibers were <5 μm and had an aspect ratio <20:1; 3.34% chrysotile fibers were <5 μm long and had an aspect ratio ≥20:1; 22.13% chrysotile fibers were ≥5 μm long and had an aspect ratio <20:1; and only 14.47% chrysotile fibers were ≥5 μm long and had an AR ≥20:1.[242] Using NIOSH 7402, MAS analyzed personal and area air samples of RG144 Calidria asbestos; they found the average AR of detected asbestos fibers ranged from 12.3 to 18.5, and the median AR ranged from 10.0 to 14.7 for these fibers (see Appendix: Analysis of Calidria Asbestos). Because "most" (more than half) of the asbestos fibers from Coalinga Mine have aspect ratios <20:1 and do not display the additional asbestiform characteristics, chrysotile fibers from this source are not asbestos under the EPA/600/R-93/116 definition.

Similarly, Germine and Puffer studied amosite asbestos by TEM and found that these fibers had formed by longitudinal splitting, rather than an asbestiform growth habit.[243] They concluded that, despite its documented carcinogenicity, "amosite would not be regulated under current asbestos regulations, which define amphibole asbestos as whole crystals that are not split and that form fibril bundles."[243] As noted above, researchers have also found that amphibole fibers found in the Thetford, Quebec asbestos mines are cleavage fragments, rather than asbestiform fibers.[102,119]

Even if a small number of asbestos fibers meet the overly stringent standard, some TEM methods are still designed to report nondetect or nonquantifiable results. In 1977, Johnson & Johnson first proposed a TEM procedure stating that a single asbestos fiber would result in a positive test result.[244] In 1989, however, Johnson & Johnson changed the procedure to require the presence of five asbestos fibers of the same type to trigger a positive result.[245] Under this new procedure, finding as many as 16 asbestos fibers (four for each type) was to be recorded as "nonquantifiable" and thus safe for consumer use.[245] In contrast, jurisdictions such

as California use 0.1% as a regulatory level for "trace" asbestos, so even a single fiber finding could be of regulatory relevance.[246]

Asbestos fibers and other toxic EMPs that occur as accessory minerals or trace contaminants in a sample also would be unlikely to meet the EPA/600/R-93/116 criteria for an asbestiform habit. Because neither tremolite nor anthophyllite asbestos fibers has high tensile or good flexibility,[103] milling during ore processing will reduce the overall ARs and generate individual fibers from bundles.[91,92] Tremolite or anthophyllite fibers formed from asbestiform talc may fall short of EPA/600/R-93/116 requirements when observed as single fibers.[16] Fibers of asbestiform origin therefore may appear "non-asbestiform" under the EPA/600/R-93/116 restrictive definition.[156,247] Thus, the asbestiform habit requirement can cause false-negative results for accessory amphibole asbestos and fibrous talc in talc because of bundle breakage during processing or natural growth as single fibers during transition from asbestos to talc.

The use of the EPA/600/R-93/116 definition results in a serious underestimation of asbestos fibers recognized by OSHA, MSHA, and EPA. The EPA/600/R-93/116 method uses a stringent definition for asbestiform habit to attempt to exclude cleavage fragments from asbestos fiber counts, but it increases type two errors (i.e., false negatives). Wylie acknowledged that "the choice of 10:1 as the aspect ratio used would increase the probability of including *all* asbestos fibers, but in this case, some nonfibrous acicular cleavage fragments might also be counted as asbestos."[248] Discrimination between cleavage fragments and asbestos fibers, however, is neither necessary nor achievable.[94–96] Evidence of cleavage fragment toxicity supports counting both types of elongated asbestos mineral fibers.

Test methods are mainly designed to adhere to regulatory standards for EMPs. This means that they should count all regulated EMPs, including fibrous talc and cleavage fragments that meet OSHA's 3:1 AR requirement. Test methods for a hazardous substance, especially a known or suspected carcinogen, should count all toxic EMPs regardless of their mineralogical description.

## Conclusion

Asbestos mineral "cleavage fragments," short fibers ($<5$ μm long), thin fibers ($<0.2$ μm wide), and some nonasbestos EMPs cause cancer in humans. We believe that a health perspective is critical for determining what data to censor in the measurement of EMPs. For many microscopic methods of measuring asbestos and EMPs, data censorship excludes some toxic EMPs from "counted" data; public health interests demand that we revisit these censorship standards. Fiber-counting methods should be altered to better encompass health-relevant EMPs by employing TEM, eliminating the requirement for an asbestiform habit, including short fibers (shorter than 5 μm), and removing all minimum fiber width criteria; EMP test methods should explicitly call for counting talc and erionite fibers.

# References

1.  A. B. Hill, "The Environment and Disease: Association or Causation?" *Journal of the Royal Society of Medicine* 58, no. 5 (1965): 295–300.

2.  K. J. Rothman, S. Greenland, and T. L. Lash, *Modern Epidemiology*, 3rd ed. (Philadelphia, PA: Lippincott Williams & Wilkins, 2008).

3.  K. L. Rothman and S. Greenland, "Causation and Causal Inference in Epidemiology," *American Journal of Public Health* 95, no. S1 (2005): S144–S150.

4.  J. P. A. Ioannidis, "Exposure-Wide Epidemiology: Revisiting Bradford Hill," *Statistics in Medicine* 35, no. 11 (2016): 1749–1762.

5.  H. Blackburn and D. Labarthe, "Stories from the Evolution of Guidelines for Causal Inference in Epidemiologic Associations: 1953–1965," *American Journal of Epidemiology* 176, no. 12 (2012): 1071–1077.

6.  D. L. Weed, "Causal Criteria and Popperian Refutation," in *Causal Inference*, ed. K. J. Rothman (Chestnut Hill, MA: Epidemiology Resources, 1988), 15–32.

7.  A. DeLean, P. J. Munson, and D. Rodbard, "Simultaneous Analysis of Families of Sigmoidal Curves: Application to Bioassay, Radioligand Assay, and Physiological Dose-Response Curves," *American Journal of Physiology-Endocrinology and Metabolism* 235, no. 2 (1978): E97.

8.  National Research Council, "Issues in the Assessment of Dose Response," in *Assessing the Human Health Risks of Trichloroethylene: Key Scientific Issues* (Washington, DC: National Academies Press, 2006), 315–328.

9.  S. Greenland, "Dose-Response and Trend Analysis in Epidemiology: Alternatives to Categorical Analysis," *Epidemiology* 6, no. 4 (1995): 356–365.

10. U. S. Kesmodel, "Information Bias in Epidemiological Studies with a Special Focus on Obstetrics and Gynecology," *Acta Obstetricia et Gynecologica Scandinavica* 97, no. 4 (2018): 417–423.

11. D. Egilman and S. Howe, "Against Anti-Health Epidemiology: Corporate Obstruction of Public Health via Manipulation of Epidemiology," *International Journal of Occupational and Environmental Health* 13, no. 1 (2007): 118–124.

12. M. Höfler, "The Bradford Hill Considerations on Causality: A Counterfactual Perspective," *Emerging Themes in Epidemiology* 2 (2005): 1–9.

13. National Institute for Occupational Safety and Health, "Asbestos Fibers and Other Elongate Mineral Particles: State of the Science and Roadmap for Research Revised Edition," *Current Intelligence Bulletin* 62 (2011), https://web.archive.org/web/20190917134451/https://www.cdc.gov/niosh/docs/2011-159/

14. A. B. Kane, "Mechanisms of Mineral Fibre Carcinogenesis," in *Mechanisms of Fibre Carcinogenesis*, ed. A. B. Kane, P. Boffetta, R. Saracci, and J. D. Wilbourn (Lyon, France: International Agency for Research on Cancer, 1996), 11–34.

15. K. Straif, "Update of the Scientific Evidence on Asbestos and Cancer," (presentation, International Conference on Environmental and Occupational Determinants of Cancer: Interventions for Primary Prevention, Asturias, Spain, March 17, 2011).

16. A. E. Aust, P. D. Cook, and R. F. Dodson, "Morphological and Chemical Mechanisms of Elongated Mineral Particle Toxicities," *Journal of Toxicology and Environmental Health, Part B: Critical Reviews* 14, no. 1–4 (2011): 40–75.

17. C. Walker, J. Everitt, and J. C. Barrett, "Possible Cellular and Molecular Mechanisms for Asbestos Carcinogenicity," *American Journal of Industrial Medicine* 21 (1992): 253–273.

18. S. Achard, M. Perderiset, and M. C. Jaurand, "Sister Chromatid Exchanges in Rat Pleural Mesothelial Cells Treated with Crocidolite, Attapulgite, or Benzo 3-4 Pyrene," *British Journal of Industrial Medicine* 44, no. 4 (1987): 281–283.

EGILMAN ET AL., DOI: 10.1520/STP161820180080     225

19.   A. Renier, F. Levy, F. Pilliere, and M. C. Jaurand, "Unscheduled DNA Synthesis in Rat Pleu-
      ral Mesothelial Cells Treated with Mineral Fibres," *Mutation Research* 241, no. 4 (1990):
      361–367.

20.   S. Endo-Capron, A. Renier, X. Janson, L. Kheuang, and M. C. Jaurand, "In Vitro Response
      of Rat Pleural Mesothelial Cells to Talc Samples in Genotoxicity Assays (Sister Chromatid
      Exchanges and DNA Repair)," *Toxicology in Vitro* 7, no. 1 (1993): 7–14.

21.   M. C. Jaurand, L. Kheuang, L. Magne, and J. Bignon, "Chromosomal Changes Induced by
      Chrysotile Fibres or Benzo-3,4-Pyrene in Rat Pleural Mesothelial Cells," *Mutation
      Research* 169, no. 3 (1986): 141–148.

22.   V. Levresse, A. Renier, F. Levy, V. C. Broaddus, and M. Jaurand, "DNA Breakage in
      Asbestos-Treated Normal and Transformed (TSV40) Rat Pleural Mesothelial Cells,"
      *Mutagenesis* 15, no. 3 (2000): 239–244.

23.   M. Oshimura, T. W. Hesterberg, T. Tsutsui, and J. C. Barrett, "Correlation of Asbestos-
      Induced Cytogenetic Effects with Cell Transformation of Syrian Hamster Embryo Cells in
      Culture," *Cancer Research* 44, no. 11 (1984): 5017–5022.

24.   G. Livingston, M. Rom, and M. Morris, "Asbestos-Induced Sister Chromatid Exchanges in
      Cultured Chinese Hamster Ovarian Fibroblast Cells," *Journal of Environmental Pathol-
      ogy, Toxicology, and Oncology* 4, nos. 2–3 (1980): 373–382.

25.   L. G. Korkina, A. D. Durnev, T. B. Suslova, Z. P. Cheremisina, N. O. Daugel-Dauge, and
      I. B. Afanas'ev, "Oxygen Radical-Mediated Mutagenic Effect of Asbestos on Human
      Lymphocytes: Suppression by Oxygen Radical Scavengers," *Mutation Research/Fundamental
      and Molecular Mechanisms of Mutagenesis* 265, no. 2 (1992): 245–253.

26.   N. Fatma, A. K. Jain, and Q. Rahman, "Frequency of Sister Chromatid Exchange and
      Chromosomal Aberrations in Asbestos Cement Workers," *British Journal of Industrial
      Medicine* 48, no. 2 (1991): 103–105.

27.   W. N. Rom, G. K. Livingston, K. R. Casey, S. D. Wood, M. J. Egger, G. L. Chiu, and L. Jero-
      minski, "Sister Chromatid Exchange Frequency in Asbestos Workers," *Journal of the
      National Cancer Institute* 70, no. 1 (1983): 45–48.

28.   S.-H. Lee, M. Shin, K.-J. Lee, S.-Y. Lee, J.-T. Lee, and Y.-H. Lee, "Frequency of Sister
      Chromatid Exchange in Chrysotile-Exposed Workers," *Toxicology Letters* 108, nos. 2–3
      (1999): 315–319.

29.   H. Dönmez, Y. Özkul, and R. Uçak, "Sister Chromatid Exchange Frequency in Inhabitants
      Exposed to Asbestos in Turkey," *Mutation Research/Environmental Mutagenesis and
      Related Subjects* 361, nos. 2–3 (1996): 129–132.

30.   B. Marczynski, A. B. Czuppon, W. Marek, G. Reichel, and X. Baur, "Increased Incidence of
      DNA Double-Strand Breaks and Anti-ds DNA Antibodies in Blood of Workers Occupa-
      tionally Exposed to Asbestos," *Human and Experimental Toxicology* 13, no. 1 (1994): 3–9.

31.   B. Marczynski, T. Kerenyi, W. Marek, and X. Baur, "Induction of DNA—Damage after Rats
      Exposure to Crocidolite Asbestos Fibers," in *Cellular and Molecular Effects of Mineral
      and Synthetic Dusts and Fibres,* ed. J. M. G. Davis and M.-C. Jaurand (Berlin, Germany:
      Springer, 1994), 227–232.

32.   B. Marczynski, T. Kerenyi, A. B. Czuppon, W. Marek, and X. Baur, "Increased Incidence of
      DNA Double-Strand Breaks in Lung and Liver of Rats after Exposure to Crocidolite
      Asbestos Fibers," *Inhalation Toxicology* 6, no. 4 (1994): 395–406.

33.   K. T. Kelsey, E. Yano, H. L. Liber, and J. B. Little, "The in vitro Genetic Effects of Fibrous
      Erionite and Crocidolite Asbestos," *British Journal of Cancer* 54, no. 1 (1986): 107–114.

34.   K. Kenne, S. Ljungquist, and N. R. Ringertz, "Effects of Asbestos Fibers on Cell Division,
      Cell Survival, and Formation of Thioguanine-Resistant Mutants in Chinese Hamster
      Ovary Cells," *Environmental Research* 39, no. 2 (1986): 448–464.

35.   K. S. Lavappa, M. M. Fu, and S. S. Epstein, "Cytogenetic Studies on Chrysotile Asbestos,"
      *Environmental Research* 10, no. 2 (1975): 165–173.

36.   M. Oshimura, T. W. Hesterberg, and J. C. Barrett, "An Early, Nonrandom Karyotypic Change in Immortal Syrian Hamster Cell Lines Transformed by Asbestos: Trisomy of Chromosome 11," *Cancer Genetics and Cytogenetics* 22, no. 3 (1986): 225–237.

37.   L. D. Palekar, J. F. Eyre, B. M. Most, and D. Coffin, "Metaphase and Anaphase Analysis of V79 cells Exposed to Erionite, UICC Chrysotile and UICC Crocidolite," *Carcinogenesis* 8, no. 4 (1987): 553–560.

38.   L. D. Palekar, B. M. Most, and D. L. Coffin, "Significance of Mass and Number of Fibers in the Correlation of V79 Cytotoxicity with Tumorigenic Potential of Mineral Fibers," *Environmental Research* 46, no. 2 (1988): 142–152.

39.   A. M. Sincock, "Preliminary Studies of the In Vitro Cellular Effects of Asbestos and Fine Glass Dusts," in *Origins of Human Cancer*, vol. 1, ed. H. H. Hiatt, J. D. Watson, and J. A. Winsten (Cold Spring Harbor, NY: Cold Spring Harbor Laboratory, 1977), 941–954.

40.   A. Sincock and M. Seabright, "Induction of Chromosome Changes in Chinese Hamster Cells by Exposure to Asbestos Fibres," *Nature* 257 (September 4, 1975): 56.

41.   A. M. Sincock, J. D. A. Delhanty, and G. A. Casey, "A Comparison of the Cytogenetic Response to Asbestos and Glass Fibre in Chinese Hamster and Human Cell Lines: Demonstration of Growth Inhibition in Primary Human Fibroblasts," *Mutation Research* 101, no. 3 (1982): 257–268.

42.   R. Bueno, E. W. Stawiski, L. D. Goldstein, S. Durinck, A. De Rienzo, Z. Modrusan, F. Gnad, et al., "Comprehensive Genomic Analysis of Malignant Pleural Mesothelioma Identifies Recurrent Mutations, Gene Fusions and Splicing Alterations," *Nature Genetics* 48, no. 4 (2016): 407–416.

43.   R. J. Cote, S. C. Jhanwar, S. Novick, and A. Pellicer, "Genetic Alterations of the p53 Gene Are a Feature of Malignant Mesotheliomas," *Cancer Research* 51, no. 19 (1991): 5410–5416.

44.   V. Levresse, A. Renier, J. Fleury-Feith, F. Levy, S. Moritz, C. Vivo, Y. Pilatte, and M. C. Jaurand, "Analysis of Cell Cycle Disruptions in Cultures of Rat Pleural Mesothelial Cells Exposed to Asbestos Fibers," *American Journal of Respiratory Cell and Molecular Biology* 17, no. 6 (1997): 660–671.

45.   J. M. Arif, S. G. Khan, M. Aslam, N. Mahmood, and Q. Rahman, "Diminution in Kerosene-Mediated Induction of Drug Metabolizing Enzymes by Asbestos in Rat Lungs," *Journal of Pharmacological and Toxicological Methods* 71, no. 1 (1992): 37–40.

46.   Q. Rahman, S. G. Khan, and S. Ali, "Effect of Chrysotile Asbestos on Cytochrome P-450-Dependent Monooxygenase and Glutathione-S-Transferase Activities in Rat Lung," *Chemico-Biological Interactions* 75, no. 3 (1990): 305–313.

47.   M. J. Chang, L. B. Joseph, R. E. Stephens, and R. W. Hart, "Modulation of Biological Processes by Mineral Fiber Adsorption of Macromolecules In Vitro," *Journal of Environmental Pathology, Toxicology, and Oncology* 10, nos. 1–2 (1990): 89–93.

48.   E. G. Gendek and A. R. Brody, "Changes in Lipid Ordering of Model Phospholipid Membranes Treated with Chrysotile and Crocidolite Asbestos," *Environmental Research* 53, no. 2 (1990): 152–167.

49.   D. M. Brown, C. Fisher, and K. Donaldson, "Free Radical Activity of Synthetic Vitreous Fibers: Iron Chelation Inhibits Hydroxyl Radical Generation by Refractory Ceramic Fiber," *Journal of Toxicology and Environmental Health Part A: Current Issues* 53, no. 7 (1998): 545–561.

50.   A. Cantin, F. Dubois, and R. Bégin, "Lung Exposure to Mineral Dusts Enhances the Capacity of Lung Inflammatory Cells to Release Superoxide," *Journal of Leukocyte Biology* 43, no. 4 (1988): 299–303.

51.   B. W. Case, M. P. C. Ip, M. Padilla, and J. Kleinerman, "Asbestos Effects on Superoxide Production: An in Vitro Study of Hamster Alveolar Macrophages," *Environmental Research* 39, no. 2 (1986): 299–306.

EGILMAN ET AL., DOI: 10.1520/STP161820180080        227

52. K. Hansen and B. T. Mossman, "Generation of Superoxide (O2-·) from Alveolar Macrophages Exposed to Asbestiform and Nonfibrous Particles," *Cancer Research* 47, no. 6 (1987): 1681–1686.

53. P. Nyberg and M. Klockars, "Interferon-$\gamma$ and Immunoglobulin Enhance Mineral Dust-Induced Production of Reactive Oxygen Metabolites by Human Macrophages," *Clinical Immunology and Immunopathology* 60, no. 1 (1991): 128–136.

54. P. L. Roney and A. Holian, "Possible Mechanism of Chrysotile Asbestos-Stimulated Superoxide Anion Production in Guinea Pig Alveolar Macrophages," *Toxicology and Applied Pharmacology* 100, no. 1 (1989): 132–144.

55. S. P. Faux and P. J. Howden, "Possible Role of Lipid Peroxidation in the Induction of NF-kappa B and AP-1 in RFL-6 Cells by Crocidolite Asbestos: Evidence Following Protection by Vitamin E," *Environmental Health Perspectives* 105, Suppl. 5 (1997): 1127–1130.

56. J. G. N. Garcia, L. D. Gray, R. F. Dodson, and K. S. Callahan, "Asbestos-Induced Endothelial Cell Activation and Injury: Demonstration of Fiber Phagocytosis and Oxidant-dependent Toxicity," *American Review of Respiratory Disease* 138, no. 4 (1988): 958–964.

57. L. A. Goodglick and A. B. Kane, "Cytotoxicity of Long and Short Crocidolite Asbestos Fibers in Vitro and in Vivo," *Cancer Research* 50, no. 16 (1990): 5153 LP–5163.

58. H. Iguchi and S. Kojo, "Possible Generation of Hydrogen Peroxide and Lipid Peroxidation of Erythrocyte Membrane by Asbestos: Cytotoxic Mechanism of Asbestos," *Biochemistry international* 18 (1989): 981–990.

59. K. Kienast, C. Kaes, K. Drumm, R. Buhl, P. Micke, F. Oesch, and J. G. Hengstler, "Asbestos-Exposed Blood Monocytes—Deoxyribonucleic Acid Strand Lesions in Co-cultured Bronchial Epithelial Cells," *Scandinavian Journal of Work, Environment, and Health* 26, no. 1 (2000): 71–77.

60. L. G. Lund and A. E. Aust, "Iron Mobilization from Crocidolite Asbestos Greatly Enhances Crocidolite-Dependent Formation of DNA Single-Strand Breaks in $\phi$X174 RFI DNA," *Carcinogenesis* 13, no. 4 (1992): 637–642.

61. E. Yano, "Mineral Fiber-Induced Malondialdehyde Formation and Effects of Oxidant Scavengers in Phagocytic Cells," *International Archives of Occupational and Environmental Health* 61, no. 1 (1988): 19–23.

62. L. A. Goodglick, L. A. Pietras, and A. B. Kane, "Evaluation of the Causal Relationship between Crocidolite Asbestos-Induced Lipid Peroxidation and Toxicity to Macrophages," *American Review of Respiratory Disease* 139, no. 5 (1989): 1265–1273.

63. J. P. Kehrer, "The Haber–Weiss Reaction and Mechanisms of Toxicity," *Toxicology* 149, no. 1 (2000): 43–50.

64. M. Fontecave, M. Jaouen, D. Mansuy, D. Costa, R. Zalma, and H. Pezerat, "Microsomal Lipid Peroxidation and Oxy-Radicals Formation Are Induced by Insoluble Iron-Containing Minerals," *Biochemical and Biophysical Research Communications* 173, no. 3 (1990): 912–918.

65. T. P. Kennedy, R. Dodson, N. V. Rao, H. Ky, C. Hopkins, M. Baser, E. Tolley, and J. R. Hoidal, "Dusts Causing Pneumoconiosis Generate OH and Produce Hemolysis by Acting as Fenton Catalysts," *Archives of Biochemistry and Biophysics* 269, no. 1 (1989): 359–364.

66. M. A. Shatos, J. M. Doherty, J. P. Marsh, and B. T. Mossman, "Prevention of Asbestos-Induced Cell Death in Rat Lung Fibroblasts and Alveolar Macrophages by Scavengers of Active Oxygen Species," *Environmental Research* 44, no. 1 (1987): 103–116.

67. J. P. Marsh and B. T. Mossman, "Role of Asbestos and Active Oxygen Species in Activation and Expression of Ornithine Decarboxylase in Hamster Tracheal Epithelial Cells," *Cancer Research* 51, no. 1 (1991): 167 LP–173.

68. A. Shukla, M. Ramos-Nino, and B. Mossman, "Cell Signaling and Transcription Factor Activation by Asbestos in Lung Injury and Disease," *International Journal of Biochemistry and Cell Biology*," 35, no. 8 (2003): 1198–1209.

69.  L. G. Lund and A. E. Aust, "Mobilization of Iron from Crocidolite Asbestos by Certain Chelators Results in Enhanced Crocidolite-Dependent Oxygen Consumption," *Archives of Biochemistry and Biophysics* 287, no. 1 (1991): 91–96.

70.  C.-C. Chao, S.-H. Park, and A. E. Aust, "Participation of Nitric Oxide and Iron in the Oxidation of DNA in Asbestos-Treated Human Lung Epithelial Cells," *Archives of Biochemistry and Biophysics* 326, no. 1 (1996): 152–157.

71.  H. Fung, T. R. Quinlan, Y. M. W. Janssen, C. R. Timblin, J. P. Marsh, N. H. Heintz, D. J. Taatjes, P. Vacek, S. Jaken, and B. T. Mossman, "Inhibition of Protein Kinase C Prevents Asbestos-Induced c-fos and c-jun Proto-Oncogene Expression in Mesothelial Cells," *Cancer Research* 57, no. 15 (1997): 3101 LP–3105.

72.  C. V. Broaddus, "Asbestos, the Mesothelial Cell and Malignancy: A Matter of Life or Death," *American Journal of Respiratory Cell and Molecular Biology* 17, no. 6 (1997): 657–659.

73.  C. V. Broaddus, L. Yang, L. M. Scavo, J. D. Ernst, and A. M. Boylan, "Asbestos Induces Apoptosis of Human and Rabbit Pleural Mesothelial Cells via Reactive Oxygen Species," *Journal of Clinical Investigation* 98, no. 9 (1996): 2050–2059.

74.  B. T. Mossman, S. Faux, Y. Janssen, L. A. Jimenez, C. Timblin, C. Zanella, J. Goldberg, E. Walsh, A. Barchowsky, and K. Driscol, "Cell Signaling Pathways Elicited by Asbestos," *Environmental Health Perspectives* 105, Suppl. 5 (1997): 1121–1125.

75.  B. Su and M. Karin, "Mitogen-Activated Protein Kinase Cascades and Regulation of Gene Expression," *Current Opinion Immunology* 8, no. 3 (1996): 402–411.

76.  R. Seger and E. G. Krebs, "The MAPK Signaling Cascade," *FASEB Journal* 9 (1995): 726–735.

77.  T. R. Quinlan, J. P. Marsh, Y. M. Janssen, K. O. Leslie, D. Hemenway, P. Vacek, and B. T. Mossman, "Dose-Responsive Increases in Pulmonary Fibrosis after Inhalation of Asbestos," *American Journal of Respiratory Critical Care Medicine* 150, no. 1 (1994): 200–206.

78.  T. R. Quinlan, K. A. BéruBé, J. P. Marsh, Y. M. Janssen, P. Taishi, K. O. Leslie, D. Henenway, P. T. O'Shaughnessy, P. Vacek, and B. T. Mossman, "Patterns of Inflammation, Cell Proliferation, and Related Gene Expression in Lung after Inhalation of Chrysotile Asbestos," *American Journal of Pathology* 147, no. 3 (1995): 728–739.

79.  B. Mossman, A. Hubbard, A. Shukla, and C. R. Timblin, "Role of Mitogen-Activated Protein Kinases, Early Response Protooncogenes, and Activator Protein-1 in Cell Signaling by Asbestos," *Inhalation Toxicology* 12, Suppl. 3 (2000): 307–316.

80.  M. Ding, Z. Dong, F. Chen, D. Pack, W.-Y. Ma, J. Ye, X. Shi, V. Castranova, and V. Vallyathan, "Asbestos Induces Activator Protein-1 Transactivation in Transgenic Mice," *Cancer Research* 59, no. 8 (1999): 1884–1889.

81.  K. E. Driscoll, J. M. Carter, D. G. Hassenbein, and B. Howard, "Cytokines and Particle-Induced Inflammatory Cell Recruitment," *Environmental Health Perspectives* 105, Suppl. 5 (1997): 1159–1164.

82.  N. Cheng, X. Shi, J. Ye, V. Castranova, F. Chen, S. S. Leonard, V. Vallyathan, and Y. Rojanasakul, "Role of Transcription Factor NF-κB in Asbestos-Induced TNFα Response from Macrophages," *Experimental and Molecular Pathology* 66, no. 3 (1999): 201–210.

83.  D. W. Kamp, G. Liu, P. Cheresh, S.-J. Kim, A. Mueller, A. P. Lam, H. Trejo, D. Williams, S. Tulasiram, M. Baker, K. Ridge, N. S. Chandel, and R. Beri, "Asbestos-Induced Alveolar Epithelial Cell Apoptosis. The Role of Endoplasmic Reticulum Stress Response," *American Journal of Respiratory Cell and Molecular Biology* 49, no. 6 (2013): 892–901.

84.  A. Aljandali, H. Pollack, A. Yeldandi, Y. LI, S. A. Weitzman, and D. W. Kamp, "Asbestos Causes Apoptosis in Alveolar Epithelial Cells: Role of Iron-Induced Free Radicals," *Journal of Laboratory and Clinical Medicine* 137, no. 5 (2001): 330–339.

85.  V. Panduri, S. A. Weitzman, N. S. Chandel, and D. W. Kamp, "Mitochondrial-Derived Free Radicals Mediate Asbestos-Induced Alveolar Epithelial Cell Apoptosis," *American Journal of Physiology Cellular and Molecular Physiology* 286, no. 6 (2004): L1220–L1227.

86.  E. Belluso, A. Cavallo, and D. Halterman, "Crystal Habit of Mineral Fibres," in *EMU Notes in Mineralogy 18*, ed. A. F. Gualtieri (Middlesex, UK: Mineralogical Society of Great Britain and Ireland, 2017), 65–110.

87.  R. Gaze, "The Physical and Molecular Structure of Asbestos," *Annals of the New York Academy of Sciences* (December 1965): 23–30.

88.  C. W. Skinner, M. Ross, and C. Frondell, *Asbestos and Other Fibrous Materials: Mineralogy, Crystal Chemistry, and Health Effects* (Oxford: Oxford University Press, 1988).

89.  A. N. Rohl and A. M. Langer, "Identification and Quantitation of Asbestos in Talc," *Environmental Health Perspectives* 9 (1974): 95–109.

90.  A. M. Langer, R. P. Nolan, and F. D. Pooley, "Phyllosilicates: Associated Fibrous Minerals," in *Health Related Effects of Phyllosilicates*, ed. J. Bignon (Berlin, Germany: Springer, 1990), 59–74.

91.  J. W. Pier, "Summary of Asbestos Analysis Options for *Talc. Lanzo v. Cyprus Amax Minerals Co, et al.*, 2007," p. IMERYS430406-9, http://web.archive.org/web/20190401214410/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/IMERYS288673.pdf

92.  R. Zazenski, J. Ferret, M. Refregier, P. Delord, and L. Jones, "Talc/Asbestos Position Paper" (Toulouse, France: Luzenac Group, December 23, 2003), p. IMERYS288673-80, http://web.archive.org/web/20190401214410/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/IMERYS288673.pdf

93.  *Standard Test Method for Airborne Asbestos Concentration in Ambient and Indoor Atmospheres as Determined by Transmission Electron Microscopy Direct Transfer (TEM)*, ASTM D6281−15 (West Conshohocken, PA: ASTM International, approved December 1, 2015), https://doi.org/10.1520/D6291-15

94.  M. Harper, E. G. Lee, S. S. Doorn, and O. Hammond, "Differentiating Non-Asbestiform Amphibole and Amphibole Asbestos by Size Characteristics," *Journal of Occupational and Environmental Hygiene* 5, no. 12 (2008): 761–770.

95.  A. Miller, "Statement of Captain Aubrey Miller, MD, MPH, U.S. Public Health Service, Region 8, U.S. Environmental Protection Agency, before the Committee on Environment and Public Works, U.S. Senate," June 12, 2007, http://web.archive.org/web/20190401214507/https://archive.epa.gov/ocir/hearings/testimony/110_2007_2008/web/pdf/2007_0612_am.pdf

96.  M. Harper, E. G. Lee, J. E. Slaven, and D. L. Bartley, "An Inter-Laboratory Study to Determine the Effectiveness of Procedures for Discriminating Amphibole Asbestos Fibers from Amphibole Cleavage Fragments in Fiber Counting by Phase-Contrast Microscopy," *Annals of Occupational Hygiene* 56, no. 6 (2012): 645–659.

97.  M. Germine, *Asbestiform and Non-Asbestiform Amphiboles, Cadmium and Zinc in Quarry Samples of Marble from Franklin and Sparta, Sussex County, New Jersey,* New Jersey Geological Survey Geologic Report 15 (Trenton, NJ: New Jersey Department of Environmental Protection, 1986), http://web.archive.org/web/20190917155646/https://www.state.nj.us/dep/njgs/pricelst/gsreport/gsr15.pdf

98.  R. J. S. Teixeira, A. M. R. Neiva, and M. E. P. Gomes, "Geochemistry of Amphibole Asbestos from Northeastern Portugal and Its Use in Monitoring the Environmental Impact of Asbestos from Quarrying," *Comunicações Geológicas* 97, no. 1 (2010): 99–112.

99.  Rio Tinto Minerals, Exhibit PLT-00008-0001, *Ingham et al. v Johnson & Johnson et al.*, 2008, p. IMERYS442002-4, http://web.archive.org/web/20190401214733/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/PLT-00008-0001.pdf

100. B. S. Van Gosen, H. A. Lowers, and S. J. Sutley, *A USGS Study of Talc Deposits and Associated Amphibole Asbestos within Mined Deposits of the Southern Death Valley Region, California*, U.S. Geological Survey Open-File Rep 2004-1092 (Reston, VA: U.S. Geological Survey, 2004), https://doi.org/10.3133/ofr20041092

101.  J. E. Schiller and S. L. Payne, *Surface Charge Measurements of Amphibole Cleavage Fragments and Fibers* (Washington, DC: U.S. Dept. of the Interior, Bureau of Mines, 1980).

102.  A. M. Langer and R. P. Nolan, "Chrysotile: Its Occurrence and Properties as Variables Controlling Biological Effects," *Annals of Occupational Hygiene* 38, no. 4 (1994): 407.

103.  M. A. Vos, "Industrial Mineral Report 36: Asbestos in Ontario" (Ontario, Canada: Ontario Department of Mines and Northern Affairs, 1971).

104.  *Air Contaminants, Occupational Safety and Health Standards for Shipyard Employment, Toxic and Hazardous Substances—Air Contaminants*, OSHA Standard 1915.1000-2017, http://web.archive.org/web/20190401215023/https://www.osha.gov/laws-regs/regulations/standardnumber/1915/1915.1000

105.  K. Straif, L. Benbrahim-Tallaa, R. Baan, Y. Grosse, B. Secretan, F. El Ghissassi, V. Bouvard, et al., "A Review of Human Carcinogens—Part C: Metals, Arsenic, Dusts, and Fibres," *Lancet Oncology* 10, no. 5 (2009): 453–454.

106.  B. W. Case, "On Talc, Tremolite, and Tergiversation," *British Journal of Industrial Medicine* 48, no. 5 (1991): 357–359.

107.  M. F. Stanton, M. Layard, A. Teregis, E. Miller, M. May, E. Morgan, and A. Smith, "Relation of Particle Dimension to Carcinogenicity in Amphibole Asbestosis and Other Fibrous Minerals," *Journal of the National Cancer Institute* 67, no. 5 (1981): 965–981.

108.  J. M. Davis, J. Addison, C. McIntosh, B. G. Miller, and K. Niven, "Variations in the Carcinogenicity of Tremolite Dust Samples of Differing Morphology," *Annals of the New York Academy of Sciences* 643 (1991): 473–490.

109.  S. Furuya, O. Chimed-Ochir, K. Takahashi, A. David, and J. Takala, "Global Asbestos Disaster," *International Journal of Environmental Research and Public Health* 15, no. 5 (2018): 1000.

110.  V. McCormack, J. Peto, G. Byrnes, K. Straif, and P. Boffetta, "Estimating the Asbestos-Related Lung Cancer Burden from Mesothelioma Mortality," *British Journal of Cancer* 106, no. 3 (2012): 575–584.

111.  D. Egilman and T. Tran, "A Commentary on Roggli's 'The So-Called Short-Fiber Controversy'," *International Journal of Occupational and Environmental Health* 22, no. 3 (2016): 181–186.

112.  Eastern Research Group, Inc., *Report on the Expert Panel on Health Effects of Asbestos and Synthetic Vitreous Fibers: The Influence of Fiber Length* (Atlanta, GA: Agency for Toxic Substances and Disease Registry, 2003), http://web.archive.org/web/20190401215134/https://www.atsdr.cdc.gov/hac/asbestospanel/asbestostoc.html

113.  A. R. Gibbs, M. Stephens, D. M. Griffiths, B. J. Blight, and F. D. Pooley, "Fibre Distribution in the Lungs and Pleura of Subjects with Asbestos Related Diffuse Pleural Fibrosis," *British Journal of Industrial Medicine* 48, no. 11 (1991): 762–770.

114.  P. Sebastien, X. Janson, A. Gaudichet, A. Hirsch, and J. Bignon, "Asbestos Retention in Human Respiratory Tissue: Comparative Measurements in Lung Parenchyma and in Parietal Pleura," *IARC Scientific Publications* 30 (1980): 237–246.

115.  M. M. Finkelstein, "Pneumoconiosis and Malignant Mesothelioma in a Family Operated Metal Casting Business That Used Industrial Talc from New York State," *American Journal of Industrial Medicine* 56, no. 5 (2013): 550–555.

116.  M. Gunter, Trial testimony, *Fishbain v. Colgate-Palmolive Company et al. Superior Court of New Jersey Law Division—Middlesex County*, Docket Number MID-L-5633-13AS, 2015, p. 973–976, http://web.archive.org/web/20190401215247/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/2015/%20Gunter%20Testimony%20%28Fishbain%20v%20Colgate-Palmolive%29.pdf

117.  M. Finkelstein, "Reply to Letter by Nolan and Colleagues—Re: The Carcinogenicity of New York State Talc Dusts in Humans," *American Journal of Industrial Medicine* 56, no. 9 (2013): 1119–1124.

118.  A. D. McDonald, B. W. Case, A. Churg, A. Dufresne, G. W. Gibbs, P. Sebastien, and J. C. McDonald, "Mesothelioma in Quebec Chrysotile Miners and Millers: Epidemiology and Aetiology," *Annals of Occupational Hygiene* 41, no. 6 (1997): 707–719.

119.  M. S. Stewart, Deposition Exhibit 27, *Booker v. BASF Catalysts et al.*, 2017, http://web.archive.org/web/20190401215426/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/Stewart%20Ex%2027%20%282017%29%20%5BREDACTED%5D.pdf

120.  M. Germine and J. H. Puffer, "Analytical Transmission Electron Microscopy of Amphibole Fibers From the Lungs of Quebec Miners," *Archives of Environmental & Occupational Health* 70 (2015): 323–331.

121.  M. J. Hull, J. L. Abraham, and B. W. Case, "Mesothelioma among Workers in Asbestiform Fiberbearing Talc Mines in New York State," *Annals of Occupational Hygiene* 46, Suppl. 1 (2002): 132–135.

122.  E. M. Allen, B. H. Alexander, R. F. MacLehose, G. Ramachandran, and J. H. Mandel, "Mortality Experience among Minnesota Taconite Mining Industry Workers," *Occupational and Environmental Medicine* 71, no. 11 (2014): 744 LP–749.

123.  C. S. Lambert, B. H. Alexander, G. Ramachandran, R. F. MacLehose, H. H. Nelson, A. D. Ryan, and J. H. Mandel, "A Case-Control Study of Mesothelioma in Minnesota Iron Ore (Taconite) Miners," *Occupational and Environmental Medicine* 73, no. 2 (2016): 103–109.

124.  J. H. Mandel and N. U. Odo, "Mesothelioma and Other Lung Disease in Taconite Miners; the Uncertain Role of Non-Asbestiform EMP," *Toxicology and Applied Pharmacology* 361 (2018): 7–12.

125.  J. Mandel, *Minnesota Taconite Workers Health Study–Final Presentation to Lung Health Partnership* (Hibbing, MN: University of Minnesota, 2014), http://web.archive.org/web/20190401215513/http://taconiteworkers.umn.edu/news/documents/TacpresentA12012014%20Final.pdf

126.  D. Bernstein, "Toxicology of the Lung," in *Toxicology of the Lung*, 4th ed., ed. D. Gardner (Boca Raton, FL: Taylor & Francis, 2006), 461–500.

127.  National Institute for Occupational Safety and Health, *Criteria for a Recommended Standard: Occupational Exposure to Asbestos* (Washington, DC: NIOSH, 1972), https://web.archive.org/web/20190917160931/https://www.cdc.gov/niosh/docs/72-10267/pdfs/7210267.pdf?id=10.26616/NIOSHPUB7210267

128.  National Institute for Occupational Safety and Health, *Workplace Exposure to Asbestos: Review and Recommendations* (Washington, DC: NIOSH-OSHA Asbestos Work Group, 1980).

129.  Y. Suzuki, S. R. Yuen, and R. Ashley, "Short, Thin Asbestos Fibers Contribute to the Development of Human Malignant Mesothelioma: Pathological Evidence," *International Journal of Hygiene and Environmental Health* 208, no. 3 (2005): 201–210.

130.  F. D. Pooley and N. J. Clark, "A Comparison of Fibre Dimensions in Chrysotile, Crocidolite and Amosite Particles from Samples of Airborne Dust and Post-Mortem Lung Tissue Specimens," *IARC Scientific Publications* 30 (1980): 79–86.

131.  E. Bossard, I. Stolkin, M. A. Spycher, and J. R. Ruttner, "Quantification and Particle Size Distribution of Inhaled Fibres in the Lung," *IARC Scientific Publications* (1980): 35–41.

132.  Y. Suzuki, S. Yuen, R. Ashley, and R. Calderaro, "Asbestos Fibers and Human Malignant Mesothelioma," in *Proceeding of the 9th International Conference on Occupational Respiratory Diseases*, ed. K. Chiyotani, Y. Hosoda, and Y. Aizawa (Kyoto, Japan: Elsevier, 1998), 709–713.

133.  Y. Suzuki and S. R. Yuen, "Asbestos Tissue Burden Study on Human Malignant Mesothelioma," *Industrial Health* 39 (2001): 150–160.

134.  R. F. Dodson, M. A. L. Atkinson, and J. L. Levin, "Asbestos Fiber Length as Related to Potential Pathogenicity: A Critical Review," *American Journal of Industrial Medicine* 44 (2003): 291–297.

135. G. Adib, F. Labreche, L. DeGuire, C. Dion, and A. Dufresne, "Short, Fine and WHO Asbestos Fibers in the Lungs of Quebec Workers with an Asbestos-Related Disease," *American Journal of Industrial Medicine* 56 (2013): 1001–1014.

136. H. W. Glen, ed., *Proceedings of Asbestos Symposium, Johannesburg 3–7 October 1977* (Randburg, South Africa: National Institute for Metallurgy, Randburg, South Africa 1978).

137. B. Bellmann, H. Muhle, F. Pott, H. Konig, H. Kloppel, and K. Spurny, "Persistence of Man-Made Mineral Fibres (MMMF) and Asbestos in Rat Lungs," *Annals of Occupational Hygiene* 31, no. 4B (1987): 693–709.

138. M. M. Finkelstein and A. Dufresne, "Inferences on the Kinetics of Asbestos Deposition and Clearance among Chrysotile Miners and Millers," *American Journal of Industrial Medicine* 35, no. 4 (1999): 401–412.

139. T. W. Hesterberg, G. Chase, C. Axten, W. C. Miller, R. P. Musselman, O. Kamstrup, J. Hadley, C. Morscheidt, D. M. Berstein, and P. Thevenaz, "Biopersistence of Synthetic Vitreous Fibers and Amosite Asbestos in the Rat Lung Following Inhalation," *Toxicology and Applied Pharmacology* 151, no. 2 (1998): 262–275.

140. A. Morgan, R. J. Talbot, and A. Holmes, "Significance of Fibre Length in the Clearance of Asbestos Fibres from the Lung," *British Journal of Industrial Medicine* 35, no. 2 (1978): 146–153.

141. V. L. Roggli, M. H. George, and A. R. Brody, "Clearance and Dimensional Changes of Crocidolite Asbestos Fibers Isolated from Lungs of Rats Following Short-Term Exposure," *Environmental Research* 42, no. 1 (1987): 94–105.

142. A. Searl, "A Comparative Study of the Clearance of Respirable Para-aramid, Chrysotile and Glass Fibres from Rat Lungs," *Annals of Occupational Hygiene* 41, no. 2 (1997): 217–233.

143. D. B. Warheit, S. I. Snajdr, M. A. Hartsky, and S. R. Frame, "Lung Proliferative and Clearance Responses to Inhaled Para-Aramid RFP in Exposed Hamsters and Rats: Comparisons with Chrysotile Asbestos Fibers," *Environmental Health Perspectives* 105, Suppl. 5 (1997): 1219–1222.

144. P. A. Moalli, J. L. MacDonald, L. A. Goodglick, and A. B. Kane, "Acute Injury and Regeneration of the Mesothelium in Response to Asbestos Fibers," *American Journal of Pathology* 128, no. 3 (1987): 426–445.

145. G. D. Hanley, S. Kess, Y. W. Stevens, S. Wilbur, M. Williams, *Toxicological Profile for Asbestos (Update)* (Atlanta, GA: Agency for Toxic Substances and Disease Registry, 2011).

146. E. King, J. Clegg, and W. Rae, "The Effects of Asbestos, and of Asbestos and Aluminum, on the Lungs of Rabbits," *Thorax* 1, no. 3 (1946): 188–197.

147. F. Pott, F. Huth, and K. H. Friedrichs, "Tumorigenic Effect of Fibrous Dust in Experimental Animals," *Environmental Health Perspectives* 9 (1974): 313–315.

148. J. Dunnigan, "Biological Effects of Fibers: Stanton's Hypothesis Revisited," *Environmental Health Perspectives* 57 (1984): 333–337.

149. P. Gross, R. T. P. De Treville, and L. J. Cralley, "Studies on the Carcinogenic Effects of Asbestos Dust," in *Pneumoconiosis Proceedings of the International Conference, Johannesburg*, ed. H. A. Shapiro (Cape Town, South Africa: Oxford Univesity Press, 1969), 220–224.

150. A. Churg, J. L. Wright, L. DePaoli, and B. Wiggs, "Mineralogic Correlates of Fibrosis in Chrysotile Miners and Millers," *American Review of Respiratory Disease* 139, no. 4 (1989): 891–896.

151. L. Stayner, E. Kuempel, S. Gilbert, M. Hein, and J. Dement, "An Epidemiological Study of the Role of Chrysotile Asbestos Fibre Dimensions in Determining Respiratory Disease Risk in Exposed Workers," *Occupational and Environmental Medicine* 65, no. 9 (2008): 613–619.

152. D. Loomis, J. Dement, D. Richardson, and S. Wolf, "Asbestos Fibre Dimensions and Lung Cancer Mortality among Workers Exposed to Chrysotile," *Occupational and Environmental Medicine* 67, no. 9 (2010): 580–584.

153. D. Loomis, J. M. Dement, L. Elliott, D. Richardson, E. D. Kuempel, and L. Stayner, "Increased Lung Cancer Mortality among Chrysotile Asbestos Textile Workers Is More Strongly Associated with Exposure to Long Thin Fibres," *Occupational and Environmental Medicine* 69, no. 8 (2012): 564–568.

154. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans, *Arsenic, Metals, Fibres, and Dusts*, IARC Monographs, vol. 100C (Lyon, France: International Agency for Research on Cancer, 2012).

155. A. N. Rohl, A. M. Langer, I. J. Selikoff, A. Tordini, R. Klimentidis, D. R. Bowes, and D. L. Skinner, "Consumer Talcums and Powders: Mineral and Chemical Characterization," *Journal of Toxicology and Environmental Health* 2 (1976): 255–284.

156. R. L. Perkins and B. W. Harvey, *Test Method for the Determination of Asbestos in Bulk Building Materials*, EPA/600/R-93/116 (Research Triangle Park, NC: U.S. Environmental Protection Agency, 1993).

157. T. Ashcroft, "The Optical and Electron Microscopic Determination of Pulmonary Asbestos Fibre Concentration and Its Relation to the Human Pathological Reaction," *Journal of Clinical Pathology* 26 (1973): 11.

158. C. Y. Hwang and G. W. Gibbs, "The Dimensions of Airborne Asbestos Fibres–I. Crocidolite from Kuruman Area, Cape Province, South Africa," *Annals of Occupational Hygiene* 24, no. 1 (1981): 23–41.

159. National Institute for Occupational Health and Safety, "Asbestos and Other Fibers by PCM, Method 7400, Issue 2," in *NIOSH Manual of Analytical Methods (NMAM)*, 4th ed. (Washington, DC: NIOSH, 1994).

160. L. H. Block, D. Beckes, J. Ferret, G. Meeker, A. Miller, R. Osterberg R, D. M. Patil, et al., "Stimuli to the Revision Process: Modernization of Asbestos Testing in USP Talc," *Pharmacopeial Forum* 40, no. 4 (2014), https://web.archive.org/web/20190927150501/http://www.asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/USP%20Stimuli.pdf.

161. J. M. Millette, "Procedure for the Analysis of Talc for Asbestos," *Journal of Microscopy* 63, no. 1 (2015): 11–20.

162. C. Y. Hwang, "Size and Shape of Airborne Asbestos Fibres in Mines and Mills," *British Journal of Industrial Medicine* 40, no. 3 (1983): 273–279.

163. C. Y. Hwang and Z. M. Wang, "Comparison of Methods of Assessing Asbestos Fiber Concentrations," *Archives of Occupational and Environmental Health* 38, no. 1 (1983): 5–10.

164. L. Paoletti, S. Caiazza, G. Donelli, and S. F. Pocchiari, "Evaluation by Electron Microscopy Techniques of Asbestos Contamination in Industrial, Cosmetic, and Pharmaceutical Talcs," *Regulatory Toxicology and Pharmacology* 4 (1984): 222–235.

165. K. B. Shedd, *Report of Investigations 8998: Fiber Dimensions of Crocidolites from Western Australia, Bolivia, and the Cape and Transvaal Provinces of South Africa* (Washington, DC: U.S. Department of the Interior, U.S. Bureau of Mines, 1985).

166. M. Lippmann, "Asbestos Exposure Indices," *Environmental Research* 46, no. 1 (1988): 86–106.

167. A. R. Gibbs, D. M. Griffiths, F. D. Pooley, J. S. P. Jones, "Comparison of Fiber Types and Size Distributions in Lung Tissues of Paraoccupational and Occupational Cases of Malignant Mesothelioma," *British Journal of Industrial Medicine* 47 (1990): 621–626.

168. R. F. Dodson, D. R. Brooks, M. O'Sullivan, S. P. Hammar, "Quantitative Analysis of Asbestos Burden in a Series of Individuals with Lung Cancer and a History of Exposure to Asbestos," *Inhalation Toxicology* 16, no. 9 (2004): 637–647.

169. J. C. Wagner, G. Berry, and V. Timbrell, "Mesotheliomata in Rats after Inoculation with Asbestos and Other Materials," *British Journal of Cancer* 28, no. 2 (1973): 173–185.

170. V. Timbrell, D. M. Griffiths, and F. D. Pooley, "Possible Biological Importance of Fibre Diameters of South African Amphiboles," *Nature* 232 (1971): 55–56.

171. A. J. Gude and R. A. Sheppard, "Woolly Erionite from the Reese River Zeolite Deposit, Lander County, Nevada, and Its Relationship to Other Erionites," *Clays and Clay Minerals* 29, no. 5 (1981): 378–384.

172.  H. Lowers, D. T. Adams, G. P. Meeker, and C. J. Nutt, *Chemical and Morphological Comparison of Erionite from Oregon, North Dakota, and Turkey* (Denver, CO: U.S. Department of the Interior, USGS, 2010), https://doi.org/10.3133/ofr20101286

173.  M. Metintas, G. Hillerdal, S. Metintas, and P. Dumortier, "Endemic Malignant Mesothelioma: Exposure to Erionite Is More Important Than Genetic Factors," *Archives of Environmental and Occupational Health* 65, no. 2 (2010): 86–93.

174.  A. Pacella, C. Cremisini, E. Nardi, M. R. Montereali, I. Pettiti, M. Giordani, M. Mattioli, and P. Ballirano, "Different Erionite Species Bind Iron into the Structure: A Potential Explanation for Fibrous Erionite Toxicity," *Minerals* 8, no. 2 (2018): 36.

175.  R. L. Attanoos, A. Churg, F. Galateau-Salle, A. R. Gibbs, and V. L. Rogglie, "Malignant Mesothelioma and Its Non-Asbestos Causes," *Archives of Pathology and Laboratory Medicine* 142, no. 6 (2018): 753–760.

176.  P. Dumortier, L. Coplü, I. Broucke, S. Emri, T. Selcuk, V. de Maertelaer, P. De Vuyst, and I. Baris, "Erionite Bodies and Fibres in Bronchoalveolar Lavage Fluid (BALF) of Residents from Tuzköy, Cappadocia, Turkey," *Occupational and Environmental Medicine* 58, no. 4 (2001): 261–266.

177.  B. Jasani and A. Gibbs, "Mesothelioma Not Associated with Asbestos Exposure," *Archives of Pathology and Laboratory Medicine* 136, no. 3 (2012): 262–267.

178.  N. H. Heintz, Y. M. Janssen, and B. T. Mossman, "Persistent Induction of c-fos and c-jun Expression by Asbestos," *Proceedings of the National Academy of Sciences of the United States of America* 90, no. 8 (1993): 3299–3303.

179.  C. R. Timblin, G. D. Guthrie, Y. W. M. Janssen, E. S. Walsh, P. Vacek, and B. T. Mossman, "Patterns of c-*fos* and c-*jun* Proto-Oncogene Expression, Apoptosis, and Proliferation in Rat Pleural Mesothelial Cells Exposed to Erionite or Asbestos Fibers," *Toxicology and Applied Pharmacology* 151, no. 1 (1998): 88–97.

180.  A. Poole, R. C. Brown, C. J. Turver, J. W. Skidmore, and D. M. Griffiths, "In Vitro Genotoxic Activities of Fibrous Erionite," *British Journal of Cancer* 47 (1983): 697–705.

181.  K. R. Spurny, "Natural Fibrous Zeolites and Their Carcinogenicity—A Review," *Science of the Total Environment* 30 (1983): 147–166.

182.  Y. Suzuki and N. Kohyama, "Malignant Mesothelioma Induced by Asbestos and Zeolite in the Mouse Peritoneal Cavity," *Environmental Research* 35, no. 1 (1984): 277–292.

183.  C. Maltoni, F. Minardi, and L. Morisi, "Pleural Mesotheliomas in Sprague-Dawley Rats by Erionite: First Experimental Evidence," *Environmental Research* 29 (1982): 238–244.

184.  M. Ozesmi, T. E. Patiroglu, G. Hillerdal, and C. Ozesmi, "Peritoneal Mesothelioma and Malignant Lymphoma in Mice Caused by Fibrous Zeolite," *British Journal of Industrial Medicine* 42, no. 11 (1985): 746–749.

185.  L. Simonato, R. Baris, R. Saracci, J. Skidmore, and R. Winkelmann, "Relation of Environmental Exposure to Erionite Fibres to Risk of Respiratory Cancer," in *IARC Scientific Publications No. 90*, ed. J. Bignon, J. Peto, and R. Saracci (Lyon, France: International Agency for Research on Cancer, 1989), 398–405.

186.  M. Artvinli and Y. I. Baris, "Malignant Mesotheliomas in a Small Village in the Anatolian Region of Turkey: An Epidemiologic Study," *Journal of the National Cancer Institute* 63 (1979): 17–22.

187.  B. Baris, A. U. Demir, V. Shehu, Y. Karakoca, G. Kisacik, and Y. I. Baris, "Environmental Fibrous Zeolite (Erionite) Exposure and Malignant Tumors Other Than Mesothelioma," *Journal of Environmental Pathology, Toxicology, and Oncology* 15, nos. 2–4 (1996): 183–189.

188.  Y. I. Baris and P. Grandjean, "Prospective Study of Mesothelioma Mortality in Turkish Villages with Exposure to Fibrous Zeolite," *Journal of the National Cancer Institute* 98, no. 6 (2006): 414–417.

189.  M. Metintas, G. Hillerdal, and S. Metintas, "Malignant Mesothelioma Due to Environmental Exposure to Erionite: Follow-Up of a Turkish Emigrant Cohort," *European Respiratory Journal* 13, no. 3 (1999): 523–526.

190. M. A. Ortega-Guerrero, G. Carrasco-Nunez, H. Barragan-Campos, and M. R. Ortega, "High Incidence of Lung Cancer and Malignant Mesothelioma Linked to Erionite Fibre Exposure in a Rural Community in Central Mexico," *Occupational and Environmental Medicine* 72, no. 3 (2015): 216–218.

191. International Agency for Research on Cancer (IARC), "Erionite," in *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans* (Lyon, France: International Agency for Research on Cancer, 2012), 311–316.

192. M. Ross, "A Definition for Talc," in *Definitions for Asbestos and Other Health-Related Silicates*, ed. B. Levadie (West Conshohocken, PA: ASTM International, 1984), 193–197.

193. A. Wylie, Comments on the Document Entitled "Talc, Asbestiform and Non-Asbestiform: Result of the NIEHS Report on Carcinogens Review Group Review" (U.S. Department of Health and Human Services, National Toxicology Program, 2000), http://web.archive.org/web/20190401215945/https://ntp.niehs.nih.gov/pubhealth/roc/zarchive/othernoms/t/talc/archive/index.html

194. IARC Working Group on the Evaluation of Carcinogenic Risks to Humans, *Carbon Black, Titanium Dioxide, and Talc,* IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, vol. 93 (Lyon, France: International Agency for Research on Cancer, 2010).

195. R. L. Virta, *The Phase Relationship of Talc and Amphiboles in a Fibrous Talc Sample* (Washington, DC: U.S. Department of the Interior, U.S. Bureau of Mines, 1985).

196. N. Jayaraman, "Alteration of Tremolite to Talc in the Dolomite Marbles of Yellandu Warangal District (Hyderabad, DN.)," *Proceedings of the Indian Academy of Sciences—Section A* 12, no. 1 (1940): 65.

197. S. I. Stemple and W. G. Brindley, "A Structural Study of Talc and Talc-Tremolite Relations," *Journal of the American Ceramic Society* 43 (2006): 34–42.

198. "Part 1910—Occupational Safety and Health Standards, Subpart G—Occupational Health and Environmental Control," *Federal Register* 37, no. 202 (1972): 22139–2263.

199. C. K. Mallory, "Part 57—Occupational Health and Safety Standards—Metal and Nonmetallic Underground Mines, Miscellaneous Amendments," *Federal Register* 39, no. 127 (1974): 24319.

200. R. E. Lomas, *Inter-Department Memorandum RE: MSHA Criteria Dust & Fiber, Eastern Magnesia Talc Company,* 1979, https://web.archive.org/web/20190917165808/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/1979.08.03%20Emtal%20MSHA%20Citation%20memo.pdf

201. "Occupational Health and Safety Standards—Talc (Containing No Asbestos)," *Federal Register* 54, no. 12 (1989): 2526–2527.

202. A. J. Ghio and V. Roggli, "Talc Should Not be Used for Pleurodesis in Patients with Nonmalignant Pleural Effusions," *American Journal of Respiratory and Critical Care Medicine* 164, no. 9 (2001): 1741.

203. A. J. Ghio, J. M. Soukup, L. A. Dailey, J. H. Richards, J. L. Turi, E. N. Pavlisko, and V. L. Roggli, "Disruption of Iron Homeostasis in Mesothelial Cells after Talc Pleurodesis," *American Journal of Respiratory Cell and Molecular Biology* 46, no. 1 (2012): 80–86.

204. V. L. Roggli, Deposition Testimony, *O'Boyle v. A.W. Chesterton Company et al.*, Iowa District Court for Polk County, Case Number CL 106817, 2009, p. 53–59, http://web.archive.org/web/20190401220412/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/2009.04.16%20Roggli%20deposition%20%28O%27Boyle%29.pdf

205. V. L. Roggli, R. T. Vollmer, K. J. Butnor, and T. A. Sporn, "Tremolite and Mesothelioma," *Annals of Occupational Hygiene* 46, no. 5 (2002): 447–453.

206. C. J. Carr, Fax to Dr. Stephen D. Gettings (CTFA), SUBJECT: Talc Meeting—Boorman's MS, 1994, p. IMERYS212328-32, http://web.archive.org/web/20190401220601/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/IMERYS212328.pdf

207. A. E. Gibbs, F. D. Pooley, D. M. Griffiths, R. Mitha, J. E. Craighead, and J. R. Ruttner, "Talc Pneumoconiosis: A Pathologic and Mineralogic Study," *Human Pathology* 23, no. 12 (1992): 1344–1354.

208. R. F. Dodson, M. O'Sullivan, C. J. Corn, and S. P. Hammar, "Quantitative Comparison of Asbestos and Talc Bodies in an Individual with Mixed Exposure," *American Journal of Industrial Medicine* 27 (1995): 207–215.

209. H. Fujiwara, T. Kamimori, K. Morinaga, Y. Takeda, N. Kohyama, Y. Miki, K. Inai, and S. Yamamoto, "An Autopsy Case of Primary Pericardial Mesothelioma in Arc Cutter Exposed to Asbestos through Talc Pencils," *Industrial Health* 43, no. 2 (2005): 346–350.

210. R. E. Gordon, S. Fitzgerald, and J. Millette, "Asbestos in Commercial Cosmetic Talcum Powder as a Cause of Mesothelioma in Women," *International Journal of Occupational and Environmental Health* 20, no. 4 (2014): 318–332.

211. Colorado School of Mines Research Institute, *Geology and Ore Reserves, Hammondsville Mine, Geological Audit, Windsor Minerals File #124*, 1970, p. JNJ000306020-179, http://web.archive.org/web/20190401220712/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/JNJ000306020.pdf

212. National Toxicology Program, "Toxicology and Carcinogenesis Studies of Talc (Non-Asbestiform) in F344/N Rats and B6C3F1 Mice (Inhalation Studies)," Technical Report Series 421 (Research Triangle Park, NC: NTP, September 1993), http://web.archive.org/web/20191029124937/https://ntp.niehs.nih.gov/ntp/htdocs/lt_rpts/tr421.pdf

213. S. D. Gettings, Letter to Dr. Gary A. Boorman (NIEHS), 1994, p. JNJ000377002, http://web.archive.org/web/20190401220810/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/JNJ000377002.pdf

214. W. H. Ashton (J&J), Letter to Dr. S. Gettings (CTFA) and Ms. Pandora Dennis (CTFA), SUBJECT: 94-TA-45 Boorman Final Minutes, 1994, p. JNJ000085290, http://web.archive.org/web/20190401220846/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/JNJ000085290.pdf

215. G. A. Boorman and J. C. Seely, "The Lack of an Ovarian Effect of Lifetime Talc Exposure in F344/N Rats and B6C3F1 Mice," *Regulatory Toxicology and Pharmacology* 21 (1995): 242–243.

216. T. Faynberg, N. Patel, A. P. Nayar, and A. J. Shienbaum, "Mesothelioid Reaction Following Talc Pleurodesis: A Case Report," *General Thoracic and Cardiovascular Surgery* 65, no. 11 (2017): 667–669.

217. *Standard Terminology for Sampling and Analysis of Asbestos*, ASTM D7712-18 (West Conshohocken, PA: ASTM International, approved June 12, 2018), http://doi.org/10.1520/D7712-18

218. *Standard Practice for Sampling and Counting Airborne Fibers, Including Asbestos Fibers*, in *Mines and Quarries, by Phase Contrast Microscopy and Transmission Electron Microscopy*, ASTM D7200-12 (West Conshohocken, PA: ASTM International, approved October 15, 2012), http://doi.org/10.1520/D7200-18

219. *Standard Practice for Sampling and Counting Airborne Fibers, Including Asbestos Fibers*, in *the Workplace, by Phase Contrast Microscopy (with an Option of Transmission Electron Microscopy)*, ASTM D7201-06(2011) (West Conshohocken, PA: ASTM International, approved October 1, 2011), http://doi.org/10.1520/D7201-06R11

220. *Standard Test Method for Determination of Asbestos in Soil*, ASTM D7521-16 (West Conshohocken, PA: ASTM International, approved May 1, 2016), http://doi.org/10.1520/D7521-16

221. *Standard Test Method for Wipe Sampling of Surfaces, Indirect Preparation, and Analysis for Asbestos Structure Number Concentration by Transmission Electron Microscopy*, ASTM D6480-05(2010) (West Conshohocken, PA: ASTM International, 2010), http://doi.org/10.1520/D6480-05

222. *Standard Test Method for Microvacuum Sampling and Indirect Analysis of Dust by Transmission Electron Microscopy for Asbestos Structure Number Surface Loading*, ASTM D5755-09(2014)e1 (West Conshohocken, PA: ASTM International, approved April 1, 2014), http://doi.org/10.1520/D5755-09R14E01

223. *Polarized Light Microscopy of Asbestos*, OSHA Method ID-191 (Salt Lake City, UT: Occupational Safey and Health Administration, 1995).

224. *Asbestos in Air*, OSHA Method ID-160 (Salt Lake City, UT: Occupational Safety and Health Administration, 1997).

225. National Institute for Occupational Health and Safety, "Asbestos by TEM, Method 7402, Issue 2," in *NIOSH Manual of Analytical Methods (NMAM)*, 4th ed. (Washington, DC: NIOSH, 1994).

226. K. A. Brackett, P. J. Clark, and J. R. Millette, *Method 100.2: Determination of Asbestos Structures over 10 $\mu$m in Length in Drinking Water*, EPA/600/R-94/134 (Cincinnati, OH: U.S. Environmental Protection Agency, 1994).

227. *Asbestiform Amphibole Minerals in Cosmetic Talc*, CTFA Method J4-1 (Washington, DC: Cosmetic, Toiletry, and Fragrance Association, 1976), http://web.archive.org/web/20190401220944/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/PCPC000960.pdf

228. U.S. Pharmacopeia, *Talc Monograph*, 2011, http://web.archive.org/web/20190401221043/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/2011%20USP%20Talc%20Monograph.pdf

229. *Asbestos Hazard Emergency Response Act*, 40 *CFR* Part 763, Subpart E–Asbestos Containing Materials in Schools (Washington, DC: U.S. Environmental Protection Agency, 1987).

230. E. J. Chatfield and M. J. Dillon, *Method 100.1: Determination of Asbestos Fibers in Water*, EPA-600/4-83-043 (Athens, GA: U.S. Environmental Protection Agency, 1983).

231. *Ambient Air—Determination of Asbestos Fibres—Direct Transfer Transmission Electron Microscopy Method*, ISO 10312:1995 (Geneva, Switzerland: International Organization for Standardization, 1995).

232. *Ambient Air—Determination of Asbestos Fibres—Indirect Transfer Transmission Electron Microscopy Method*, ISO 13794:1999 (Geneva, Switzerland: International Organization for Standardization, 1999).

233. J. B. Thompson Jr., "Biopyriboles and Polysomatic Series," *American Mineralogist* 63, no. 3– 4 (1978): 239–249.

234. D. R. Veblen and C. W. Burnham, "New Biopyriboles from Chester, Vermont: I. Descriptive Mineralogy," *American Mineralogist* 63, nos. 11–12 (1978): 1000–1009.

235. D. R. Veblen and C. W. Burnham, "New Biopyriboles from Chester, Vermont: II. The Crystal Chemistry of Jimthompsonite, Clinojimthompsonite, and Chesterite, and the Amphibole-Mica Reaction," *American Mineralogist* 63, nos. 11–12 (1978): 1053–1073.

236. D. R. Veblen, *Triple- and Mixed-Chain Biopyriboles from Chester, Vermont* (Cambridge, MA: Harvard University, 1976).

237. F. Baumann, J.-P. Ambrosi, and M. Carbone, "Asbestos Is Not Just Asbestos: An Unrecognised Health Hazard," *Lancet Oncology* 14, no. 7 (2013): 576–578.

238. X. Baur, "Review on the Adverse Health Effects of Asbestiform Antigorite, a Non-Regulated Asbestiform Serpentine Mineral," *American Journal of Industrial Medicine* 61, no. 7 (2018): 625–630.

239. G. Meeker, "Asbestos Sans Mineralogy? A View from a Different Hilltop," *Elements* (2009): 269.

240. A. G. Wylie, "Membrane Filter Methods for Estimating Asbestos Fiber Exposure," in *Definitions for Asbestos and Other Health Related Silicates*, ed. B. Levadie (West Conshohocken, PA: ASTM International, 1984), 105–117.

241. A. Churg, "Pathologic Reactions to Chrysotile and Their Mineralogic Correlates," in *Biological Effects of Chrysotile*, ed. J. B. Lippincott (West Conshohocken, PA: ASTM International, 1987), 54–59.

242. K. E. Pinkerton, A. R. Brody, D. A. McLaurin, B. Atkins Jr., R. W. O'Connor, P. C. Pratt, and J. D. Crapo, "Characterization of Three Types of Chrysotile Asbestos after Aerosolization," *Environmental Research* 31 (1983): 32–53.

243. M. Germine and J. H. Puffer, "Analytical Transmission Electron Microscopy of Amosite Asbestos from South Africa," *Archives of Environmental and Occupational Health* (January 31, 2019): 1–9.

244. G. Lee, Letter to Mr. R. N. Miller (President, Windsor Minerals), 1978, p. JNJ000246709-17, http://web.archive.org/web/20190401221310/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/JNJ000246709.pdf

245. *Analysis of Powdered Talc for Asbestiform Minerals by Transmission Electron Microscopy*, Test Method Specification TM7024 (Montgomery Township, NJ: Johnson & Johnson Consumer Products, Inc., 1995), p. IMERYS210465-71, http://web.archive.org/web/20190401221358/http://asbestosandtalc.com/EMP%20Detection%20Limits%20ASTM/IMERYS210465.pdf

246. *Construction Safety Orders: Dusts, Fumes, Mists, Vapors, and Gases*, Title 8 CCR Sec. 1529 Cal-OSHA, Asbestos Construction Standard (Oakland, CA: Cal-OSHA, 2014).

247. W. J. Campbell, *Selected Silicate Minerals and Their Asbestiform Varieties: Mineralogical Definitions and Identification-Characterization* (Washington, DC: U.S. Department of the Interior, U.S. Bureau of Mines Information Circular, 1977).

248. A. G. Wylie, "Fiber Length and Aspect Ratio of Some Selected Asbestos Samples," *Annals of the New York Academy of Sciences* 330, no. 1 (1979): 605–610.

249. Health Effects Institute-Asbestos Research, *Special Report: Asbestos in Public and Commercial Buildings: A Literature Review and Synthesis of Current Knowledge* (Cambridge, MA: Health Effects Institute-Asbestos Research, 1991), http://web.archive.org/web/20190401221522/https://www.healtheffects.org/publication/asbestos-public-and-commercial-buildings

# Appendix

**APPENDIX: ANALYSIS OF CALIDRIA ASBESTOS**

## Pouring of Calidria Asbestos

MAS performed an exposure study in a large exposure characterization lab (ECL) $15' \times 20' \times 8'$) while pouring RG 144 Calidria asbestos. The air exchange in the ECL was between 200-250 cubic feet per minute during the exposure study.

Prior to pouring the Calidria asbestos, a worker was fitted with four personal air samples located in the breathing zone of the worker. 25 mm air cassettes containing 0.8 micron pore size mixed cellulose ester (MCE) filters run at a flow rate of 1 to 2 liters per minute were used for air sampling. Area air sample samples, placed approximately 1 to 2 feet from the pouring activity, were used to collect air samples during the pouring. Area air sampling was performed at a rate of 10 liters per minute. Approximately 1,000 grams of RG144 Calidria asbestos was then poured into a plastic container during the air sampling.

All personal and area air samples were analyzed by the NIOSH 7402 TEM method for the presence of chrysotile asbestos. The aspect ratio of chrysotile from the air was determined by dividing the length by the width of each chrysotile structure. Results are attached.

EGILMAN ET AL., DOI: 10.1520/STP161820180080          239

**ASPECT RATIO OF AIRBORNE CHRYSOTILE ASBESTOS FROM POURED RG 144 CALIDRIA ASBESTOS**

## Personal air samples

| Sample | Chrysotile Structures | Aspect Ratio Average | Aspect Ratio Median |
|---|---|---|---|
| M52707-005 | 64 | 14.9 | 14.4 |
| M52707-006 | 44 | 15.3 | 12.6 |
| M52707-007 | 27 | 12.9 | 13.3 |
| M52707-008 | 39 | 18.5 | 14.7 |
| M62163-007 | 21 | 12.3 | 10.0 |
| M62163-008 | 28 | 13.9 | 13.4 |

## Area air samples

| Sample | Chrysotile Structures | Aspect Ratio Average | Aspect Ratio Median |
|---|---|---|---|
| M52707-009 | 120 | 14.8 | 12.8 |
| M52707-010 | 119 | 13.7 | 10.4 |
| M62163-011 | 47 | 12.9 | 11.5 |
| M62163-012 | 34 | 15.0 | 12.8 |

## Summary all samples

| | Chrysotile Structures | Aspect Ratio Average | Aspect Ratio Median |
|---|---|---|---|
| ALL PERSONAL SAMPLES | 223 | 15.0 | 13.5 |
| ALL AREA SAMPLES | 320 | 14.2 | 12.0 |
| ALL SAMPLES | 543 | 14.5 | 12.3 |

Copyright by ASTM Int'l (all rights reserved); Wed Nov 6
Downloaded/printed by
Joan E. Steffen (Never Again Consulting, Attleboro, MA, USA)
Pursuant to License Agreement. No further reproduction authorized.

# EXHIBIT B

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | **)** | CASE NO. CV-22-960873 |
| | **)** | |
| Plaintiff, | **)** | JUDGE HARRY A. HANNA |
| | **)** | |
| vs. | **)** | |
| | **)** | |
| AUTOLIV ASP INC., et al. | **)** | **AMENDED COMPLAINT** |
| | **)** | (Jury Trial Demanded) |
| **NEW PARTY DEFENDANT** | **)** | |
| WT/HRC CORPORATION | **)** | |
| C/O NATIONAL REGISTERED AGENTS | **)** | |
| INC. | **)** | |
| 208 SOUTH LASALLE ST., SUITE 814 | **)** | |
| CHICAGO, IL 60604 | **)** | |
| | **)** | |
| Defendants. | **)** | |

## FACTUAL BACKGROUND

1.      Plaintiff JOSEPH J. DOUGHERTY is a resident of the State of Ohio, who was

diagnosed with malignant mesothelioma by a pathology report dated November 23, 2021.

2.      Plaintiff was employed at the WR Grace Davison Chemical Division Plant on or

near 4775 Paddock Road in Cincinnati, Ohio from approximately 1966 until 1972. Plaintiff was

also employed at the Morton International Facility on or near 2000 West Street in Reading, Ohio

from approximately 1976 until 2005.

3.      At all relevant times while on the aforesaid premises, JOSEPH J. DOUGHERTY

continuously used, worked with and/or around others who used asbestos[1], asbestos-containing

---

[1] Unless indicated otherwise, "asbestos" is used herein, not in a limited regulatory sense, but in a broad, human health-based sense, and includes non-regulated and non-commercial forms of asbestos, all forms of elongate mineral particles, fibrous minerals, fibrous talc, cleavage fragments of amphiboles, individual fibers, bundles, fibrils and transition/transitional fibers. "Asbestiform" and "asbestos" shall also be interpreted broadly and without any single definitional limitation regarding fiber size, length, dimension, ratio, presence of multiple fibers, or geologic origin or "habit." The foregoing notwithstanding, "asbestos" also includes vermiculite and talc, whether or not known or

products and/or machinery requiring the use of asbestos and/or asbestos-containing products. The premises, products and/or machinery required use, maintenance, cleaning, repair, and/or replacement by the Plaintiff and/or individuals who worked in close proximity to the Plaintiff.

4.     Plaintiff JOSEPH J. DOUGHERTY used and/or was exposed to asbestos-containing products while he and/or others in his close proximity engaged in the maintenance, construction, renovation, repair, refurbishment and/or caretaking of personal property.

5.     Defendant, DONALD MCKAY SMITH INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

6.     Defendant, R.E. KRAMIG & CO. INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

7.     Defendant, RED SEAL ELECTRIC CO., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

8.     Defendant, THE SCOTTS COMPANY LLC, or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

9.     Defendant corporations and companies or their predecessors-in-interest (hereinafter collectively, "Defendants"), or their predecessors-in-interest reside in this County,

---

acknowledged by defendant(s) to contain asbestiform minerals or other elongate mineral particles. *See, e.g.,* Egilman, et al., Health Effects of Censored Elongated Mineral Particles: A Critical Review, *Detection Limits in Air Quality and Environmental Measurements* (STP 1618, 2019; doi: 10.1520/STP161820180080) (**Exhibit A**)

and/or maintain offices in this County, and/or have agents in this County, and/or have done and are doing business in this County and/or State.

10.     Defendants at all times relevant and pertinent hereto, were or are miners, millers, manufacturers, fabricators, designers, formulators, creators, makers, processors, distributors, importers, converters, compounders, or merchants of asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for the purpose of protecting workers exposed to asbestos.

11.     Defendants, acting through their servants, employees, agents, and representatives, caused asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products be placed in the stream of commerce to which Plaintiff JOSEPH J. DOUGHERTY was exposed.

12.     Plaintiff JOSEPH J. DOUGHERTY continuously used, worked with and/or worked around others and was exposed to the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products mined, manufactured, processed, imported, converted, compounded or sold by Defendants.

13.     During the course of his employment and also during his use of asbestos-containing products, Plaintiff JOSEPH J. DOUGHERTY was exposed to Defendants' asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for protection from asbestos-containing products, which exposure directly and proximately caused Plaintiff JOSEPH J. DOUGHERTY to contract mesothelioma.

## **COUNT I**

14.     Plaintiff re-alleges paragraphs 1 through 13 above as if fully rewritten herein.

15.     Defendants negligently produced, sold or otherwise put into the stream of commerce asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products, which the Defendants knew or in the exercise of ordinary care, ought to have known, were deleterious and highly harmful to Plaintiff JOSEPH J. DOUGHERTY's health.

16.     As the designer, developer, manufacturer, distributor and seller of the above-described asbestos and asbestos-containing products, and/or machinery requiring the use of asbestos and/or asbestos-containing products, Defendants owed a duty to foreseeable users and handlers of said products, to use ordinary care in designing, manufacturing, marketing and selling said products in such a manner as to render them safe for their intended and foreseeable users.

17.     Defendants negligently gave inadequate warning or instruction during and after the time of marketing in that Defendants knew or in the exercise of reasonable care should have known about the risks associated with its products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

18.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT II

19.     Plaintiff re-alleges paragraphs 1 through 18 above as if fully rewritten herein.

20.     Although Defendants knew or in the exercise of ordinary care ought to have known that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos

and/or asbestos-containing products were deleterious, and highly harmful to Plaintiff JOSEPH J. DOUGHERTY's health, Defendants nonetheless:

a)      Failed to advise or warn Plaintiff JOSEPH J. DOUGHERTY of the dangerous characteristics of their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

b)      Failed to provide Plaintiff JOSEPH J. DOUGHERTY with the knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if any, to protect Plaintiff from being harmed by exposure to asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

c)      Failed to place any warnings on containers of said asbestos and asbestos-containing products alerting Plaintiff JOSEPH J. DOUGHERTY of the dangers to health caused by contact with asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and

d)      Failed to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan and/or a safe method of handling and installing asbestos and asbestos-containing products, or utilizing the machinery requiring the use of asbestos and/or asbestos-containing products in a safe manner.

21.     Defendants' products were defective due to inadequate warning or instruction during and after the time of marketing in that Defendants knew, or in the exercise of reasonable care, should have known about the risks associated with their products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

22.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and Plaintiff has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for its failure to warn at common law and pursuant to R.C. 2307.71 et seq.

## COUNT III

23.     Plaintiff re-alleges paragraphs 1 through 22 above as if fully rewritten herein.

24.     Defendants failed to design, manufacture, market, distribute, and sell asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable uses.  By way of example and not limitation, Defendants:

a)      Failed to design, develop, manufacture and test the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable users, when Defendants knew or should have known that the foreseeable use or intended purpose of its products was by persons, specifically Plaintiff JOSEPH J. DOUGHERTY, who worked with and around said products;

b)      Marketed and sold said products while the same was in an inherently and unreasonably dangerous and defective condition, presenting an ultra-hazardous risk to Plaintiff JOSEPH J. DOUGHERTY's well-being;

c)      Failed to recall or attempt to repair the defective products when Defendants were and had been aware of the propensity of said products to injure Plaintiff JOSEPH J. DOUGHERTY; and

d)      Failed to properly test said products to ensure that they were reasonably safe for use throughout their product lifetime.

25.     Defendants violated the requirements of §402(A) of the Restatement of Torts, 2d, as adopted by the Supreme Court of the State of Ohio, all of which proximately resulted in Plaintiff JOSEPH J. DOUGHERTY's asbestos-related disease.

26.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for defective design and manufacture and/or marketing, distributing and selling a defective product at common law and pursuant to R.C. 2307.71 et seq.

## COUNT IV

27.     Plaintiff re-alleges paragraphs 1 through 26 above as if fully rewritten herein.

28.     Defendants impliedly warranted that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of good and merchantable quality and fit for the ordinary purposes for which the products are used.

29.     Plaintiff JOSEPH J. DOUGHERTY used and/or worked in close proximity to the asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products of the Defendants, and Plaintiff JOSEPH J. DOUGHERTY's presence was known, or ought to have reasonably been anticipated by the Defendants.

30.     The implied warranty made by the Defendants that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of merchantable quality and fit for their particular intended use was breached in that certain harmful matter was given off into the atmosphere where Plaintiff JOSEPH J. DOUGHERTY worked and/or used the aforesaid products.

31.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT V

32.     Plaintiff re-alleges paragraphs 1 through 31 above as if fully rewritten herein.

33.     Defendants, since 1929 have possessed medical and scientific data which clearly indicates that asbestos fibers and asbestos-containing products are hazardous to one's health. Defendants, prompted by pecuniary motives, individually and collectively, ignored and intentionally failed to act upon said medical and scientific data and conspired with other asbestos

2193214                                        7

manufacturers, miners, distributors and sellers to deprive the public, and particularly the users of their products, including Plaintiff JOSEPH J. DOUGHERTY of said medical and scientific data, and therefore deprived Plaintiff of the opportunity of free choice as to whether or not to expose himself to Defendants' asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and further, Defendants willfully, intentionally and wantonly failed to warn Plaintiff of the serious bodily harm which would result from the inhalation of the asbestos fibers and the dust from their products.

34.　Plaintiff JOSEPH J. DOUGHERTY reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the Defendants regarding the nature of their asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products.

35.　The award for this Count should be in such an amount as would act as a deterrent to Defendants and others from the future commission of like offenses and wrongs.

36.　Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VI

37.　Plaintiff re-alleges paragraphs 1 through 36 above as if fully rewritten herein.

38.　Defendants' actions, as stated herein, constitute a flagrant disregard for the rights and safety of Plaintiff JOSEPH J. DOUGHERTY and by engaging in such actions, Defendants acted with fraud, recklessness, willfulness, wantonness and/or malice and should be held liable in punitive and exemplary damages to Plaintiff.

39.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VII

40.     Plaintiff re-alleges paragraphs 1 through 39 above, as if fully rewritten herein.

41.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY incurred expenses for medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined.

42.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY suffered lost wages, a progressive loss of earning capacity, and other economic damages during his lifetime.

43.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VIII

44.     Plaintiff re-alleges paragraphs 1 through 431 above, as if fully rewritten herein.

45.     Plaintiff JOSEPH J. DOUGHERTY worked at the premises owned by Defendant AUTOLIV ASP INC (F/K/A MORTON INTERNATIONAL INC.) ("Premises Defendant") from approximately 1976 through 2005, including, but not limited to the Morton International Facility plant on or near 2000 West Street in Reading, Ohio, at which he was exposed to asbestos products and dust from asbestos products; all of which were within the care, custody and control of the Premises Defendant.

46.     At all times mentioned herein, the Premises Defendant, owned, leased, maintained, managed and controlled the premises when Plaintiff was present.

47.     While present at premises owned and/or operated by the above Premises Defendant, Plaintiff JOSEPH J. DOUGHERTY was continuously exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by Premises Defendant, who had the responsibility for such, and further, the exposure to the Plaintiff regularly exceeded the threshold limit values adopted by this State and that the Premises Defendant allowed that condition to persist in violation of safety standards.

48.     Plaintiff's injuries, illness, and disabilities were the result of intentional acts and omissions and negligence and gross negligence in the use of asbestos at premises owned by Premise Defendants. The Premise Defendants failed to properly remove and abate said asbestos at these facilities and/or provide adequate and reasonable safeguards during asbestos abatement at the time Plaintiff JOSEPH J. DOUGHERTY was working there.

49.     Premises Defendant was negligent, grossly negligent, and committed certain intentional acts, all of which were the proximate cause of the disease and injuries resulting in Plaintiff JOSEPH J. DOUGHERTY's mesothelioma from exposure to asbestos.

50.     In particular, Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff, and that such intentional acts and omissions proximately caused Plaintiff's asbestos-related injuries and disabilities.

51.     Specific intentional acts and acts constituting negligence and gross negligence committed by Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities include:

(a)      Failing to timely and adequately warn Plaintiff of the dangerous characteristics and serious health hazards associated with exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(b)      Failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Plaintiff from being harmed and disabled by exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(c)      Requiring Plaintiff JOSEPH J. DOUGHERTY to work in close proximity to and/or with, install, cut, fit, manipulate, remove, and/or clean debris released by asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products in the workplace without taking adequate precautions for the protection of Plaintiff, workers in the vicinity of such work activities performed by others, and/or on the premises generally;

(d)      Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)      Failure to provide safe equipment for Plaintiff to use;

(f)      Failure to provide adequate safety measures and protection against deadly and life-threatening asbestos dust, all despite Premises Defendant's knowledge of the extreme risk of harm inherent to asbestos exposure;

(g)      Failure to adequately warn Plaintiff of the inherent dangers of asbestos contamination;

(h)      Failure to provide Plaintiff a safe place to work by failing to maintain the ambient and environmental conditions of Defendant's premises in proper and safe condition;

(i)      Failure to follow and adhere to various state and U.S. Governmental statutes, regulations and guidelines pertaining to asbestos and the exposure to asbestos of employees and others. Such failure constituted negligence *per se* at a minimum. Plaintiff is not making claims for damages under Federal Law.

52.      Premises Defendant intentionally, knowingly, and due to negligence and gross negligence, failed to ensure that individuals such as Plaintiff were protected from the inhalation of

asbestos and asbestos fibers. Such actions proximately caused Plaintiff JOSEPH J. DOUGHERTY's asbestos-related injuries and disabilities.

53.     Additionally, specific actions or omissions on the part of Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities were:

(a)     Attempting to remove asbestos dust in the workplace while Plaintiff was present and without taking adequate precautions for the protection of workers, including Plaintiff, in the vicinity of same and/or in the premises generally;

(b)     Failing to provide proper protective gear for individuals exposed to asbestos;

(c)     Failing to provide adequate ventilation to ensure that individuals in the vicinity were not exposed to asbestos;

(d)     Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)     Failing to adhere to industry safe standards and other established measures to protect workers from harm;

(f)     Failing to adequately warn of the extreme risk of danger of inherent to asbestos exposure.

54.     Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions alleged above were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff JOSEPH J. DOUGHERTY.

## COUNT IX

55.     Plaintiff re-alleges paragraphs 1 through 54 above as if fully rewritten herein.

56.     Defendants were the supplier and seller of asbestos-containing products manufactured by entities that have asserted insolvency.

57.     As prescribed by Ohio Revised Code Section 2307.78, Defendants as suppliers, sellers or distributors of asbestos-containing products manufactured by an entity that has asserted insolvency, are liable to Plaintiff JOSEPH J. DOUGHERTY based upon product liability claims

under Ohio Revised Code Sections 2307.71 to 2307.77, as if they were the manufacturer of asbestos-containing products and for negligence.

WHEREFORE, Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered and will continue to suffer great pain and severe mental anguish.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has incurred expenses for his medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined, and will continue to incur such expenses into the future.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered economic damages and will continue to suffer them throughout his lifetime.

The aforesaid acts and/or omissions of Defendants were wanton and willful and in reckless disregard of the safety of Plaintiff.

Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of Twenty-five Thousand Dollars ($25,000.00) and an amount for punitive damages, plus interest, costs and such further relief to which Plaintiff may be entitled.

A trial by jury is hereby demanded as to all counts.

Respectfully submitted,

*/s/Anthony Gallucci*
Anthony Gallucci (0066665)
Christopher J. Hickey (0065416)
Kevin E. McDermott (0027813)
**MCDERMOTT & HICKEY, LLC**
20525 Center Ridge Road, Ste. 200
Rocky River, OH 44113
Telephone: (216) 712-7452
Facsimile: (216) 916-9238
Email:  ag@mesohio.com
        chip@mesohio.com
        kevin@mesohio.com

-and-

*/s/ Daniel C. LaTerra*
Daniel C. LaTerra, *(PHV 25834-2022)*
R. Austin Taylor *pro hac vice pending*
**THE LANIER LAW FIRM, P.C.**
126 E. 56th Street, 6th Floor
New York, New York 10022
Telephone: 212-421-2800
Facsimile: 713-659-2204
Email: daniel.laterra@lanierlawfirm.com
austin.taylor@lanierlawfirm.com

***Attorneys for Plaintiff***

## CASE BROCHURE

**NAME: JOSEPH J. DOUGHERTY**

**DATE OF BIRTH:** ███████

**SOCIAL SECURITY NUMBER: XXX-XX-2454**

**DIAGNOSIS: MESOTHELIOMA**

**DATE OF DIAGNOSIS:    CONFIRMED BY PATHOLOGY REPORT DATED NOVEMBER 23, 2021**

**JOB SITES:  WR GRACE DAVISON CHEMICAL DIVISION PLANT (1966-1972)**
**4775 PADDOCK ROAD**
**CINCINNATI, OHIO**

**MORTON INTERNATIONAL FACILITY (1976-2005)**
**2000 WEST STREET**
**READING, OHIO**

**DISCOVERY IS ONGOING.  PLAINTIFF RESERVES THE RIGHT TO SUPPLEMENT THIS INFORMATION.**

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing Amended Complaint has been served electronically upon all counsel of record via Lexis/Nexis File & Serve this 16th day of May 2022.

<div style="text-align:right">

*/s/ Anthony Gallucci*
ANTHONY GALLUCCI (0066665)
Attorney for Plaintiff

</div>

# EXHIBIT C

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | ) | CASE NO.  CV-22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| | ) | |
| AUTOLIV ASP INC. (f/k/a Morton International, Inc., individually and as successor to Gershwin Acquisition Corp., l/k/a Morton Acquisition Corp.), *et al*. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**ANSWERS TO DEFENDANTS' MASTER CONSOLIDATED DISCOVERY REQUESTS TO PLAINTIFF**

Plaintiff by and through undersigned counsel and pursuant to Rules 33 and 34 of the Ohio Rules of Civil Procedure, states for his answers to Defendants' Master Consolidated Discovery Requests as follows; <u>all of which are subject to amendment and/or supplemental answers as investigation, discovery and medical care remain ongoing</u>:

**<u>INTERROGATORIES</u>**

1.     Please state the following:

a.     Your Full name:

**ANSWER:  Joseph John Dougherty**

b.     All of the names by whom you have been known, including nicknames, maiden names or aliases:

**ANSWER:  I have not been known by any other names.**

c.     Your present address and the date you first resided at that address:

**ANSWER:** 

2197261-5

d.      The addresses at which you have resided for five (5) years prior to this date:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous. Without waiving the foregoing objection, plaintiff responds as follows:**



e.      Your Social Security number:

**ANSWER:** ████████

f.      Your date of birth:

**ANSWER:** ████████

2.      Are you employed?

**ANSWER:  No.**

a.      If your answer is in the affirmative, please state your current occupation, place of employment, and the date you first became so employed:

**ANSWER:  Not applicable.**

b.      If your answer is in the negative, please state your last occupation, your last place of employment, the date you last worked and your reason(s) for not working since that time:

**ANSWER:  Boat Dock Attendant**
**Sharon Woods**
**Great Parks of Hamilton County**
**11450 Lebanon Road**
**Sharonville, OH 45241**
**May 2021 (approximate)**
**I did not return to work as a result of my illness.**

3.      State the following with respect to your parents:

a.      The names of your mother and father:

**ANSWER:  Mary Dougherty**
**                   Joseph Dougherty**

b.      Their dates of birth:

**ANSWER:  Mother:** ▉▉▉▉▉
**                   Father: I do not know.**

c.      Their current health conditions:

**ANSWER:  Deceased.**

d.      If deceased, their date of death:

**ANSWER:  Mother: June 1971**
**                   Father: I do not know.**

e.      If deceased, their cause of death:

**ANSWER:  Mother: Breast cancer.**
**                   Father: I do not know.**

4.      Do you have any brothers and/or sisters?

**ANSWER:  Yes.**

If your answer is in the affirmative, please state the following for each such brother and/or sister:

a.      The names and addresses of each such brother and/or sister:

**ANSWER:    Leo Connell (deceased)**

**                   Mary Dougherty**
▉▉▉▉▉▉

**                   Rosemarie Ippolitto**
▉▉▉▉

**                   Veronica Bostick**
▉▉▉▉

3 of 43

2197261-5

**Theresa Jackson**

b.      The age of each such brother and/or sister:

**ANSWER:    Leo Connell (deceased)**

**Mary Dougherty, 81 (approximate)**

**Rosemarie Ippolitto, 70 (approximate)**

**Veronica Bostick, 69 (approximate)**

**Theresa Jackson, 66 (approximate)**

c.      The current health condition of each such brother and/or sister:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is confidential and not material or necessary.**

d.      If deceased, the age at death for each deceased brother and/or sister:

**ANSWER:  I do not know Leo Connell's age when he died.**

e.      If deceased, the cause of death for each deceased brother and/or sister:

**ANSWER:  I do not know Leo Connell's cause of death.**

5.      Has any member of your family ever filed a suit for an asbestos-related disease?

**ANSWER:  No.**

If your answer is in the affirmative, please state the following:

a.      Identify the name of the family member:

**ANSWER:  Not applicable.**

b.      Their relationship(s) to you:

**ANSWER:  Not applicable.**

c.      The case name(s), court(s) and case number(s) of the lawsuit(s):

2197261-5

**ANSWER: Not applicable.**

6.      If you are currently married, state the following:

   a.      The date of marriage:

   **ANSWER: Not applicable.**

   b.      Your spouse's name:

   **ANSWER: Not applicable.**

   c.      Your spouse's date of birth:

   **ANSWER: Not applicable.**

   d.      Your spouse's Social Security number:

   **ANSWER: Not applicable.**

   e.      Your spouse's occupation:

   **ANSWER: Not applicable.**

   f.      The name and address of your spouse's employer:

   **ANSWER: Not applicable.**

   g.      The amount of our spouse's average gross monthly salary:

   **ANSWER: Not applicable.**

   h.      Whether your spouse was financially dependent upon you at the commencement of
           this action.

   **ANSWER: Not applicable.**

   i.      Whether you and your spouse were ever voluntarily or legally separated?

   **ANSWER: Not applicable.**

   j.      If applicable, state the circumstances, inclusive dates and length of time of any such
           legal or voluntary separation.

   **ANSWER: Not applicable.**

7.      Have you ever had any previous marriages?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following:

a.      The name(s) of any former spouse(s):

**ANSWER:  Mari Jo Dougherty**

b.      The address(es) of any former spouse(s):

**ANSWER:  She is deceased.**

c.      If terminated by court order, the court(s), city or cities, and the circumstances under which the marriage or marriages were dissolved or terminated:

**ANSWER:  We divorced in approximately 2010 in Cincinnati, Ohio.**

8.      Do you have any children?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following for each child:

a.      The name of each such child:

**ANSWER:  Joseph Dougherty, Jr.; Patrick Dougherty; Adam Dougherty**

b.      The address of each such child:

**ANSWER:      Joseph Dougherty, Jr.**

███████████████

**Patrick Dougherty**

███████████████

**Adam Dougherty**

███████████████

c.      The age of each such child:

**ANSWER:      Joseph Dougherty, Jr., 55**
**Patrick Dougherty, 54**
**Adam Dougherty, 51**

6 of 43

d.      The occupation of each such child:

**ANSWER: Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is confidential and not material or necessary.**

e.      The current health condition, including specific medical problems, of each such child:

**ANSWER: Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is confidential and not material or necessary.**

f.      Whether any such child is financially dependent upon you. If so, state the name of such dependent child.

**ANSWER: None.**

g.      If any child is deceased, state his or her date of death, cause of death, and age at death:

**ANSWER: Not applicable.**

9.      Is anyone who is not listed in the preceding interrogatory financially dependent upon you?

**ANSWER: No.**

If the answer is in the affirmative, please state the following:

a.      The name of each such dependent:

**ANSWER: Not applicable.**

b.      The date of birth of each such dependent:

**ANSWER: Not applicable.**

c.      The relationship of each such dependent to you:

**ANSWER: Not applicable.**

d.      Whether you have legal custody of each such dependent:

**ANSWER: Not applicable.**

e.      If custody was awarded to you by court decree, state the date such custody was obtained for each such dependent:

**ANSWER:  Not applicable.**

10.     Did you graduate from high school?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following:

a.      The date graduated and the name of the school:

**ANSWER:  1960, Camden High School.**

11.     Have you ever enrolled in or attended any colleges, vocational schools, union sponsored training, or correspondence courses?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following:

a.      The name(s) and address(es) of each such institution:

**ANSWER:    Xavier University**
**3800 Victory Parkway**
**Cincinnati, OH 45207**

b.      The date(s) attended:

**ANSWER:  I attended an evening program from approximately 1969 through 1976.**

c.      Courses of study:

**ANSWER:  I focused on business courses.**

d.      Degree(s) or certification received, if any, for each such enrollment or attendance:

**ANSWER:  B.S./B.A. Business Administration**

12.     Have you ever been a member of the Armed Forces?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following:

a.      The branch of service:

**ANSWER:  U.S. Navy.**

b.      Serial number:

8 of 43

**ANSWER:** ███████

c.      Veteran's Administration Number (if applicable):

**ANSWER:** ██████

d.      The dates of service ending with the date of last discharge:

**ANSWER:  December 1960 and honorably discharged in December 1964.**

e.      The highest rank or grade held:

**ANSWER:  Boatswain's Mate Third Class (BM3).**

f.      The type of discharge:

**ANSWER:  Honorable.**

g.      The type of technical education or training received and the length of such training:

**ANSWER:  I do not recall any technical education or training aside from boot camp.**

h.      Whether you were ever exposed to asbestos, or asbestos-containing products during your military service.

**ANSWER: Objection. Plaintiff objects to this interrogatory as being vague and ambiguous. Subject to and without waiving the foregoing objection, plaintiff states: upon information and belief, I worked with and around asbestos-containing products that were present on some Navy vessels and at some shipyards.**

i.      If answer is affirmative, please describe in detail the manner in which you were exposed, the type of duties being performed, and the product to which you were exposed.

**ANSWER:  Objection. Plaintiff objects to this interrogatory as vague, ambiguous and unduly burdensome. Plaintiff further objects to this interrogatory to the extent it requests information in defendants' possession or equally available to them, including from non-parties and public sources. Plaintiff further objects to this interrogatory to the extent it requests information that constitutes attorney work product. Subject to and without waiving said objections, plaintiff states: Plaintiff incorporates his objections and answer to interrogatory 12(h).**

13.    Have you ever been convicted of a crime other than a traffic offense?

**ANSWER:  No.**

If the answer is in the affirmative, please state fully in detail the following:

a.      The date(s), place(s), court(s) and nature(s) conviction:

**ANSWER:  Not applicable.**

14.     Have you filed a suit for damages for any injuries?

**ANSWER:  No, aside from the present matter.**

If the answer is in the affirmative, please state the following:

a.      Names and addresses of all the plaintiffs, defendants and their attorneys for each such action:

**ANSWER:  Not applicable.**

b.      The case number, court, place and date of filing for each such action:

**ANSWER:  Not applicable.**

c.      The nature and extent of injuries claimed for each such action:

**ANSWER:  Not applicable.**

d.      The present status of each suit, and if concluded, the final result, including the amount of any settlements or judgments for each such action:

**ANSWER:  Not applicable.**

15.     Have you ever filed a Workers' Compensation Claim?

**ANSWER:  No.**

If your answer is in the affirmative, please state the following:

a.      The claim number for each and every claim:

**ANSWER:  Not applicable.**

b.      The employer under which each and every claim was filed:

 **ANSWER:  Not applicable.**

c.      State the allowed conditions for each and every claim:

**ANSWER:  Not applicable.**

d.      State the amount of any compensation received for each and every claim:

**ANSWER:  Not applicable.**

e.      The present status of each and every claim:

**ANSWER:  Not applicable.**

16.    Have you ever used cigarettes, cigars, or pipe or other tobacco products of any kind?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: Yes.**

If the answer is in the affirmative, please state the following:

a.    The dates and time periods during which each type of tobacco product was smoked or used:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I started smoking cigarettes in approximately 1952 and stopped smoking in 1962.**

b.    The types of tobacco products you smoked or used and as to each such product whether the smoke was inhaled or was not inhaled:

**ANSWER:    Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I smoked cigarettes.**

c.    The daily frequency with which tobacco products were smoked or used (i.e., 2 packs of cigarettes daily, 3 cigars daily, 2 pipefuls daily, etc.):

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: From approximately 1952 to approximately 1960, I smoked as few as 2-3 cigarettes per week and at most less than half a pack per day. From 1960 to 1962, while in the service, I smoked approximately one and one-half packs per week.**

d.    For any time period during which use of tobacco products stopped, state the dates during which your use ceased and the reasons why the use stopped:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26.**

11 of 43

**Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I quit smoking in 1962 when I first heard it could have adverse health consequences.**

e.      For any time period when the use of tobacco products began after a period of having stopped, state the reasons for restarting:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: None.**

f.      If you ever smoked cigarettes, please state the average number of packs per day and brand so consumed in each of the following periods from 1930 to the present time:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I smoked Lucky Strikes and Paul Mall brand cigarettes between 1952 and 1962.**

g.      If advice was ever given to you by any physician to stop smoking or using tobacco products, identify each physician who gave such advice, the dates on which the advice was given and also state whether the advice was followed:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, lacking foundation, ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: None that I recall.**

h.      Are you aware of the United States Surgeon General's warning placed on all cigarette packages and advertisements:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is false, vague, overly broad, lacking foundation, unduly burdensome and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I did not see any warnings on the cigarette packages during the time period I smoked between 1952 and 1962 because there were none.**

i.      If the answer to subpart (h) is in affirmative, please indicate the date on which you first became aware of such warning:

12 of 43

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, lacking foundation, unduly burdensome and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: I did not see any warnings on the cigarette packages during the time period I smoked between 1952 and 1962 because there were none.**

j.      Did you stop smoking at the time you became aware of such warning?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, lacking foundation, unduly burdensome and ambiguous and calls for information that is not material or necessary.  Subject to and without waiving the foregoing objection, plaintiff states as follows: See answer to subpart "i."**

17.     Has any diagnosis and/or prognosis of your medical condition been made as a result of any illness or conditions allegedly sustained as a result of any exposure to asbestos or asbestos-containing products?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: Yes.**

If the answer is in the affirmative, please state the following:

a.     Each and every diagnosis which has been made:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: I have malignant mesothelioma. See medical records provided as Exhibit A via the FileCloud link[1]. Additionally, plaintiff provided duly executed authorizations to obtain the same.**

b.     The date(s) of any such diagnosis:

---

[1] ████████████████████████████████████████████

2197261-5

**ANSWER:  See objections and answer to Interrogatory No. 17(a). Subject to and without waiving the foregoing objection, plaintiff states as follows: I first learned I had malignant mesothelioma on October 30, 2021.**

c.      Identify each person making any such diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 17(a). Subject to and without waiving the foregoing objection, plaintiff states as follows: I was told by my surgeon, Robert Adams, M.D., and also my oncologist, Mark Andolina, M.D.**

d.      The prognosis made for each and every diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 17(a).**

e.      Identify each person making any such prognosis:

**ANSWER:  See objections and answer to Interrogatory No. 17(a).**

f.      The date of last prognosis regarding any diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 17(a).**

g.      The date the condition or conditions diagnosed first manifested symptoms:

**ANSWER:  See objections and answer to Interrogatory Nos. 17(a). Subject to and without waiving the foregoing objection, plaintiff states as follows: In April 2021 I began to experience difficulty breathing for the first time. I was digging in my backyard and something felt wrong. I could not catch my breath and felt a burn in my chest. I never had any breathing difficulty when completing this or similar activities before this time.**

18.     For each and every symptom, indication, malaise, or affliction which you contend to be directly or indirectly related to any asbestos-related disease, disability or physical condition, please state the following:

a.      The nature and description of such symptom:

**ANSWER:  See objections and answer to Interrogatory Nos. 17(a) and 17(g). Subject to and without waiving the foregoing objection, plaintiff states as follows: I experience difficulty breathing and a shortness of breath while attempting to perform my usual and customary activities. There is a constant pressure and pain that results from the accumulation of fluid within my chest, which also places pressure on my lungs making breathing more difficult. I also feel pain as a result of my medical care, including, thoracic surgery and procedures to drain fluid from my chest. I find it difficult to maintain the same level of energy to perform my hobbies, like golfing and dancing, and other tasks when compared to before my illness. There are more examples that I**

continue to experience and will experience as my illness and treatment remain ongoing.

b.      The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: See answer to Interrogatory No. 18(a). In April 2021 I began to experience difficulty breathing for the first time. I was digging in my backyard and something felt wrong. I could not catch my breath and felt a burn in my chest. I never had any breathing difficulty when completing similar activities before this time.**

c.      Whether you contend such symptom is related in any fashion to your exposure to asbestos, and the nature and extent of such relationship:

**ANSWER:     Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: Yes. See objections and answer to Interrogatory Nos. 17(a).**

d.      All facts and opinions on which you rely in alleging that the symptoms identified are related to exposure to asbestos:

**ANSWER:     Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion.**

19.    Has any diagnosis and/or prognosis of your medical condition been made as a result of any illness or conditions allegedly sustained as a result of any exposure to silica or silica-containing products?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: None to my knowledge.**

If the answer is in the affirmative, please state the following:

a.      Each and every diagnosis which has been made:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

b.      The date(s) of any such diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

c.      Identify each person making any such diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

d.      The prognosis made for each and every diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

e.      Identify each person making any such prognosis:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

f.      The date of last prognosis regarding any diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

g.      The date the condition or conditions diagnosed first manifested symptoms:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

h.      The date, time, place and manner in which such symptom first manifested itself or was made known to you, including all pertinent information as to the source of such knowledge:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

i.      Whether you contend such symptom is related in any fashion to your exposure to silica, and the nature and extent of such relationship:

**ANSWER:  See objections and answer to Interrogatory No. 19.**

j.      All facts and opinions on which you rely in alleging that the symptoms identified are related to exposure to silica.

**ANSWER:  See objections and answer to Interrogatory No. 19.**

20.     Have you ever been hospitalized, operated upon, or confined to an institution, including nursing homes or extended care facilities?

2197261-5

**ANSWER:  Yes.**

If the answer is in the affirmative, please state the following:

a.        Names and addresses of all hospitals or institutions involved:

**ANSWER: See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same. I was confined to the following facility for my mesothelioma care:**

> **Bethesda North Hospital**
> **10500 Montgomery Road**
> **Cincinnati, OH 45242**
>
> **Good Samaritan Hospital**
> **375 Dixmyth Avenue**
> **Cincinnati, OH 45220**

b.        The beginning and ending dates of each period of hospitalization or institutionalization;

**ANSWER:  See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same.**

c.        The nature of the illness, injury or complaint for which you were admitted;

**ANSWER:  Malignant mesothelioma. See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same. My only admission to Good Samaritan Hospital was in approximately 1967 for appendicitis.**

d.        The names and addresses and relationship to you of all persons who treated or examined you:

**ANSWER:  See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same. Additionally, I received treatment from the following medical providers:**

> **William Fenton, M.D. (PCP)**
> **12029 Sheraton Lane**
> **Cincinnati, OH 45246**
>
> **Bethesda Butler Hospital (Radiology)**
> **3125 Hamilton Mason Road**
> **Hamilton, OH 45011**

**Craig Eisentrout, M.D. (Pulmonologist)**
**Bethesda North Hospital**
**10500 Montgomery Road**
**Cincinnati, OH 45242**

**Robert Adams, M.D. (Thoracic Surgeon)**
**Bethesda North Hospital**
**10500 Montgomery Road**
**Cincinnati, OH 45242**

**Mark Andolina, M.D. (Oncologist)**
**Bethesda North Hospital**
**10500 Montgomery Road**
**Cincinnati, OH 45242**

**Travis Dugger, D.O. (General Surgeon)**
**Bethesda North Hospital**
**10500 Montgomery Road**
**Cincinnati, OH 45242**

**Michael Shehata, M.D. (Radiation Oncologist)**
**TriHealth Bethesda Butler Hospital**
**3125 Hamilton Mason Road**
**Hamilton, OH 45011**

**David P. Carbone, M.D. (Oncologist)**
**The James at Brain and Spine Hospital**
**300 West 10th Avenue**
**Columbus, Ohio 43210**

**Faisal Adhami, M.D. (Oncologist)**
**Bethesda Butler Hospital**
**3125 Hamilton Mason Road**
**Hamilton, OH 45011**

21.   With respect to each physician, not listed in the preceding interrogatory, who examined or treated you during your lifetime to date, state the following:

a.      Identify each physician and his address;

**ANSWER:  Objection. Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Plaintiff further objects to this interrogatory to the extent it requests information that is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Subject to and**

**without waiving said objections, plaintiff states: See objections and answer to Interrogatory No. 20(d).  Without waiving said objection, see medical records.**

b.      List the complaint you had that caused you to see each particular physician;

**ANSWER:  Objection. Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Plaintiff further objects to this interrogatory to the extent it requests information that is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Without waiving said objection, see medical records.**

c.      The type of examination, the diagnosis and type of treatment that each doctor gave you;

**ANSWER:  Objection. Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Plaintiff further objects to this interrogatory to the extent it requests information that is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Without waiving said objection, see medical records.**

d.      The date or dates on which you were examined, diagnosed and treated by each particular physician:

**ANSWER:  Objection. Plaintiff objects to this interrogatory as overly broad and unduly burdensome. Plaintiff further objects to this interrogatory to the extent it requests information that is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Without waiving said objection, see medical records.**

22.      Have you ever had x-rays taken of your chest other than at any of the institutions listed previously, including x-rays performed by the Armed Forces, employers or unions?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous. Subject to and without waiving the foregoing objection, plaintiff states as follows: I do not recall.**

If the answer is in the affirmative, please state the following for each set of x-rays taken:

a.      Name and address of the office or hospital where each set of x-rays was taken:

**ANSWER:  See objections and answer to Interrogatory No. 22.**

b.      The reason(s) why such x-rays were taken;

**ANSWER:  See objections and answer to Interrogatory No. 22.**

c.　　Whether anything was reported to you, and the nature of any such report(s), as being the x-ray diagnosis;

**ANSWER:  See objections and answer to Interrogatory No. 22.**

d.　　Who paid to have the x-rays taken;

**ANSWER:  See objections and answer to Interrogatory No. 22.**

e.　　The names and addresses of any physicians, hospitals, clinics, or other persons to whom copies of x-ray reports were sent:

**ANSWER:  See objections and answer to Interrogatory No. 22.**

23.　　Have you ever had a pulmonary function test ("PFT") or breathing test?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous. Subject to and without waiving the foregoing objection, plaintiff states as follows: I do not recall. See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same.**

If the answer is in the affirmative, please state for each such test:

a.　　Name and address of the office or hospital where each such PFT or breathing test was taken:

**ANSWER:  See objections and answer to Interrogatory No. 23.**

b.　　The reason(s) why such PFT or breathing test was taken;

**ANSWER:  See objections and answer to Interrogatory No. 23.**

c.　　Whether anything was reported to you, and the nature of any such report(s), as being the PFT or breathing test diagnosis:

**ANSWER:  See objections and answer to Interrogatory No. 23.**

24.　　Have you ever had any of the following conditions?  Please place an "X" next to the appropriate ANSWER and state the date of diagnosis for each such condition:

|  |  | Yes | No | Date of Diagnosis |
|---|---|---|---|---|
|  | Bronchitis |  | X |  |
|  | Emphysema |  | X |  |

|  |  | Yes | No | Date of Diagnosis |
|---|---|---|---|---|
|  | Asthma |  | X |  |
|  | Tuberculosis |  | X |  |
|  | chronic obstructive pulmonary disease |  | X |  |
|  | Pneumonia |  | X |  |
|  | high blood pressure |  | X |  |
|  | heart trouble |  | X |  |
|  | skin cancer |  | X |  |
|  | Diverticulitis |  | X |  |
|  | Colitis |  | X |  |
|  | Ulcers |  | X |  |
|  | Polyps |  | X |  |
|  | Jaundice |  | X |  |
|  | Arthritis |  | X |  |
|  | Gout |  | X |  |

**ANSWER: See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same.**

25.    Have you used any drugs or medicines during the past ten (10) years in connection with any injury, complaint or illness?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: Yes.**

If your answer is in the affirmative, please state fully in detail:

a.    A description of each item, including its name and dosage:

**ANSWER:  See objections and answer to Interrogatory Nos. 17(a) and 25. Subject to and without waiving said objections, plaintiff further states as follows: I presently take Metformin (500mg) twice a day for diabetes; Atorvastatin (20mg) once per day for cholesterol; Fenofibrate (160mg) once per day for triglycerides; Gabapentin (300mg) once per day and Lyrica (300mg) twice per day for peripheral neuropathy.**

b.    Identify the physician who prescribed each item, if any:

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous and calls for medical or scientific opinion. Subject to and without waiving the foregoing objection, plaintiff states as follows: William Fenton, M.D. (PCP), 12029**

**Sheraton Lane, Cincinnati, OH 45246. See objections and answer to Interrogatory No. 17(a).**

c.        The injury, complaint or illness for which each item was prescribed or used:

**ANSWER:  See objections and answer to Interrogatory Nos. 17(a) and 25(a).**

d.        The dates during which each item was used:

**ANSWER:  See objections answer to Interrogatory Nos. 17(a) and 25(a).**

26.     Have you ever been discharged, or voluntarily left a job, or changed residence due to health reasons?

**ANSWER:  Yes.**

If the answer is in the affirmative, please state in detail the dates, places and circumstances:

**ANSWER:  In approximately April 2021, I resigned from my employment with Great Parks of Hamilton County due to my illness.**

27.     Have you ever received financial benefits (other than wages), either directly or indirectly, from any source at any time in your lifetime (including but not limited to government agencies, illness or disability wages from employers, life or health insurance companies, service providers or others)?

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26. Additionally, this interrogatory is vague, overly broad, unduly burdensome and ambiguous.**

If the answer is in the affirmative, please indicate the following:

a.        The date of each such payment(s):

**ANSWER:  See objections to Interrogatory No. 27.**

b.        The source of each such payment(s):

**ANSWER:  See objections to Interrogatory No. 27.**

c.        The time period and amount of each such payment(s):

**ANSWER:  See objections to Interrogatory No. 27.**

d.        The reason for each such payment(s):

**ANSWER:  See objections to Interrogatory No. 27.**

e. The identity of all persons, including but not limited to physicians, insurance carriers, government employees or others who participated in the determination of each such payment(s):

**ANSWER:  See objections to Interrogatory No. 27.**

28. Please identify each of your employers in whose employ you claim you were exposed to asbestos. Include in your answer the following:

a. The name, address and telephone number for each such employer;

**ANSWER:  Objection. Plaintiff objects to this interrogatory as being vague and ambiguous. However, without waiving said objection, Plaintiff states as follows: I may have been exposed to asbestos as a result of my employment with the following employers and/or at the following job sites:**

> **Philadelphia Naval Shipyard**
> **South Broad Street**
> **Philadelphia, PA**
> **Telephone: I do not recall.**
>
> **W.R. Grace Davison Chemical Division**
> **4775 Paddock Road**
> **Cincinnati, OH**
> **Telephone: I do not recall.**
>
> **Cosmopolitan Cleaning Company**
> **Job site: Morton International, Inc.**
> **2000 West Street**
> **Reading, OH**
> **Telephone: I do not recall.**

b. For each such employer, indicate the jobsite, address and inclusive dates of claimed exposure:

**ANSWER:  See objections and answer to Interrogatory No. 28(a). Without waiving said objections, Plaintiff, in an effort to be cooperative, states as follows:**

> **Philadelphia Naval Shipyard**
> **South Broad Street**
> **Philadelphia, PA**
> **October 1965 – December 1965 (approximate)**
>
> **W.R. Grace Davison Chemical Division**
> **4775 Paddock Road**

Cincinnati, OH
October 1966 – October 1972 (approximate)

Cosmopolitan Cleaning Company
Morton International, Inc.
2000 West Street
Reading, OH
1982 – August 2000 (approximate)

c.      Your job title and work description for each such employment of claimed exposure:

ANSWER: See objections and answer to Interrogatory Nos. 28(a) and 28(b). Without waiving said objections, Plaintiff, in an effort to be cooperative, states as follows:

Philadelphia Naval Shipyard
Laborer. I assisted various tradesmen in ship construction and general maintenance in the shipyard.

W.R. Grace Davison Chemical Division
Spray Dryer Operator/Laborer. I operated and maintained Spray Dryers B7 and B7A. I maintained and cleaned the workspace around the dryers and my work area during my shift.

Cosmopolitan Cleaning Company
Owner/Janitor. I personally performed and managed commercial and industrial janitorial services, cleaning services and landscape services at Morton International, Inc.

d.      The dates of such employment of claimed exposure:

ANSWER: See objections and answer to Interrogatory No. 28(b).

e.      The length of time you spent on each jobsite:

ANSWER: See objections and answer to Interrogatory No. 28(b). Without waiving said objections, Plaintiff, in an effort to be cooperative, states as follows:

Philadelphia Naval Shipyard
My shift times varied, but I worked approximately eight (8) hour day shifts.

W.R. Grace Davison Chemical Division
My shift times varied, but I worked approximately five (5) days on and two (2) days off, with shifts of approximately eight (8) hours. Many times I worked a double shift or overtime, which would be a minimum of 12-16 hours shift.

**Cosmopolitan Cleaning Company**
**I worked at the Morton International plant five (5) days per week for at**
**least eight (8) hours per day; however, I often worked for longer periods**
**of time during the day and filled in for workers who did not show up.**

f.     The manufacturer, or if the manufacturer is unknown, the trade name and/or the
generic type of each and every product which you believe contained asbestos, to
which you were exposed during each such employment, and the dates from the first
exposure to the last exposure:

**ANSWER:    Objection. Plaintiff objects to this interrogatory as being vague,**
**ambiguous, overly broad and unduly burdensome. Moreover, certain aspects of this**
**interrogatory call for information that is not reasonably calculated to lead to the**
**discovery of admissible evidence. Plaintiff also objects to this interrogatory to the**
**extent it requests information that constitutes attorney work product. However,**
**without waiving said objection, Plaintiff states as follows: available information and**
**documents indicate that the Spray Dryers at W.R. Grace Davison Chemical Division**
**contained asbestos and were manufactured by the Swenson Evaporator Company.**
**In addition, the identity of other manufacturers and suppliers of asbestos-containing**
**products to which Plaintiff was exposed will be determined after further discovery.**

g.     Whether the jobs were inside work or outside work:

**ANSWER:    See objections and answer to Interrogatory No. 28(b). I performed both**
**inside and outside work at the Philadelphia Naval Shipyard, W.R. Grace Davison**
**Chemical Division and Morton International, Inc. jobsites.**

29.    For each exposure to asbestos and to products you believe contained asbestos that are listed
in the answer to Interrogatory 28, please state the name and address of each co-worker who
has knowledge that these exposures occurred.

**ANSWER:  Objection. Plaintiff objects to this interrogatory as being vague and**
**ambiguous. Moreover, certain aspects of this interrogatory call for information that**
**is not reasonably calculated to lead to the discovery of admissible evidence. However,**
**without waiving said objection, Plaintiff states as follows: I do not know the extent of**
**any co-worker's personal knowledge regarding asbestos exposure. Nevertheless, I do**
**not know the name of any co-worker while employed at the Philadelphia Naval**
**Shipyard. I recall co-workers Tom Hayden, Ron Miles and Harold Boehme at the**
**W.R. Grace Davison Chemical Division plant. My co-workers from Cosmopolitan**
**Cleaning Co. included, but are not limited to, Adam Dougherty, Joseph Dougherty,**
**Jr. and Patrick Dougherty.**

30.    Please identify each of your employers in whose employ you claim you were exposed to
silica. Include in your answer the following:

a.     The name, address and telephone number for each such employer;

25 of 43

**ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous and not understood by the answering party. Moreover, the interrogatory calls for information that is not reasonably calculated to lead to the discovery of admissible evidence. However, without waiving said objection, Plaintiff, in an effort to be cooperative, states: I do not allege that exposure to silica, if any, I may have had caused or contributed to my malignant mesothelioma.**

b. For each such employer, indicate the jobsite, address and inclusive dates of claimed exposure:

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

c. Your job title and work description for each such employment of claimed exposure:

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

d. The length of time you spent on each jobsite:

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

e. The manufacturer, or if the manufacturer is unknown, the trade name and/or the generic type of each and every product which you believe contained silica, to which you were exposed during each such employment, and the dates from the first exposure to the last exposure:

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

f. Whether the jobs were inside work or outside work:

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

g. For each job, whether it involved new construction, repair, replacement or tear-out (specify which):

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

31. For each exposure to silica and to products you believe contained silica that are listed in the answer to Interrogatory 30, please state the name and address of each co-worker who has knowledge that these exposures occurred.

**ANSWER:  See objections and answer to Interrogatory No. 30(a).**

32. Please state whether safety equipment such as respirators or masks to reduce exposure to asbestos and/or silica material was provided or required by any of your employers (specify which):

**ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, lacking foundation and not understood by the answering party. Moreover, the interrogatory calls for information that is not reasonably calculated to**

**lead to the discovery of admissible evidence and is otherwise outside the scope of discovery permitted under Ohio Civil Rule 26. However, without waiving said objection, Plaintiff states: No respiratory-protection equipment was required or provided to reduce exposure to asbestos.**

If the answer is in the affirmative, please state:

a.        Whether you used the masks or respirators:

**ANSWER:  See objections and answer to Interrogatory No. 32. Not applicable.**

b.        If so, identify the jobsites at which you used such masks or respirators:

**ANSWER:  See objections and answer to Interrogatory No. 32. Not applicable.**

33.    State whether showers were provided for each such employment:

**ANSWER: Objection. Plaintiff objects to this interrogatory assumes facts, lacks foundation and is not reasonably calculated to lead to the discovery of admissible evidence and otherwise outside the scope of discovery permitted under Ohio Civil Rule 26. Subject to and without waiving said objection, Plaintiff states:  Showers were available at the following job sites: W.R. Grace Davison Chemical Division and Morton International.**

34.    State whether separate lockers for work and personal clothing were provided for each such employment:

**ANSWER:  Objection. Plaintiff objects to this interrogatory assumes facts, lacks foundation and is not reasonably calculated to lead to the discovery of admissible evidence and otherwise outside the scope of discovery permitted under Ohio Civil Rule 26. Subject to and without waiving said objection, Plaintiff states:  Lockers were available at the W.R. Grace Davison Chemical Division plant.**

35.    Have you ever been a member of any trade or labor union?

**ANSWER:    Yes.**

For each and every membership please list the following:

a.        The union, including the local designation for each such union membership:

**ANSWER: Teamsters.**

b.        The beginning and ending dates of membership(s) and the reasons why such membership(s) was terminated:

2197261-5

**ANSWER:  I was a member from 1966 through 1972 (approximate).**

c.      The types of work authorized to perform by virtue of each and every membership:

**ANSWER:  I worked as a spray dryer operator and laborer for W.R. Grace Davison Chemical Division.**

d.      The places, dates and offices held or the committees on which you served in both the local and international union(s) for each such membership:

**ANSWER:  I served as a Chief Union Steward for the Local Teamsters for approximately one year.**

e.      Whether union meetings are or were regularly attended in reference to each such membership:

**ANSWER:  Yes.**

f.      The names of each and every publication(s) received from the unions and the dates and frequency with which they were received:

**ANSWER:  I do not recall receiving any publications.**

g.      The frequency with which such publications are or were read (i.e., regularly, occasionally, rarely):

**ANSWER:  I do not recall receiving any publications.**

36.    State whether you were exposed to asbestos or asbestos-containing products which were manufactured, sold, produced, prepared or distributed by any entity not named as a defendant in this lawsuit. If so, identify the manufacturer, the product and the dates of exposure.

**ANSWER:   Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, unduly burdensome and calls for legal opinions and conclusions. Plaintiff also objects to this interrogatory because it requests information in defendants' possession or equally available to them, including from non-parties and public sources, and to the extent it requests information that constitutes attorney work product. Without waiving said objections, Plaintiff states: a lawsuit was filed in the Circuit Court, Third Judicial Circuit of Madison County, Illinois for mesothelioma-related claims. The case name is *Dougherty v. Atlas Valve Co., et als.*; the case number is 2022-LA-000523. Attached as Exhibit B via the FileCloud link is a copy of the Complaint.**

37.    Have you ever been exposed to asbestos or asbestos-containing products outside the workplace?

2197261-5

**ANSWER: Objection. Plaintiff objects to this interrogatory as being vague and ambiguous. Without waiving said objections, Plaintiff states: Yes. I do not have personal knowledge regarding the asbestos content (or lack thereof) of products used by me or others around me while outside the workplace. I have been advised by my counsel, however, that asbestos or asbestos-containing materials may have been present in various products I used outside the workplace, including, but not limited to, automotive brakes, construction materials, fertilizer and talcum powder products.**

If the answer is in the affirmative, please state the following:

a. The date of each such exposure:

**ANSWER: See objections and answer to Interrogatory No. 37. Without waiving said objections, plaintiff states: I personally used Johnson's Baby Powder from 1960 through approximately 2018. Additionally, I personally performed and was around others who performed automotive work on cars from approximately the early 1970s to mid-1980s. In the 1970s and 1980s I performed home renovations and utilized joint compound and DAP caulk, among others. Also, starting in 1971 and continuing every year, I applied Scott's Fertilizer on my yard three (3) times per year. There were several years where I hired a company to apply the fertilizer.**

b. The place of each such exposure:

**ANSWER: See objections and answer to Interrogatory No. 37(a). Without waiving said objections, in an effort to be cooperative, plaintiff states:**

**I applied Johnson's Baby Powder while in the Navy and living aboard the USS Traverse County. After the Navy, I applied the powder in the bathroom of my homes at the following years and addresses:**



1. **1964-1965**

2. **1965-1966**

3. **October 1966**

4. **1967**

5. **1967-1969**



6. **1969-1970**



7. **July 1971-2018 (approximate)**

**Beginning in the early 1970s and through the mid-1980s, I performed work on cars and also stood nearby friends and neighbors who worked on cars. The auto work was typically done in my driveway or my neighbors driveway, or at European Auto where my friend worked. I recall NAPA brakes were used in my driveway, because I purchased them from the NAPA store on 1000D Erie Highway in Hamilton, OH, and also 5072 Dixie Highway in Fairfield, Ohio.**

**In July 1971, I moved into my home at ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. In approximately 1972, I renovated the garage and utilized joint compound. The joint compound was in five-gallon buckets.**

**In approximately 1982, I renovated the bathroom in my home. I used DAP Caulk onto my bathtub, sink and also on all the windows in my home.**

**In approximately 1986, I purchased an investment property in ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓. The investment property required renovation work performed by me and my friends. I personally installed drywall and used joint compound and DAP caulk.**

**In approximately October 1989, I purchased an investment property located on ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. The investment property required renovation work performed by me and my friends. I personally installed drywall and used joint compound and DAP caulk.**

**Since 1971, Scott's Fertilizer was applied by me or a company in my front and backyard of my home three (3) times per year.**

c.      The trade name(s) and/or manufacturer(s) of the asbestos containing product(s) for each such exposure:

**ANSWER:  See objections and answer to Interrogatory Nos. 37(a) and 37(b).**

d.      The names and addresses of each individual with knowledge to corroborate each such exposure:

30 of 43

**ANSWER: Objection. Plaintiff objects to this interrogatory as being vague and ambiguous. Moreover, certain aspects of this interrogatory call for information that is not reasonably calculated to lead to the discovery of admissible evidence. However, without waiving said objection, Plaintiff states as follows: I do not know the extent of any individual's personal knowledge regarding asbestos exposure. Nevertheless, my neighbors, who I socialized with while he or I worked on cars, passed away. Larry Gardner worked on cars. My sons may have personal knowledge with respect to the renovation, landscape and auto work.**

38. State whether you have ever received any instruction, recommendations or warnings of any kind regarding each asbestos-containing product to which you were exposed (i.e., printed on container or package, tag, covering, or instruction sheet accompanying the product, etc.):

   **ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, lacking foundation and unduly burdensome. However, without waiving said objection, plaintiff answers as follows: I did see or receive any instruction, recommendation or warning for any asbestos-containing product.**

39. State whether you ever received any instructions or recommendations by your employer or superior at any time regarding the safety precautions to be taken when using each asbestos-containing product to which you were exposed, including, but not limited to, the creation, inhalation or ingestion of dust.

   **ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, lacking foundation and unduly burdensome. However, without waiving said objection, plaintiff answers as follows: I did not receive any such instructions or recommendations from my employer or superiors.**

40. Did you at any time receive, have knowledge of, or possess any advice, publication, warning, order, directive, requirement or recommendation, written or oral, which purported to either advise or warn you of the possible harmful effects of exposure to or inhalation of, asbestos, asbestos-containing materials, silica, or silica-containing materials?

   **ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, lacking foundation and unduly burdensome. However, without waiving said objection, plaintiff answers as follows: I did not receive any such advice, publication, warning, order, directive, requirement or recommendation to advise or warn of the possible harmful effects of asbestos exposure or inhalation.**

41. Did you at any time receive, have knowledge of, or possess any advice, publication, warning, order, directive, requirement or recommendation, either written or oral, which purported to advise or recommend techniques, methods or equipment, which would serve to reduce or guard against such potentially harmful exposure?

   **ANSWER: Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, lacking foundation and unduly burdensome. However, without waiving said objection, plaintiff answers as follows: I did not receive any such**

2197261-5

**advice, publication, warning, order, directive, requirement or recommendation that advised or recommended techniques, methods or equipment to reduce or guard against asbestos exposure.**

If the answer is in the affirmative, please state the following:

a.      The nature and exact working of such advice, warning, recommendation etc.:

**ANSWER:  See objections and answer to Interrogatory No. 41.**

b.      The complete identity of each source of such advice, warning or recommendation, etc.:

**ANSWER:  See objections and answer to Interrogatory No. 41.**

c.      The date, time, place and manner and circumstances when each such advice, warning, recommendation, etc. was given:

**ANSWER:  See objections and answer to Interrogatory No. 41.**

d.      Identify each and every co-worker or similar member of your trade and occupation who also received the same or similar advice, warning, recommendation, etc.:

**ANSWER:  See objections and answer to Interrogatory No. 41.**

42.     Have you ever provided testimony, or been SPRINT interviewed in a lawsuit?

**ANSWER:  No.**

If the answer is in the affirmative, please state the following:

a.      The name of the case and case number for which each such testimony or SPRINT interview was given:

**ANSWER:  Not applicable.**

b.      The nature of each such proceeding and/or testimony:

**ANSWER: Not applicable.**

c.      The approximate date when each such testimony and/or SPRINT interview was given:

**ANSWER: Not applicable.**

43.     Have you ever been exposed to radiation medically, incidentally or occupationally?

**ANSWER:  Yes, medically.**

a.   If the answer is in the affirmative, describe the circumstances of exposure and date or dates of exposure:

**ANSWER:  See medical records provided as Exhibit A via the FileCloud link. Additionally, plaintiff provided duly executed authorizations to obtain the same.**

44.   State the nature, extent and frequency of any physical examinations which any of your employers required or made available to you, and the frequency (with specific dates) with which you submitted to such examinations.

**ANSWER:  Objection. Plaintiff objects to this interrogatory as being vague, ambiguous, overly broad, lacking foundation and unduly burdensome. However, without waiving said objection, plaintiff answers as follows: I do not recall attending any physical examinations required by an employer, with exception to receiving a series of tetanus shots while at Morton International.**

45.   Please state whether you have obtained any judgments, settlements, or compromises, payments from or entered into any agreements with any person or entity arising from exposure to asbestos, asbestos-containing products, silica or silica containing products.

**ANSWER:  Objection.  This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26; this interrogatory seeks information protected by the work product doctrine and/or otherwise protected from disclosure.  Relevant information relative to settlements, if any, will be provided after a jury verdict has been rendered for plaintiff, in accordance with Ohio Law.**

If the answer is in the affirmative, please state:

a.   The amount of such each and every judgment, settlement, compromise or payment:

**ANSWER:  See objection above.**

b.   The date upon which each such judgment, settlement, compromise or payment was received:

**ANSWER:  See objection above.**

c.   The person or entity from whom such judgment, settlement, compromise or payment was received:

**ANSWER:  See objection above.**

46.   Please state whether you have entered into any agreement with any party or non-party to this litigation regarding future claims or payments resulting from your alleged exposure to asbestos, asbestos-containing products, silica or silica-containing products.

**ANSWER:  Objection. This Interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26; this interrogatory seeks information protected by Ohio Evidence Rule 408, the work product doctrine and/or otherwise protected from disclosure.  Relevant information relative to settlements, if any, will be provided after a jury verdict has been rendered for plaintiff, in accordance with Ohio Law.**

If the ANSWER is in the affirmative, please state:

a.    The amount of consideration for each such agreement:

**ANSWER:  See objection above.**

b.    The date upon which each agreement was entered into:

**ANSWER:  See objection above.**

c.    The person or entity with whom each such agreement was reached:

**ANSWER:  See objection above.**

d.    The dates upon which each such payment is to be received:

**ANSWER:  See objection above.**

47.    State whether plaintiff, plaintiff's estate, or any legal representatives acting on behalf of plaintiff or plaintiff's estate has sought or applied for compensation for any asbestos-related injuries or diseases from any trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products.

**ANSWER:  Objection. This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26; this interrogatory seeks information protected by Ohio Evidence Rule 408, the work product doctrine and/or otherwise protected from disclosure. Additionally, this interrogatory is vague and ambiguous. Without waiving the foregoing objection, Plaintiffs respond as follows: upon information and belief, none at this time.**

48.    If the response to interrogatory number 47 is affirmative, identify each trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products to which plaintiff, plaintiff's estate, or legal representative has applied for compensation for asbestos-related injuries or diseases.

**ANSWER:  Objection.  This interrogatory is not reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of Ohio Civil Rule 26; this interrogatory seeks information protected by Ohio Evidence Rule 408, the work product doctrine and/or otherwise protected from disclosure. Additionally, this**

interrogatory is vague and ambiguous. Without waiving the foregoing objection, Plaintiffs respond as follows: upon information and belief, none at this time.

49.    State whether plaintiff, plaintiff's estate, or any legal representatives acting on behalf of plaintiff or plaintiff's estate have evidentiary support for seeking or applying for compensation for any asbestos-related injuries or diseases from any trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products, even if the claims process has not commenced.

**ANSWER:  Objection.  This interrogatory is overly broad and unduly burdensome. This interrogatory seeks information protected by Ohio Evidence Rule 408, the work product doctrine and/or otherwise protected from disclosure.  Without waiving said objection, Plaintiff refers Defendants to the answers in the above Interrogatories, all Product Identification Witness Disclosures and depositions that will be or have been filed in this case, and Plaintiffs' Consolidated Brief in Opposition to Defendants' Motion for Summary Judgment that will be filed in this case.**

50.    If the response to interrogatory number 49 is affirmative, identify each trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products to which plaintiff, plaintiff's estate, or legal representative has not yet applied for compensation for asbestos-related injuries or diseases.

**ANSWER:  See objections and answer to Interrogatory No. 49.**

51.    State whether plaintiff, plaintiff's estate, or legal representative has filed a lawsuit in any other jurisdiction seeking compensation for personal injuries or for wrongful death.

**ANSWER:  Objection. This interrogatory is over broad and unduly burdensome; additionally, this interrogatory is not reasonably calculated to lead to the discovery of relevant admissible evidence and is outside the scope of Ohio Civil Rule 26. Subject to and without waiving said objection, plaintiff states: A lawsuit was filed in the Circuit Court, Third Judicial Circuit of Madison County, Illinois for mesothelioma-related claims. The case name is *Dougherty v. Atlas Valve Co., et als.*; the case number is 2022-LA-000523. Attached as Exhibit B via FileCloud link is a copy of the filed Complaint.**

52.    If the response to interrogatory number 51 is affirmative, identify each lawsuit filed by state, county, case number, date filed, injuries claimed, status, and legal representation of plaintiff or plaintiff's estate in the matter.

**ANSWER:    See objections and answer to Interrogatory No. 51.**

53.    State whether plaintiff, plaintiff's estate, or legal representatives allege or have ever claimed that plaintiff has a pneumoconiosis or any cancer or lung injury.

**ANSWER**:    **Objection. This interrogatory is over broad and unduly burdensome; additionally, this interrogatory is not reasonably calculated to lead to the discovery of relevant admissible evidence and is outside the scope of Ohio Civil Rule 26. Subject to and without waiving said objection, plaintiff states: Please refer to the pleadings and medical records provided as Exhibits via the FileCloud link, which set forth the claimed injuries and/or damages.**

54.     If the response to interrogatory number 53 is affirmative, identify any worker's compensation application filed by plaintiff, plaintiff's estate, or legal representative by employer name, state, county, case number, date filed, injuries claimed, status, and legal representation in the matter.

**ANSWER:    Objection. This interrogatory is over broad and unduly burdensome; additionally, this interrogatory is not reasonably calculated to lead to the discovery of relevant admissible evidence and is outside the scope of Ohio Civil Rule 26. Defendant has equal access to information regarding claims made under the Bureau of Workers' Compensation.  Subject to and without waiving said objection, plaintiff states: Not applicable.**

55.     If the response to interrogatory number 53 is affirmative, identify any claim for compensation for pneumoconiosis, any cancer or lung injury filed by plaintiff, plaintiff's estate or legal representative by state, county, case number, date filed, injuries claimed, status, and legal representation in the matter.

**ANSWER:    Objection. This interrogatory is over broad and unduly burdensome; additionally, this interrogatory is not reasonably calculated to lead to the discovery of relevant admissible evidence and is outside the scope of Ohio Civil Rule 26. Defendant has equal access to information regarding claims made under the Bureau of Workers' Compensation.  Subject to and without waiving said objection, plaintiff states: Please refer to the pleadings, medical records and/or the medical authorizations provided hereto that set forth the claimed injuries and/or damages.**

<u>REQUEST FOR PRODUCTION OF DOCUMENTS</u>

1.    Identify and produce all literature or other documents which relate to the product or products, allegedly containing asbestos and/or silica, to which you claim you were exposed which are in your possession or in the possession of your attorney.

**ANSWER: Objection. This request for production is overly broad and unduly burdensome. This request for production seeks information protected by Ohio Evidence Rule 408, the attorney/client privilege, work product doctrine and/or otherwise protected from disclosure. Additionally, this information is more particularly in the possession of Defendants and/or can be obtained by the Defendants just as easily as by Joseph Dougherty.**

2.    Identify and produce your complete work history including the location of each and every jobsite at which you worked wherein you claim you were exposed to asbestos and/or silica. for each such jobsite, state the dates you were present, the length of time you spent at each jobsite, the name and manufacturers of each asbestos-containing product to which you were exposed at each jobsite, the name of your employer, the type of work you performed, and the names and addresses of each co-worker with whom you worked.

**ANSWER: Objection. This request for production is vague, ambiguous, overly broad and unduly burdensome. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, directs defendant to the Work History Sheet attached to the Madison County Complaint as Exhibit B via the FileCloud link. Moreover, plaintiff incorporates the objections and answers to Interrogatory Nos. 28 and 29, respectively.**

3.    Identify and produce all literature or other documents in your possession or in the possession of your attorney, that constitute or relate to advice, warnings, orders, directives, requirements or recommendations, which purported to advise you of the possible harmful effects of exposure to asbestos or asbestos-containing products, or of techniques, methods, or equipment which would serve to reduce or guard against such exposure.

**ANSWER:  Objection. See objections and response to Request No. 1.**

4.    Identify and produce all literature or other documents which relate to your claim of conspiracy as to each defendant named in this lawsuit.

**ANSWER:  Objection. See objections and response to Request No. 1.**

2197261-5

5.     Identify and produce all medical records and reports in your possession or in the possession of your attorney.

**ANSWER:   See copies of all available medical records as Exhibit A via the FileCloud[2] link. Additionally, duly executed medical authorizations are available to defendants.**

6.     Copies of all bills and receipts for medical services, drugs, medication, doctors' fees or other expenses incurred as a result of the injuries you allege you received relevant to this lawsuit:

**ANSWER:   Copies of all available medical bills and receipts for medical services, drugs, medication and doctors' fees were requested and shall be attached as Exhibit C via the FileCloud link. Additionally, duly executed medical authorizations are available to defendants.**

7.     All documents regarding any and all x-ray screening and the results thereof.

**ANSWER: See response to Request No. 5. Additionally, duly executed medical authorizations are available to defendants.**

8.     Identify and produce tax returns for the last ten (10) years, a Social Security Statement of Earnings, and any other documents relating to income earned in the last ten (10) years which are in your possession or in the possession of your attorney.

**ANSWER: Objection. This request for production is vague, ambiguous, overly broad and unduly burdensome. Moreover, certain aspects of this request call for information that is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff attaches copies of his tax returns in his possession as as Exhibit D via the FileCloud link. Plaintiff is not in possession of a Statement of Earnings from the Social Security Administration. Plaintiff continues to conduct a reasonably diligent search for additional responsive documents.**

9.     Identify and produce all non-medical expert reports which are in your possession or in the possession of your attorney.

**ANSWER: Objection. This request for production calls for information protected by the Work Product Doctrine and is otherwise privileged and confidential information protected from disclosure. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff shall exchange all non-privileged, testifying expert reports, if any, as discovery continues in accordance with the dates set forth in the Case Management Order.**

---

2 ████████████████████████████████████████████

2197261-5

10.   Identify and produce all documents and prior testimonies of which you have knowledge which relate to your allegation that you are entitled to receive punitive or exemplary damages.

**ANSWER: Plaintiff continues to conduct a reasonably diligent search for responsive documents.**

11.   Identify and produce the names and full addresses of all persons you expect to call as expert witnesses at trial, including a summary of the testimony that each witness is expected to give.

**ANSWER:   Objection. Plaintiff is not required to create documents. See also plaintiff's response to Request No. 9.**

12.   Identify and produce the names and full addresses of all non-experts you expect to call as witnesses at trial including a summary of the testimony that each witness is expected to give.

**ANSWER:   Objection. At this juncture, this request for production calls for information protected by the Work Product Doctrine and is otherwise privileged litigation and trial strategy protected from disclosure. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Discovery and investigation remain ongoing at this early juncture. Notwithstanding, plaintiff shall identify the names and addresses of all non-expert witnesses who shall be called at the time of trial in accordance with the Case Management Order.**

13.   Documents in your possession constituting or relating to your employment history including, but not limited to, documents which would indicate the place(s) or department(s) of your employer(s) in which you worked, the dates worked, and the names of co-workers with whom you worked at each job or jobsite.

**ANSWER: Objection. This request for production is vague, ambiguous, overly broad and unduly burdensome. Moreover, certain aspects of this request call for information that is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: I am not in possession of any documents responsive to this request. Plaintiff continues to conduct a reasonably diligent search for responsive documents.**

14.   Any lists which have been prepared or which have been prepared by others on your behalf which indicate the types of products to which you claim you were exposed, and the names of the manufacturers, installers, distributors, sellers, suppliers and outside contractors of those products.

**ANSWER: Objection. This request for production is vague, ambiguous, overly broad and unduly burdensome. Moreover, certain aspects of this request call for information that is not reasonably calculated to lead to the discovery of admissible evidence. This request further calls for information protected by the Work Product**

2197261-5

**Doctrine and privileged and confidential information submitted for settlement purposes protected from disclosure under Ohio Evidence Rule 408. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff is not aware of or in possession of any such lists.**

15. All documents pertaining to union memberships, meetings or events relating to the discussions or warnings given concerning hazardous exposures in the workplace and precautions to be taken.

    **ANSWER:    After a reasonably diligent search, plaintiff, Joseph Dougherty, did not locate any responsive documents in his possession.**

16. Any and all documents or photographs you have reviewed or will review in preparation for any testimony you may give in this case or as a co-worker in any other case.

    **ANSWER: Objection. This request for production is vague and ambiguous. Moreover, certain aspects of this request call for information that is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff, Joseph Dougherty, did not review any documents or photographs in preparation for any testimony in this case or as a co-worker in any other case, with the exception to his review of his Answers to Consolidated Discovery Requests and exhibits thereto. Attached as Exhibit E via the FileCloud link are copies of military records in plaintiff's possession. Attached as Exhibit F via the FileCloud link are copies of various family and personal photographs in plaintiff's possession.**

17. Identify and produce all documents, other than those previously identified in your responses to these requests, that you expect to offer as evidence at trial.

    **ANSWER: Objection. This request for production is vague, overly broad, unduly burdensome and ambiguous. Moreover, certain aspects of this request call for information that is protected by the Work Product Doctrine and/or privileged and confidential information submitted for settlement purposes protected from disclosure under Ohio Evidence Rule 408. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff has not determined the extent of all documents that he expects to offer as evidence at trial.**

18. Copies of all documents supporting the itemization of damages you claim in this suit.

    **ANSWER: Objection. This request for production is vague, overly broad, unduly burdensome and ambiguous. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff will supplement this answer pursuant to the Case Management Order.**

19. Copies of all affidavits, statements, and declarations regarding exposure to asbestos and/or asbestos-containing products made or authorized by or on behalf of plaintiff, plaintiff's estate, or legal representative further to efforts made by plaintiff or plaintiff's estate for the purpose of obtaining compensation for asbestos-related injuries or diseases, which

affidavits, statements, and/or declarations were submitted to any trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products.

**ANSWER: Objection. This request for production is vague, overly broad, unduly burdensome and ambiguous. Moreover, certain aspects of this request call for information that is protected by the Work Product Doctrine and/or privileged and confidential information submitted for settlement purposes protected from disclosure under Ohio Evidence Rule 408. Moreover, since virtually all bankruptcy claims, if any, are filed electronically online, copies are not in possession of Plaintiff or Counsel. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff is not aware of or in possession of any Bankruptcy Trust Claims.**

20.    Copies of all claim forms and supporting documentation regarding exposure to asbestos and/or asbestos-containing products made or authorized by or on behalf of plaintiff, plaintiff's estate, or legal representative further to efforts made by plaintiff or plaintiff's estate for the purpose of obtaining compensation for asbestos-related injuries or diseases, which claim forms and supporting documentation were submitted to any trust entity established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products.

**ANSWER: Objection. This request for production is vague, overly broad, unduly burdensome and ambiguous. Moreover, certain aspects of this request call for information that is protected by the Work Product Doctrine and/or privileged and confidential information submitted for settlement purposes protected from disclosure under Ohio Evidence Rule 408. Moreover, since virtually all bankruptcy claims, if any, are filed electronically online, copies are not in possession of Plaintiff or Counsel. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff is not aware of or in possession of any Bankruptcy Trust Claims.**

21.    Copies of all complaints in any lawsuit filed by plaintiff, plaintiff's estate, or legal representative in any jurisdiction other than Cuyahoga County, Ohio against any manufacturer, distributor or supplier of asbestos-containing products seeking compensation for any asbestos-related personal injuries or diseases or for wrongful death.

**ANSWER:    Plaintiff attaches as Exhibit B via the FileCloud link the Complaints filed in the Circuit Court, Third Judicial Circuit, Madison County, Illinois.**

22.    Authorizations executed by plaintiff, plaintiff's estate, or legal representative authorizing the release of all claims information, including supporting documentation, from all trust entities established pursuant to the jurisdiction of any United States Bankruptcy Court by any manufacturer, distributor or supplier of asbestos-containing products from all bankruptcy trusts.

**ANSWER: Objection. This request for production is vague, overly broad, unduly burdensome and ambiguous. Moreover, certain aspects of this request call for information that is protected by the Work Product Doctrine and/or privileged and**

41 of 43

confidential information submitted for settlement purposes protected from disclosure under Ohio Evidence Rule 408. Moreover, since virtually all bankruptcy claims, if any, are filed electronically online, copies are not in possession of Plaintiff or Counsel. Subject to and without waiving said objection, plaintiff, in an effort to be cooperative, responds: Plaintiff is not aware of or in possession of any documents responsive to this request.

**AS TO OBJECTIONS:**

Respectfully submitted,

*/s/Anthony Gallucci*
ANTHONY GALLUCCI (0066665)
CHRISTOPHER J. HICKEY (0065416)
KEVIN E. MCDERMOTT (0027813)
McDermott & Hickey, LLC
20525 Center Ridge Road, Ste. 200
Rocky River, OH  44113
Telephone: (216) 712-7452
Email: ag@mcdermotthickeylaw.com
        chip@mcdermotthickeylaw.com
        kevin@mcdermotthickeylaw.com

DANIEL C. LaTERRA *pro hac vice*
R. AUSTN TAYLOR *pro hac vice*
The Lanier Law Firm, P.C.
126 E. 56th Street, 6th Fl.
New York, NY 10022
Telephone: (212) 421-2800
Email: daniel.laterra@lanierlwfirm.com
        austin.taylor@lanierlawfirm.com

***Attorneys for Plaintiffs***

**<u>CERTIFICATE OF SERVICE</u>**

A copy of the foregoing was filed on Cuyahoga County's File and Serve System this 10th

day of May 2022, via LexisNexis File and Serve Xpress, and deemed served on all parties.

>     */s/Anthony Gallucci*
>     ANTHONY GALLUCCI (0066665)
>     Attorney for Plaintiffs

## **VERIFICATION**

STATE OF OHIO         )     SS:

                               )

COUNTY OF _Butler_ )

       Plaintiff, JOSEPH DOUGHERTY, having been duly sworn, deposes and says he/she is the plaintiff in the above action, and that the facts set forth in the attached Answers to Master Consolidated Discovery Requests served on him/her are true and correct to the best of his/her knowledge.

                         _____
                         JOSEPH DOUGHERTY

Sworn to and subscribed before me this the _9th_ day of _May_____, 2022



ASHLEY NICOLE ALLEGREE
Notary Public, State of Ohio
My Commission Expires
June 22, 2025
COMMISSION: 2020-RE-816197

_____
Notary Public

My Commission Expires: _June 22, 2025_

# EXHIBIT D

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | ) | CASE NO.  CV-22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| vs. | ) | |
| | ) | **PLAINTIFF'S PRELIMINARY** |
| AUTOLIV ASP INC. (f/k/a Morton | ) | **PRODUCT IDENTIFICATION** |
| International, Inc., individually and as | ) | **DISCLOSURE** |
| successor to Gershwin Acquisition Corp., | ) | |
| l/k/a Morton Acquisition Corp.), *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Now comes Plaintiff, Joseph J. Dougherty, by and through counsel, and files this Product Identification Disclosure pursuant to Section F of the Case Management Order.

Plaintiff Joseph J. Dougherty is currently suffering from mesothelioma. Mr. Dougherty served in the U.S. Navy from 1960 through 1964. Mr. Dougherty worked as a laborer at the Philadelphia Naval Shipyard located in Philadelphia, Pennsylvania from approximately October 1965 through approximately December 1965. Mr. Dougherty worked as a spray dryer operator and laborer for W.R. Grace Davison Chemical Division located in Cincinnati, Ohio from approximately October 1966 through approximately October 1972. Mr. Dougherty was an owner and employee of Cosmopolitan Cleaning Company, which performed janitorial, cleaning and landscaping services at Morton International, Inc. located in Reading, Ohio from approximately 1982 through approximately August 2000. Aside from his employment, Mr. Dougherty resided at 11786 Elkwood Drive in Cincinnati, Ohio since approximately July 1971. While residing at this residence (and some additional residences), Mr. Dougherty and other individuals around him used automotive brakes, construction materials, fertilizer and talcum powder products. It is anticipated that Mr. Dougherty will testify that he may have been exposed to asbestos-containing

products and/or machinery as a result of his military service, employment and presence outside of the workplace at the aforesaid locations.

All Defendants are put on notice that Mr. Dougherty may identify asbestos-containing products, either directly by name, indirectly by description and/or work history, and/or based on his testimony and the relevant documentation related to such products. Therefore, all Defendants are on notice to attend and Plaintiff intends to use any testimony by Mr. Dougherty in the litigation and trial of the asserted claims.

It is anticipated that Mr. Dougherty will identify by name the following Defendants:

AUTOLIV ASP INC (F/K/A MORTON INTERNATIONAL INC., INDIVIDUALLY AND AS SUCCESSOR TO GERSHWIN ACQUISITION CORP., L/K/A MORTON ACQUISITION CORP.)

DAP PRODUCTS INC.

DONALD MCKAY SMITH INC

HONEYWELL INTERNATIONAL INC. (F/K/A ALLIED SIGNAL, INC., F/K/A ALLIED CORPORATION, SUCCESSORIN-INTEREST TO BENDIX CORPORATION)

KAISER-GYPSUM COMPANY, INC.,

PFIZER INC.

PNEUMO ABEX LLC

R.E. KRAMIG & CO. INC.

RED SEAL ELECTRIC CO.

RHEEM MANUFACTURING CO.

THE SCOTTS COMPANY LLC

SWENSON TECHNOLOGY INC

UNION CARBIDE CORP.

VANDERBILT MINERALS LLC (INDIVIDUALLY AND AS SUCCESSOR TO GOUVERNERU TALC CO. AND R.T. VANDERBILT CO.)

On Notice to:

ATLAS VALVE CO.

C.H. WHEELER

CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVE BARKSDALE VALVES

CRANE COMPANY

FMC CORPORATION (ON BEHALF OF ITS FORMER PEERLESS PUMP DIVISION AND CHICAGO PUMP DIVISION)

GENERAL ELECTRIC COMPANY

GOULDS PUMPS (IPG), LLC

GRINNELL, LLC

IMO INDUSTRIES, INC. (INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO DELAVAL TURBINE, INC.)

ITT CORPORATION, INC. (F/K/A ITT INDUSTRIES, INC., INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO BELL & GOSSETT)

JAMES WALKER MANUFACTURING

JOHN CRANE, INC.

MORSE TEC LLC, AS SUCCESSOR-BY-MERGER TO BORG-WARNER CORPORATION

NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER

PAR SYSTEMS, LLC

SPRINKMANN SONS CORPORATION OF WISCONSIN

VIACOMCBS INC., F/K/A CBS CORPORATION, A DELAWARE CORPORATION, F/K/A VIACOM INC., SUCCESSOR BY MERGER TO CBS CORPORATION, A PENNSYLVANIA CORPORATION, F/K/A WESTINGHOUSE ELECTRIC CORPORATION

WARREN PUMPS, INC.

WILSONART INTERNATIONAL, INC.

Respectfully submitted,

*/s/Anthony Gallucci*
Anthony Gallucci (0066665)
Christopher J. Hickey (0065416)
Kevin E. McDermott (0027813)
**MCDERMOTT & HICKEY, LLC**
20525 Center Ridge Road, Ste. 200
Rocky River, OH 44113
Telephone: (216) 712-7452
Email: ag@mcdermotthickeylaw.com
chip@mcdermotthickeylaw.com
kevin@mcdermotthickeylaw.com

-and-

*/s/ Daniel C. LaTerra*
Daniel C. LaTerra, *pro hac vice*
R. Austin Taylor *pro hac vice*
**THE LANIER LAW FIRM, P.C.**
126 E. 56th Street, 6th Floor
New York, New York 10022
Telephone: 212-421-2800
Facsimile: 212-421-2878
Email: daniel.laterra@lanierlawfirm.com
austin.taylor@lanierlawfirm.com

***Attorneys for Plaintiff***

## **CERTIFICATION OF SERVICE**

A copy of the foregoing was filed on Cuyahoga County's File and Serve System this 10th

day of May 2022, via LexisNexis File and Serve Xpress, and deemed served on all parties.


*/s/Anthony Gallucci*
Attorney for Plaintiff

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## <u>CONSENT TO REMOVAL</u>

Defendant DAP, Inc. k/n/a/ La Mirada Products Co., Inc. hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,


__/s/  *Brendan P. Kelley*_____
 Laura Kingsley Hong (0033147)
Brendan P. Kelley (0078308)
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Tel:    216.592.5000
Fax:    216.592.5009
E-mail:laura.hong@tuckerellis.com
Brendan.kelley@tuckerellis.com

*Attorneys for Defendant DAP, Inc. k/n/a La Mirada*
*Products Co., Inc., improperly served as "Dap*
*Products Inc."*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## CONSENT TO REMOVAL

Defendant Donald McKay Smith, Inc. hereby indicates its consent to the removal

of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.

Respectfully submitted,

*/s/ William D. Bonezzi*
WILLIAM D. BONEZZI (0018093)
BONEZZI SWITZER
POLITO & HUPP CO., L.P.A.
100 2nd Avenue South, Suite 502-S
St. Petersburg, FL 33701-4314
Telephone: (727) 826-0909
Fax: (727) 826-0914
Email: wbonezzi@bsphlaw.com

Attorney for Defendant
Donald McKay Smith, Inc.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSEPH J. DOUGHERTY, | : |
| | : |
|      Plaintiff, | : |
| | :     Judge _____ |
| v. | : |
| | :     Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : |
| International, Inc., individually and as | : |
| Successor to Gershwin Acquisition Corp., | : |
| f/k/a Morton Acquisition Corp.), et al., | : |
| | : |
|      Defendants. | : |

## CONSENT TO REMOVAL

     Defendant Honeywell International Inc. hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully Submitted,

By */s/ Steven G. Blackmer*
Steven G. Blackmer, Esquire
Ohio I.D. 0072235
Counsel for Defendant,
Honeywell International Inc.

Willman and Silvaggio LLP
One Corporate Center
5500 Corporate Drive, Suite 150
Pittsburgh PA 15237
(412)-366-3333
sblackmer@willmanlaw.com

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JOSEPH J. DOUGHERTY,           :
                                   :
        Plaintiff,           :
                                   :     Judge _____
v.                             :
                                 :     Case No. _____
AUTOLIV ASP INC., (f/k/a Morton    :
International, Inc., individually and as  :
Successor to Gershwin Acquisition Corp.,  :
f/k/a Morton Acquisition Corp.), et al.,  :
                                 :
        Defendants.       :

## CONSENT TO REMOVAL

Defendant Kaiser Gypsum Company hereby indicates its consent to the removal

of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

By: /s/ David J. Fagnilli
DAVID J. FAGNILLI (0032930)
LINDA M. GORCZYNSKI (0070607)
127 Public Square, Suite 3510
Cleveland, Ohio 44114
Phone:  (216) 912-3800
Fax:  (216) 344-9006
Email:    djfagnilli@mdwcg.com
              lmgorczynski@mdwcg.com
*Counsel for Defendant Kaiser Gypsum Company, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## **CONSENT TO REMOVAL**

Defendant Pfizer Inc. hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

*/s/ Karen E. Ross*_____

KAREN E. ROSS (0074173)
KRoss@tuckerellis.com
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH  44113
Telephone:     (216) 592-5000
Facsimile:     (216) 592-5009

*Attorney for Separate Defendant*
*Pfizer Inc.*

5561387.1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Joseph J. Dougherty, | ) | CASE NO. |
| Plaintiff, | ) | JUDGE |
| v. | ) | |
| AUTOLIV ASP INC., (f/k/a Morton International, Inc., individually and as Successor to Gershwin Acquisition Corp., f/k/a Morton Acquisition Corp.), et al, | ) | |
| Defendants. | ) | |

**CONSENT TO REMOVAL**

Defendant, Pneumo Abex LLC, Successor in Interest to Abex Corporation, hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

Christopher J. Caryl
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
Tel:     216-592-5000
Fax:    216-592-5009
Email:  Christopher.caryl@tuckerellis.com

*Attorney for Defendant, Pneumo Abex LLC,*
*Successor in Interest to Abex Corporation*

5563130.1

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOSEPH J. DOUGHERTY,                   :
                                       :
            Plaintiff,                 :
                                       :      Judge _____
v.                                     :
                                       :      Case No. _____
AUTOLIV ASP INC., (f/k/a Morton        :
International, Inc., individually and as :
Successor to Gershwin Acquisition Corp., :
f/k/a Morton Acquisition Corp.), et al.,  :
                                       :
            Defendants.                :

## CONSENT TO REMOVAL

Defendant R.E. Kramig & Co., Inc., hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

David H. Boehm (0072610)
dboehm@flannerygeorgalis.com
Flannery Georgalis, LLC
1375 E. Ninth St., Floor 30
Cleveland, Ohio 44114

Attorney for Defendant R.E. Kramig & Co., Inc.

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## CONSENT TO REMOVAL

   Defendant Red Seal Electric Company hereby indicates its consent to the removal

of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.

           Respectfully submitted,

           **KELLEY JASONS McGOWAN**
           **SPINELLI HANNA & REBER, LLP**

           */s/ John A. Kristan, Jr.*
           John A. Kristan, Jr.
           OH Bar Id. #0073463
           1220 West 6th Street
           The Bradley Building, Suite 305
           Cleveland, OH 44113
           Telephone: (216) 902-4444
           Facsimile: (216) 902-4447
           Email: jkristan@kjmsh.com

           **Attorney for Defendant**
           **Red Seal Electric Company**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## <u>CONSENT TO REMOVAL</u>

Defendant, Rheem Manufacturing Company, through counsel, hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

*/s/ Nathan F. Studeny*
Matthew C. O'Connell (0029043)
Nathan F. Studeny (0077864)
Sutter O'Connell Co.
1301 East 9th Street
3600 Erieview Tower
Cleveland, Ohio 44114
(216) 928-2200 phone
(216) 928-4400 facsimile
moconnell@sutter-law.com
nstudeny@sutter-law.com

Attorneys for Defendant
Rheem Manufacturing Company

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## CONSENT TO REMOVAL

Defendant The Scotts Company, LLC hereby indicates its consent to the removal

of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.

Respectfully submitted,

_____

Richard D. Schuster (0022813)
Perry W. Doran, II (0071757)
Stephen C. Musilli (0071754)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216
Phone: 614-464-6400
Facsimile: 614-464-6350
Email: rdschuster@vorys.com
        pdoran@vorys.com
        scmusilli@vorys.com

*Attorneys for Defendant*
*The Scotts Company, LLC*

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Judge _____ |
| v. | : | |
| | : | Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : | |
| International, Inc., individually and as | : | |
| Successor to Gershwin Acquisition Corp., | : | |
| f/k/a Morton Acquisition Corp.), et al., | : | |
| | : | |
| Defendants. | : | |

## CONSENT TO REMOVAL

Defendant Swenson Technology, Inc. hereby indicates its consent to the removal

of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.

Respectfully submitted,

_____

RYAN T. WINKLER (0089591)
BRENDAN P. KELLY (0078308)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, Ohio 44113-7213
Telephone: 216.592.5000
Telefax: 216.592.5009

*Attorneys for Defendant Swenson Technology, Inc.*

5561205.1

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| JOSEPH J. DOUGHERTY, | : |
| | : |
| Plaintiff, | : |
| | : Judge _____ |
| v. | : |
| | : Case No. _____ |
| AUTOLIV ASP INC., (f/k/a Morton | : |
| International, Inc., individually and as | : |
| Successor to Gershwin Acquisition Corp., | : |
| f/k/a Morton Acquisition Corp.), et al., | : |
| | : |
| Defendants. | : |

## CONSENT TO REMOVAL

Defendant Union Carbide Corporation hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,

_____
Richard D. Schuster (0022813)
Perry W. Doran, II (0071757)
Stephen C. Musilli (0071754)
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
P.O. Box 1008
Columbus, Ohio 43216
Phone: 614-464-6400
Facsimile: 614-464-6350
Email: rdschuster@vorys.com
        pdoran@vorys.com
        scmusilli@vorys.com

*Attorneys for Defendant*
*Union Carbide Corporation*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOSEPH J. DOUGHERTY,   :
            :
   Plaintiff,     :
            :  Judge _____
v.           :
            :  Case No. _____
AUTOLIV ASP INC., (f/k/a Morton :
International, Inc., individually and as :
Successor to Gershwin Acquisition Corp., :
f/k/a Morton Acquisition Corp.), et al., :
            :
   Defendants.   :

## CONSENT TO REMOVAL

Defendant Vanderbilt Minerals, LLC, successor by merger to R.T. Vanderbilt Company, Inc. hereby indicates its consent to the removal of the above-captioned action from the Cuyahoga County Court of Common Pleas to the United States District Court for the Northern District of Ohio.

Respectfully submitted,


/s/ James N. Kline
JAMES N. KLINE (0007577)
jkline@bsphlaw.com
KURT S. SIEGFRIED (0063563)
ksiegfried@bsphlaw.com
Bonezzi Switzer Polito & Hupp Co. L.P.A.
1300 East 9th Street, Suite 1950
Cleveland, Ohio 44114
Phone (216) 875-2767
Fax (216) 875-1570

Attorneys for Defendant
Vanderbilt Minerals, LLC, successor by merger to
R.T. Vanderbilt Company, Inc.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

JOSEPH J. DOUGHERTY,                     :
                                         :
      Plaintiff,                    :
                                         :
v.                                       :          Judge _____
                                         :
                                         :          Case No. _____
AUTOLIV ASP INC., (f/k/a Morton          :
International, Inc., individually and as  :
Successor to Gershwin Acquisition Corp., :
f/k/a Morton Acquisition Corp.), et al., :
                                         :
      Defendants.                   :


**<u>CONSENT TO REMOVAL</u>**

      Defendant WT/HRC Corporation hereby indicates its consent to the removal of

the above-captioned action from the Cuyahoga County Court of Common Pleas to the United

States District Court for the Northern District of Ohio.


      Respectfully submitted,


      _____
      RYAN T. WINKLER (0089591)
      BRENDAN P. KELLY (0078308)
      TUCKER ELLIS LLP
      950 Main Avenue
      Suite 1100
      Cleveland, Ohio  44113-7213
      Telephone:  216.592.5000
      Telefax:  216.592.5009


      *Attorneys for Defendant WT/HRC Corporation*

5561208.1

# EXHIBIT F

***EFILED***
Case Number 2022LA000523
Date: 4/22/2022 12:17 PM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

IN THE CIRCUIT COURT
THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 2022LA000523 |
| | § | NO. _____ |
| ATLAS VALVE CO.; | § | |
| | § | |
| C.H. WHEELER; | § | |
| | § | |
| CRANE COMPANY, AS SUCCESSOR TO | § | |
| CHAPMAN VALVE CO., JENKINS | § | |
| VALVES, STOCKHAM VALVES, | § | |
| COCHRANE VALVES, AND BARKSDALE | § | |
| VALVES; | § | |
| | § | |
| CRANE COMPANY; | § | |
| | § | |
| FMC CORPORATION (ON BEHALF OF ITS | § | |
| FORMER PEERLESS PUMP DIVISION AND | § | |
| CHICAGO PUMP DIVISION); | § | |
| | § | |
| GENERAL ELECTRIC COMPANY; | § | |
| | § | |
| GOULDS PUMPS (IPG), LLC ; | § | |
| | § | |
| GRINNELL, LLC; | § | |
| | § | |
| IMO INDUSTRIES, INC. (INDIVIDUALLY | § | |
| AND AS SUCCESSOR IN INTEREST TO | § | |
| DELAVAL TURBINE, INC.); | § | |
| | § | |
| ITT CORPORATION, INC. (F/K/A ITT | § | |
| INDUSTRIES, INC., INDIVIDUALLY AND | § | |
| AS SUCCESSOR IN INTEREST TO BELL & | § | |
| GOSSETT); | § | |
| | § | |
| JAMES WALKER MANUFACTURING; | § | |
| | § | |
| JOHN CRANE, INC.; | § | |
| | § | |
| MORSE TEC LLC, AS SUCCESSOR-BY- | § | |
| MERGER TO BORG-WARNER | § | |
| CORPORATION; | § | |
| | § | |

1

NEWTERRA, INC., INDIVIDUALLY AND    §
AS SUCCESSOR-IN-INTEREST TO    §
COCHRANE VALVES AND CHICAGO    §
HEATER;    §
   §
PAR SYSTEMS, LLC;    §
   §
SPRINKMANN SONS CORPORATION OF    §
WISCONSIN;    §
   §
VIACOMCBS INC., F/K/A CBS    §
CORPORATION, A DELAWARE    §
CORPORATION, F/K/A VIACOM INC.,    §
SUCCESSOR BY MERGER TO CBS    §
CORPORATION, A PENNSYLVANIA    §
CORPORATION, F/K/A WESTINGHOUSE    §
ELECTRIC CORPORATION;    §
   §
WARREN PUMPS, INC.; and    §
   §
WILSONART INTERNATIONAL, INC.    §
   §
                Defendants.    §

## **COMPLAINT**

## **COUNT I**

## **(NEGLIGENCE COUNT AS TO MANUFACTURERS OF ASBESTOS PRODUCTS)**

Now comes the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE
LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the
Defendants, states:

1.     The Plaintiff worked from 1960 to 1964 as a Boatswain's Mate in the US Navy,
from 1965 to 1966 as a truck driver at Ryan Oil Co., from 1965 to 1966 as a laborer at
Philadelphia Naval Shipyard, from 1965 to 1966 as a steel press operator and laborer at Budd
Company, for several months in 1966 as a laborer at Midvale Hospital, from 1966 to 1972 as a
dryer operator and laborer at W.R. Grace Davison Chemical Division, from 1972 to 1976 as a
salesman and truck driver at Johnson Wax and at Stigler's Supply, from 1976 to 2005 as an

owner of Cosmopolitan Cleaning Company, from 2000 to 2014 as a part time bus driver for Fairfield City Schools in Fairfield, Ohio, and from 2001 to 2021 as a dockman at Great Parks of Hamilton County in Ohio.

2.     During the course of his employment at the locations mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around which were manufactured, sold, distributed or installed by the Defendants:  ATLAS VALVE CO.; C.H. WHEELER; CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES; CRANE COMPANY; FMC CORPORATION (ON BEHALF OF ITS FORMER PEERLESS PUMP DIVISION AND CHICAGO PUMP DIVISION); GENERAL ELECTRIC COMPANY; GOULDS PUMPS (IPG), LLC; GRINNELL, LLC; IMO INDUSTRIES, INC. (INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO DELAVAL TURBINE, INC.); ITT CORPORATION, INC. (F/K/A ITT INDUSTRIES, INC., INDIVIDUALLY AND AS SUCCESSOR IN INTEREST TO BELL & GOSSETT); JAMES WALKER MANUFACTURING; JOHN CRANE, INC.; MORSE TEC LLC, AS SUCCESSOR-BY-MERGER TO BORG-WARNER CORPORATION; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; SPRINKMANN SONS CORPORATION OF WISCONSIN; VIACOMCBS INC., F/K/A CBS CORPORATION, A DELAWARE CORPORATION, F/K/A VIACOM INC., SUCCESSOR BY MERGER TO CBS CORPORATION, A PENNSYLVANIA CORPORATION, F/K/A WESTINGHOUSE ELECTRIC CORPORATION; WARREN PUMPS, INC.; and WILSONART INTERNATIONAL, INC.

3

3.      At all times herein set forth, the Defendants' products were being employed in the manner and for the purposes for which they were intended.

4.      The Plaintiff's exposure to and inhalation, ingestion or absorption of the asbestos fibers emanating from the above-mentioned products was completely foreseeable and could or should have been anticipated by the Defendants.

5.      The Defendants knew or should have known that the asbestos fibers contained in their products had a toxic, poisonous, and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them.

6.      That on or about November 8, 2021, Plaintiff first became aware that he had developed MESOTHELIOMA, an asbestos-induced disease, and that said disease was wrongfully caused.

7.      At all times herein relevant, the Defendants had a duty to exercise reasonable care and caution for the safety of the Plaintiff and others working with and around the products of the Defendants containing asbestos.

8.      The Defendants failed to exercise ordinary care and caution for the safety of the Plaintiff in one or more of the following respects:

(a)     Included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around them would inhale, ingest or otherwise absorb great amounts of that asbestos;

(b)     Included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

4

(c)    Included asbestos in their products when adequate substitutes for the asbestos in them was available;

(d)    Failed to provide any or adequate warnings to persons working with and around the products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers contained in them;

(e)    Failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

(f)    Failed to conduct tests on the asbestos containing products manufactured, sold, delivered or installed by the Defendants in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with the products.

9.    That as a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Defendants mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers causing Plaintiff to develop the asbestos disease aforesaid, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

10.    Defendants either owed a duty to Plaintiffs or are liable for the tort of negligent undertaking pursuant to Sections 323 and 324A of the Restatement (Second) of Torts. Defendants undertook to provide services for others and therefore had a duty to use reasonable care in the provision of said services.  Defendants' assumption of the duties enumerated herein and their failure to exercise reasonable care in the performance of such duties proximately caused Plaintiffs' injuries and damages.

WHEREFORE, Plaintiff prays judgment be entered against the Defendants for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS which will fairly and reasonably compensate for the Plaintiff's injuries.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT II

## (WILLFUL AND WANTON COUNT AS TO MANUFACTURERS OF ASBESTOS PRODUCTS)

Now comes the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Defendants, states:

1. - 7.  Plaintiff repeats and re-alleges Paragraphs 1, 2, 3, 4, 5, 6 and 7 of Count I as and for Paragraphs 1, 2, 3, 4, 5, 6 and 7 of this Count II.

8.    Defendants are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

(a)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products, even though it was completely foreseeable and could or should have been anticipated that persons such as the Plaintiff working with or around

them would inhale, ingest or otherwise absorb great amounts of that asbestos;

(b)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in their products when the Defendants knew or should have known that said asbestos fibers would have a toxic, poisonous and highly deleterious effect upon the health of persons inhaling, ingesting or otherwise absorbing them;

(c)    Intentionally or with a reckless disregard for the safety of Plaintiff, included asbestos in the products when adequate substitutes for the asbestos in them was available;

(d)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate warnings to persons working with and around the products of the dangers of inhaling, ingesting or otherwise absorbing the asbestos fibers in them;

(e)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with and around the products, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers in them; and

(f)    Intentionally or with a reckless disregard for the safety of the Plaintiff, failed to conduct tests on the asbestos containing products manufactured, sold or delivered by the Defendants in order to determine the hazards to which workers such as the Plaintiff might be exposed while working with the products.

9.    Plaintiff repeats and re-alleges Paragraph 9 of Count I as and for Paragraph 9 of this Count II.

WHEREFORE, Plaintiff prays that he be awarded, in addition to his compensatory damages, punitive and exemplary damages in an amount in excess of FIFTY THOUSAND ($50,000.00) DOLLARS.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT III

Comes now the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Conspirator Defendant(s) states:

1. Plaintiff repeats and re-alleges Paragraph 1 of Count I as and for Paragraph 1 of this Count III.

2. During the course of his employment, Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around which were manufactured, sold or distributed by the Defendants named in Count I above.

3. The Conspirator Defendants (both named and not named herein), individually and as agents of one another and as co-conspirators, agreed and conspired among themselves and with other asbestos manufacturers, distributors, and trade organizations, to injure the Plaintiff in the following manner.

4. The manufacturers, sellers, suppliers and/or premises owners named herein acted in concert along with insurers, such as Travelers and Liberty Mutual and others, including the Johns-Manville Corp., Raymark Industries, Inc., Celotex Corp. and its predecessors (and others as the evidence may show) with the intent to deceive and misinform decedents.

5.     The evidence destroyed by each of the Conspirators includes, without limitation, preliminary reports of toxicology and epidemiology studies, records of meetings between the agents and employees of the Conspirators, including those conducted under the auspices of trade associations, and records of plant and premise inspections reporting asbestos and other hazards.

6.     The Conspirators reached an agreement or understanding to inflict a wrong against or injury to the Plaintiff and others so situated.  Moreover, Conspirators minds met on the object or course of action, amounting to some mutual mental action coupled with an intent to commit the acts which resulted in the injuries complained of.  In short, Conspirators hatched a preconceived plan with unity of design and purpose.  They intended to engage in the course of conduct complained of that resulted in injury and death, and the course of conduct was known to them through their officers, directors, agents, servants and managers.

7.     The conspiratorial conduct of the insurers based on presently available discovery began around 1937 as to Liberty Mutual, 1935 as to Travelers, and continues until the present.

8.     The course of conduct continues to the present and is amplified by the destruction of studies and reports concerning the incidence of asbestos-related diseases in refinery workers, the concealment from Plaintiff and others similarly situated of their medical conditions, intentional misrepresentations of the health effects of asbestos dust inhalation, and the intellectually dishonest and fraudulent design of epidemiology, mortality and morbidity studies to fraudulently conceal the incidence of MESOTHELIOMA in refinery workers.

9.     In particular, the Conspirators, acting through their own medical departments and in conjunction with those of their co-conspirators, including their trade associations and most especially the insurers, investigated the health hazards faced by workers, thereby learning of, in the exercise of reasonable care and having reason to learn of, the hazards of asbestos.

9

10.    Acting maliciously, and with guile and deceit, all other Conspirators did intentionally suppress and misrepresent the results of such investigations--actively concealing the information from customers, the users of the asbestos products, their own workers and the employees of contractors upon their premises, as well as from governmental and medical authorities--and ultimately conspired to destroy or alter records of such knowledge in order to prevent the scientific and medical evidence from being discovered by the victims of the conspiracy and to forestall regulatory efforts and legislation intended to protect innocent workers.

11.    The Conspirator insurers also conspired with one another and other, as yet unnamed insurers, to suppress, misrepresent, and conceal facts about the carcinogenicity and hazards posed by asbestos to persons exposed in the construction and manufacturing trades, which conspiracy began in the 1930's and continued into the 1980's.

12.    In addition to all allegations above, the conspirators actively suppressed publications concerning asbestosis in the *Asbestos Magazine*, a trade magazine and important source of information to the public, and also to users of asbestos products, including users such as the Plaintiff herein.  This magazine was read by sales and marketing personnel in the asbestos industry.

13.    The acts of the defendant conspirators, as described above, constitute a fraudulent misrepresentation/concealment which proximately caused the injuries to the Plaintiff in the following manner:

A.    The material published or caused to be published by the conspirators was false and incomplete in that the Defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

10

B.    The Defendants individually, as members of a conspiracy, and as agents of other co-conspirators, intended the publication of false and misleading reports, and/or the non-disclosure of documented reports of the health hazards of asbestos:

      1.    To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;

      2.    To assist in the continued pecuniary gain of the Defendants through the sale of asbestos products to an ignorant public;

      3.    To influence in the Defendant's favor legislation to regulate asbestos exposures and limit medical and disability claims for compensation;

      4.    To provide a defense in lawsuits brought for injury resulting from asbestos disease;

      5.    To prevent relevant medical inquiry about asbestos disease;

      6.    To mislead the general public, and the Plaintiff herein, about the hazards associated with asbestos products; and

      7.    To induce the Plaintiff to use and continue to use asbestos products.

C.    The Plaintiff reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products to asbestos because Plaintiff believed it to be safe.

D.    Defendants individually, and as members of a conspiracy, and as agents of other co-conspirators intended that the Plaintiff rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the

absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, to continue their exposure to those products.

E.   Defendants individually, and as members of a conspiracy, and as agents of other co-conspirators were in a position of superior knowledge regarding the health hazards of asbestos and therefore the Plaintiff and others deciding to use said asbestos-containing products to which Plaintiff was exposed had a right to rely and did rely on the published reports commissioned by the Defendant regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

F.   Plaintiff suffered injuries as a direct and proximate result of the acts alleged above.

14.   Specifically, the Conspirator insurers had an express or tacit understanding with their insured some of whom are Defendants herein or other insured who manufactured asbestos-containing products to participate in a common plan or design to commit a tortious act, for example, to misrepresent to Plaintiff and others similarly situated that asbestos was not hazardous, would not cause cancer, and was not present in the air regularly breathed by plaintiff in the presence of the insureds products.

15.   As a direct and proximate result of the acts of the Conspirators in furtherance of their plan of deception, done intentionally or negligently, and always in concert, rendering them each jointly and severally liable for the wanton behavior of the other Defendants and or other co-conspirators, as described above, the Plaintiff was occupationally exposed to asbestos and/or asbestos-containing products used at his places of employment and has inhaled or otherwise ingested hazardous asbestos dust resulting in his developing MESOTHELIOMA.

16.     Each Conspirator Defendant which remained silent either (a) actively took part in the suppression, concealment, misrepresentation and eventual destruction of data and evidence, or (b) furthered the plan or plans by cooperation and request, or (c) lent aid or encouragement to the actual wrongdoers, or (d) ratified and adopted the wrongdoers' acts done for their benefit.

17.     As a direct and proximate result of one or more of the foregoing acts or omissions on the part of the Conspirator Defendants, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amount of asbestos fibers causing Plaintiff to develop the asbestos disease aforesaid, which has disabled and disfigured the Plaintiff; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; that as a further result of his asbestos-induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

18.     As a result of the above-described conspiratorial acts of the Defendant conspirators as well as those conspirators not named herein, the dangers of asbestos to the human respiratory and digestive systems were hidden from industry in particular and society in general, with the consequences (a) that asbestos products were installed in virtually every plant and building in the United States and a large part of the rest of the industrialized world, (b) that safe substitutes were not developed by industry until after plants and building had already been made hazardous by the application or installation of numerous asbestos products, and (c) that a large

13

number of people who have come into contact with asbestos have become ill or died as a result of the inhalation or ingestion of asbestos fibers.  The Plaintiff herein was among those who worked in the hidden danger of asbestos, sometimes unaware of the presence of asbestos and always unaware of the carcinogenic and other adverse properties of asbestos fibers.  As a proximate consequence of the conspiratorial acts of the Defendant conspirators in suppressing evidence concerning the carcinogenic and other adverse properties of asbestos, some of which were installed in or applied to the plant facilities, Plaintiff was caused to be exposed to, and was unable to protect himself from, the asbestos fibers in his environment and thereby suffered grave and progressive bodily injury.

WHEREFORE, Plaintiff prays that he be awarded, in addition to his compensatory damages, punitive and exemplary damages in an amount in excess of FIFTY THOUSAND ($50,000.00) DOLLARS.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT IV

## NEGLIGENT SPOLIATION OF EVIDENCE

1.    At a point in time prior to the commencement of this case, Defendant, SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, had in their possession, custody and control certain documents and information relating to asbestos-containing products, which SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, sold, distributed and applied.

2.    Upon information and belief, said documents and information were relevant to issues in this case, including, but not limited to: the identification of asbestos-containing products sold, distributed and applied by SPRINKMANN INSULATION, INC., and

14

SPRINKMANN SONS CORPORATION, the locations to, and at, which SPRINKMANN INSULATION, INC., and SPRINKMANN SONS CORPORATION, sold, distributed and applied asbestos-containing products; the identity of the manufacturers and wholesale distributors of said products; and, SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, knowledge, notice and information regarding the hazards of asbestos and whether or not it was negligent.

3.      It was foreseeable to a reasonable person/entity in the position of SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, that said documents and information constituted evidence, which was material to potential civil litigation-namely, asbestos litigation. SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, had a duty to maintain and preserve said documents and information because they knew or should have known that said documents and information were material evidence in potential asbestos litigation.

4.      SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, breached their duty to preserve said material evidence by destroying and otherwise disposing of said documents and information, at a time when they knew or should have known that the same constituted material evidence in potential civil litigation.

5.   As a direct and proximate result of SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, destruction and disposal of said material evidence, Plaintiff has been prejudiced and impaired in proving his claims against all potentially liable parties, including, but not limited to, SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, and, as a further result thereof, has been compelled to dismiss and/or compromise said claims against other defendants.

6.      As a result of this prejudice and impairment, Plaintiff has been caused to suffer damages in the form of impaired ability to recover against SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION and loss of reduced compensation from potentially liable parties in this litigation.

WHEREFORE, Plaintiff prays this Court to enter judgment against Defendant SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, and to award compensatory damages in an amount to be proved at trial, but believed to exceed $50,000, and for such other and further relief that this Court deems appropriate.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT V

## WILLFUL AND WANTON SPOLIATION OF EVIDENCE

1.      At a point in time prior to the commencement of this case Defendant SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, had in their possession, custody and control certain documents and information relating to asbestos-containing products, which SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, sold, distributed and applied.

2.      Upon information and belief, said documents and information were relevant to issues in this case, including, but not limited to: the identification of asbestos-containing products sold distributed and applied by SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, the locations to, and at, which SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, sold, distributed and applied asbestos-containing products; the identity of the manufacturers and wholesale distributors of said products; and, SPRINKMANN INSULATION, INC. and SPRINKMANN

16

SONS CORPORATION, knowledge, notice and information regarding the hazards of asbestos and whether or not it was negligent.

3.      It was foreseeable to a reasonable person/entity in the position of SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, that said documents and information constituted evidence, which was material to potential civil litigation-namely, asbestos litigation.    SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, had a duty to maintain and preserve said documents and information because they knew or should have known that said documents and information were material evidence in potential asbestos litigation.

4.      SPRINKMANN    INSULATION,    INC.    and    SPRINKMANN    SONS CORPORATION, breached its duty to preserve said material evidence by destroying and otherwise deposing of said documents and information, at a time when it knew or should have known that the same constituted material evidence in potential civil litigation.  In destroying and disposing of said material evidence, SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, acted intentionally and/or in reckless disregard of its duty to preserve the same.

5.      As a direct and proximate result of SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, destruction and disposal of said material evidence, Plaintiff has been prejudiced and impaired in proving his claims against all potentially liable parties, including, but not limited to, SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, and, as a further result thereof, has been compelled to dismiss and/or compromise said claims against other defendants.

6.     As a result of this prejudice and impairment, Plaintiff has been caused to suffer damages in the form of impaired ability to recover against SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, and lost or reduced compensation from potentially liable parties in this litigation.

WHEREFORE, Plaintiff prays this Court to enter judgment against Defendant SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, and to award: compensatory damages in an amount to be proved at trial, but believed to exceed $50,000; punitive damages in an amount sufficient to punish SPRINKMANN INSULATION, INC. and SPRINKMANN SONS CORPORATION, for their misconduct and to deter similarly situated parties from committing like acts of misconduct in the future; and for such other and further relief that this Court deems appropriate.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT VI

### (FRAUDULENT MISREPRESENTATION AGAINST PREMISES DEFENDANTS)

Comes now the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Defendants, ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES; states as follows:

1.     Plaintiff repeats and realleges Paragraph 1 of Count I as and for Paragraph 1 of this Count VI.

2.      During the course of his employment at the locations mentioned above, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed large amounts of asbestos fibers emanating from certain products he was working with and around, which products were supplied by Defendants.

3.      Plaintiff was unaware of the dangers of the asbestos-containing products which rendered them unsafe for their intended use.  At the time Plaintiff used or worked around these products, such use was in a manner that was reasonably anticipated by.

4.      That on or about November 8, 2021, Plaintiff first became aware that he had developed MESOTHELIOMA an asbestos-induced disease, and that said disease was wrongfully caused.

5.      Defendants, through its officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe. Notwithstanding this knowledge, these Defendants engaged in the following omissions or commissions:

    (a)    It deliberately, intentionally, wantonly and designedly furnished asbestos-containing products to Plaintiff for use in his duties at the facility;

    (b)    It deliberately, intentionally, wantonly and designedly failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;

    (c)    It deliberately, intentionally, wantonly and designedly failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;

    (d)    It deliberately, intentionally, wantonly and designedly failed to replace the hazardous asbestos-containing

19

products with asbestos substitutes which it knew or should have known by 1930 were available;

(e)    It deliberately, intentionally, wantonly and designedly failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;

(f)    It deliberately, intentionally, wantonly and designedly made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;

(g)    It deliberately, intentionally, wantonly and designedly failed to restrict Plaintiff from working in dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;

(h)    It deliberately, intentionally, wantonly and designedly failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i)    It deliberately, intentionally, wantonly and designedly failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j)    It deliberately, intentionally, wantonly and designedly failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

6.    In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, these defendants deliberately, intentionally, wantonly and designedly engaged

in conduct designed to actively conceal and suppress material facts knowing Plaintiff would rely on these facts to his detriment and cause him bodily harm.

7.     In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, Defendants through its silence deliberately, intentionally, wantonly and designedly engaged in false and deceptive conduct of a material nature, knowing or believing said conduct to be false and doing it for the purpose of inducing Plaintiff to continue to work at ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES causing him bodily harm.  Plaintiff reasonably believed and relied on Defendants' conduct to his detriment.

8.     In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, Defendants committed, commanded or expressly authorized the concealment of the known dangers of asbestos intending that the Plaintiff would rely on its silence and thereby inhale, ingest or otherwise absorb asbestos fibers and become injured.

9.     Defendants undertook a duty to provide a safe work place for Plaintiff. Defendants knew that Plaintiff relied on it to provide a safe work place.  In permitting and knowing that Plaintiff would rely on Defendant to provide a safe work place, the Defendants deliberately, intentionally, wantonly and designedly engaged in a false representation of a material fact, knowing it to be false and doing it for the purpose of inducing Plaintiff to continue to work at ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO

21

HEATER;  PAR  SYSTEMS,  LLC;  and  CRANE  COMPANY,  AS  SUCCESSOR  TO
CHAPMAN  VALVE  CO.,  JENKINS  VALVES,  STOCKHAM  VALVES,  COCHRANE
VALVES,  AND  BARKSDALE  VALVES.  Plaintiff  reasonably  believed  and  relied  on
Defendants' false representation to his detriment.  By this conduct, the Defendants intended to
cause bodily harm to Plaintiff.

10.    As  a  proximate  cause  of  each  of  the  foregoing  acts  or  omissions,  active
concealments and false representations, and intentional and wanton conduct, both individually
and collectively, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great
amounts of asbestos fibers without his consent, causing Plaintiff to develop MESOTHELIOMA;
the Plaintiff has in the past and will in the future be compelled to expend and become liable for
large  sums  of  monies  for  hospital,  medical  and  other  health  care  services  necessary  for  the
treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in
the  future  experience  great  physical  pain  and  mental  anguish  as  a  result  of  the  inhalation,
ingestion  and  absorption  of  said  asbestos  fibers;  and  that  as  a  further  result  of  his  asbestos-
induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and
prevented from pursuing his normal course of employment, thereby losing large sums of money
which otherwise would have accrued to him.

WHEREFORE, Plaintiff prays judgment be entered against the Defendant in a sum in
excess of FIFTY THOUSAND ($50,000.00) DOLLARS for his economic damages which will
fairly and reasonably compensate for the Plaintiff's injuries.

> Respectfully submitted,
> JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT VII

## (BATTERY AGAINST PREMISES DEFENDANTS)

22

Comes now the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Defendant, ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES, states as follows:

1.      Plaintiff repeats and realleges Paragraph 1 of Count I as and for Paragraph 1 of this Count VII.

2. - 5.  Plaintiff repeats and realleges Paragraphs 2, 3, 4 and 5 of Count VI as and for Paragraphs 2, 3, 4 and 5 of this Count VII.

6.      In failing to act on each of these items as listed in Paragraph 5, both individually and collectively the Defendants, through their silence deliberately, intentionally, wantonly and designedly concealed the known dangers of asbestos, intending that Plaintiff would come in contact with asbestos and that asbestos fibers would become trapped in Plaintiff's lungs without his consent.

7.      In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, the Defendants, through their silence deliberately, intentionally, wantonly and designedly engaged in a course of conduct intending that Plaintiff would inhale, ingest or otherwise absorb asbestos fibers and become injured.

8.      In failing to act on each of these items as listed in Paragraph 5, both individually and collectively, the Defendants committed, commanded or expressly authorized the concealment of the known dangers of asbestos intending that the Plaintiff would come in contact

23

with asbestos and inhale, ingest, or otherwise absorb asbestos fibers which would result in Plaintiff's injury.

9. Plaintiff repeats and realleges Paragraph 10 of Count VI as and for Paragraph 9 of this Count VII.

WHEREFORE, Plaintiff prays judgment be entered against the Defendant for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS for his economic damages, which will fairly and reasonably compensate for the Plaintiff's injuries.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT VIII

### (NEGLIGENCE AGAINST PREMISES DEFENDANTS)

Comes now the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Defendants, ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES, states as follows:

1. Plaintiff repeats and realleges Paragraph 1 of Count I as and for Paragraph 1 of this Count VIII.

2. - 4. Plaintiff repeats and realleges Paragraphs 2, 3, and 4 of Count VI as and for Paragraphs 2, 3, and 4 of this Count VIII.

5. The Defendants, through their officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used

24

extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe.

6.     The Defendants, as employers of Plaintiff, owed to Plaintiff a duty to provide a safe place to work and a duty to give Plaintiff timely notice of latent or concealed dangers which were known or should have been known by the Defendants.

7.     Defendants breached its duties to Plaintiff by engaging in the following omissions or commissions:

> (a)     It negligently furnished asbestos-containing products to Plaintiff for use in his duties at the facility;
>
> (b)     It negligently failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;
>
> (c)     It negligently failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;
>
> (d)     It negligently failed to replace the hazardous asbestos-containing products with asbestos substitutes which it knew or should have known by 1930 were available;
>
> (e)     It negligently failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;
>
> (f)     It negligently made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;
>
> (g)     It negligently failed to restrict Plaintiff from working in dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;
>
> (h)     It negligently failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on

25

how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i)     It negligently failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j)     It negligently failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

8.     Defendants undertook a duty to provide a safe work place for Plaintiff. Defendants knew that Plaintiff relied on it to provide a safe work place.  In permitting and knowing that Plaintiff would rely on Defendant to provide a safe work place, the Defendants negligently engaged in a false representation of a material fact, knowing it to be false and doing it for the purpose of inducing Plaintiff to continue to work at ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES.   Plaintiff reasonably believed and relied on Defendants' representation to his detriment.

9.     The breach by Defendants of its duties to Plaintiff was a direct and proximate cause of his development and contraction of an asbestos-related disease, including MESOTHELIOMA, and resulted in damages more particularly described below.

10.     As a direct and proximate cause of each of the foregoing negligent acts or omissions, both individually and collectively, the Plaintiff was exposed to and inhaled, ingested or otherwise absorbed great amounts of asbestos fibers without his consent, causing him to

26

develop MESOTHELIOMA; the Plaintiff has in the past and will in the future be compelled to expend and become liable for large sums of monies for hospital, medical and other health care services necessary for the treatment of his asbestos-induced disease and conditions; the Plaintiff has in the past and will in the future experience great physical pain and mental anguish as a result of the inhalation, ingestion and absorption of said asbestos fibers; and that as a further result of his asbestos-induced disease and conditions, the Plaintiff has in the past and will in the future be hindered and prevented from pursuing his normal course of employment, thereby losing large sums of money which otherwise would have accrued to him.

WHEREFORE, Plaintiff prays judgment be entered against the Defendant for a sum in excess of FIFTY THOUSAND ($50,000.00) DOLLARS for his economic damages, which will fairly and reasonably compensate for the Plaintiff's injuries.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff

## COUNT IX

### (WILLFUL AND WANTON COUNT AGAINST PREMISES DEFENDANTS)

Comes now the Plaintiffs JOSEPH JOHN DOUGHERTY, by his attorneys, THE LANIER LAW FIRM and THE GORI LAW FIRM, P.C., and for his cause of action against the Defendants, ATLAS VALVE CO.; C.H. WHEELER; NEWTERRA, INC., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST TO COCHRANE VALVES AND CHICAGO HEATER; PAR SYSTEMS, LLC; and CRANE COMPANY, AS SUCCESSOR TO CHAPMAN VALVE CO., JENKINS VALVES, STOCKHAM VALVES, COCHRANE VALVES, AND BARKSDALE VALVES, states:

1.     Plaintiff repeats and realleges Paragraph 1 of Count I as and for Paragraph 1 of this Count IX.

27

2. - 4.   Plaintiff repeats and realleges Paragraphs 2, 3, and 4 of Count VI as and for Paragraphs 2, 3, and 4 of this Count IX.

5.       Defendants, through its officers and employees, knew or should have known at least by 1930 that asbestos-containing products which it supplied and which were used extensively throughout the facility, were a health hazard to people who worked with and around them, and in the alternative, had no positive proof that prolonged exposure to asbestos was safe.

6.       Defendants are guilty of one or more of the following acts or omissions amounting to willful and wanton misconduct:

(a)   It intentionally or with reckless disregard for the safety of Plaintiff, furnished asbestos-containing products to Plaintiff for use in his duties at the facility;

(b)   It intentionally or with reckless disregard for the safety of Plaintiff, failed to warn Plaintiff about the known dangers of asbestos exposure at the facility;

(c)   It intentionally or with a reckless disregard for the safety of Plaintiff, failed to inform Plaintiff of its known potentially hazardous work place as a result of asbestos exposure;

(d)   It intentionally or with reckless disregard for the safety of Plaintiff, failed to replace the hazardous asbestos-containing products with asbestos substitutes which it knew or should have known by 1930 were available;

(e)   It intentionally or with reckless disregard for the safety of Plaintiff, failed to abate or contain the unsafe work environment although it knew or should have known in the 1930s that containment and abatement were available;

(f)   It intentionally or with reckless disregard for the safety of Plaintiff, made Plaintiff work in dangerous areas of the facility knowing that it posed a significant health hazard to people because of the friable and deteriorating condition of asbestos-containing products;

(g)   It intentionally or with reckless disregard for the safety of Plaintiff, failed to restrict Plaintiff from working in

dangerous areas of the facility which had been identified as posing a significant health hazard because of the friable or deteriorating condition of asbestos-containing products;

(h)     It intentionally or with reckless disregard for the safety of Plaintiff, failed to provide any or adequate instructions concerning the safe methods of working with and around the products it supplied, including specific instructions on how to avoid inhaling, ingesting or otherwise absorbing the asbestos fibers;

(i)     It intentionally or with reckless disregard for the safety of Plaintiff, failed to provide masks, respirators or other protective apparel to Plaintiff, thereby permitting Plaintiff to work around hazardous asbestos-containing material without protection; and

(j)     It intentionally or with reckless disregard for the safety of Plaintiff, failed 1) to provide medical examinations (until the 1980s), 2) failed to determine past asbestos exposure of its employees and workers, and 3) failed to identify those trades that came into contact with asbestos-containing products it supplied.

7.     In failing to act on each of these items as listed in Paragraph 6, both individually and collectively, Defendants intentionally or with reckless disregard for the safety of Plaintiff engaged in a course of conduct designed to actively conceal and suppress material facts knowing Plaintiff would rely on those facts to his detriment and cause him bodily harm.

8.     In failing to act on each of these items as listed in Paragraph 6, both individually and collectively, the Defendants, through their silence, intentionally or with reckless disregard for the safety of Plaintiff, engaged in false and deceptive conduct of a material nature, knowing or believing said conduct to be false and doing it for the purpose of inducing Plaintiff to continue to work at its facility, causing him bodily harm.  Plaintiff reasonably believed and relied on Defendants' conduct to his detriment.

9.      Plaintiff repeats and realleges Paragraph 10 of Count VI as and for Paragraph 9 of this Count IX.

WHEREFORE, Plaintiff prays that he be awarded, in addition to his economic damages in excess of FIFTY THOUSAND ($50,000.00) DOLLARS, punitive and exemplary damages.

Respectfully submitted,
JOSEPH JOHN DOUGHERTY, Plaintiff


**THE GORI LAW FIRM, P.C.**


By:___/s/Sara M. Salger___

Sara M. Salger, # 6296640
Erin L. Beavers, # 6276139
Martavious A. Thomas, # 6278592
Attorneys for Plaintiff
156 N. Main St.
Edwardsville, IL  62025
Phone: (618) 659-9833
Fax: (618) 659-9834
asbestoslitigation@gorilaw.com

AND

W. MARK LANIER,      TSB#:  11934600
CASE A. DAM, ISB#:  6286001
JONATHAN F. ARMOUR, TSB#:  24061055
**THE LANIER LAW FIRM, P.C.**
10940 W. Sam Houston Pkwy N, Suite 100
Houston, TX 77064
Telephone:  (713) 659-5200
Facsimile:  (713) 659-2204
Case.dam@lanierlawfirm.com
Jonathan.armour@lanierlawfirm.com
**ATTORNEYS FOR PLAINTIFFS**

**NAME:**        **Dougherty, Joseph John**

**NICKNAME:**    **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**    U.S. Navy

**SUPERVISOR:**

**JOB SITES:**    - Basic Training Little Creek, VA, 1960-1961;
                - U.S.S. Traverse County 1160, 1961-1963;
                - Drydocked Jacksonville, FL, 1963-1964

**CITY, STATE:**    Jacksonville      **,**    Florida

**DATE OF JOB:**    12/1960    **-**    12/1964

**JOB LENGTH:**    4 years

**JOB DUTIES:**    4th Class Boatswain's Mate

**MATERIALS USED ON THIS JOB:**

**NAME:**              **Dougherty, Joseph John**

**NICKNAME:**       **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**     Ryan Oil Co.

**SUPERVISOR:**

**JOB SITES:**

**CITY, STATE:**    Germantown        ,   Pennsylvania

**DATE OF JOB:**   1965       -   1966

**JOB LENGTH:**    Several months

**JOB DUTIES:**     Truck Driver

**MATERIALS USED ON THIS JOB:**

**NAME:**             **Dougherty, Joseph John**

**NICKNAME:**     **Joe**

## **WORK HISTORY SHEET**

**EMPLOYER:**     Philadelphia Naval Shipyard

**SUPERVISOR:**

**JOB SITES:**       Philadelphia Naval Shipyard

**CITY, STATE:**    Philadelphia       ,  PA

**DATE OF JOB:**   1965      -  1966

**JOB LENGTH:**   3-5 months

**JOB DUTIES:**    Laborer who assisted various tradesmen in new ship construction and overhauls, and in general maintenance in the shipyard.

**MATERIALS USED ON THIS JOB:**

**NAME:**                      **Dougherty, Joseph John**

**NICKNAME:**           **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**      Budd Company

**SUPERVISOR:**

**JOB SITES:**       - Budd Company, Huntingon Park Plant;
                   - Budd Company, Red Lion Plant.

**CITY, STATE:**    North Philadelphia    **,**   Pennsylvania

**DATE OF JOB:**    1965     **-**   1966

**JOB LENGTH:**    several months

**JOB DUTIES:**

**MATERIALS USED ON THIS JOB:**   Plaintiff will supplement

**NAME:**            **Dougherty, Joseph John**

**NICKNAME:**      **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**      Midvale Heppenstall

**SUPERVISOR:**

**JOB SITES:**

**CITY, STATE:**    Nicetown        ,  PA

**DATE OF JOB:**    1966      -   1966

**JOB LENGTH:**     several months

**JOB DUTIES:**

**MATERIALS USED ON THIS JOB:**

**NAME:**            **Dougherty, Joseph John**

**NICKNAME:**        **Joe**

## <u>WORK HISTORY SHEET</u>

**EMPLOYER:**        Midvale Hospital

**SUPERVISOR:**

**JOB SITES:**        Midvale Hospital in

**CITY, STATE:**      Germantown              ,    Pennsylvania

**DATE OF JOB:**      1966              -    1966

**JOB LENGTH:**       several months

**JOB DUTIES:**       Laborer

**MATERIALS USED ON THIS JOB:**

**NAME:**          **Dougherty, Joseph John**

**NICKNAME:**      **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**    WR Grace Davison Chemical Division

**SUPERVISOR:**

**JOB SITES:**    - WR Grace Davison Chemcial Division, 4775 Paddock Road, Cincinnati OH

**CITY, STATE:**    Cincinnati      **,**   OH

**DATE OF JOB:**    1966    **-**  1972

**JOB LENGTH:**    6 years

**JOB DUTIES:**    Chemical Operator - Dryers B7 and B7A

**MATERIALS USED ON THIS JOB:**    Plaintiff will supplement

**NAME:**                   **Dougherty, Joseph John**

**NICKNAME:**        **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**      Johnson Wax

**SUPERVISOR:**    Richard 'Dick' Evans (dead)

**JOB SITES:**       Various commercial and industrial locations, including but not limited to;
- General Motors, Reading Road, Cincinnati, OH.

**CITY, STATE:**    Bond Hill            ,   OH

**DATE OF JOB:**    1972         -   1976

**JOB LENGTH:**    4 years on and off

**JOB DUTIES:**

**MATERIALS USED ON THIS JOB:**   No Known Asbestos Exposure

**NAME:** **Dougherty, Joseph John**

**NICKNAME:** **Joe**

## WORK HISTORY SHEET

**EMPLOYER:** Stigler's Supply

**SUPERVISOR:** Dave and Joe Stigler

**JOB SITES:** - Harrison Avenue, Main Warehouse.

**CITY, STATE:** Cincinnati , OH

**DATE OF JOB:** 1972 - 1976

**JOB LENGTH:** 4 years on and off

**JOB DUTIES:**

**MATERIALS USED ON THIS JOB:** No Known Asbestos Exposure

**NAME:**        **Dougherty, Joseph John**

**NICKNAME:**    **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**    Cosmopolitan Cleaning Company

**SUPERVISOR:**    Self

**JOB SITES:**    Various commercial and industrial locations, including, but not limited to:
- Morton Salt, 2000 West Street, Reading, OH (aka Cincinnati Milacron, aka Carstab, aka Rohm & Haas, aka Dow Chemical);
Bethesda North Hospital, Cincinnati, Oh;
Bethany School District, Cincinnati, OH.

**CITY, STATE:**    various    **,**    Ohio

**DATE OF JOB:**    1976    **-**    2005

**JOB LENGTH:**

**JOB DUTIES:**    Owner/Employee of Janitorial Service.

**MATERIALS USED ON THIS JOB:**    Plaintiff will supplement

**NAME:**        **Dougherty, Joseph John**

**NICKNAME:**      **Joe**

## **WORK HISTORY SHEET**

**EMPLOYER:**    Fairfield City Schools

**SUPERVISOR:**

**JOB SITES:**

**CITY, STATE:**    Fairfield        **,**  OH

**DATE OF JOB:**    2000     **-**  2014

**JOB LENGTH:**

**JOB DUTIES:**    Part time school bus driver

**MATERIALS USED ON THIS JOB:**    No Known Asbestos Exposure

**NAME:**            **Dougherty, Joseph John**

**NICKNAME:**      **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**      Great Parks of Hamilton County

**SUPERVISOR:**

**JOB SITES:**      201 Woodland Mound Dr, Cincinnati, OH 45255

**CITY, STATE:**      Cincinnati            ,    OH

**DATE OF JOB:**      2001       -    2021

**JOB LENGTH:**

**JOB DUTIES:**      Attendant; Boat Dock helper/cashier. Helped people in and out of boats, gave directions

**MATERIALS USED ON THIS JOB:**      No Known Asbestos Exposure

**NAME:**          **Dougherty, Joseph John**

**NICKNAME:**     **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**    Home renovation

**SUPERVISOR:**

**JOB SITES:**    Various personal residences, including but not limited to:
- 11786 Elkwood Dr., Cincinnati, OH 45240.

**CITY, STATE:**             ,   Ohio

**DATE OF JOB:**   1971      -   1985

**JOB LENGTH:**

**JOB DUTIES:**   Multiple home renovation projects.

**MATERIALS USED ON THIS JOB:**

**NAME:**          **Dougherty, Joseph John**

**NICKNAME:**      **Joe**

## WORK HISTORY SHEET

**EMPLOYER:**      Shadetree mechanic

**SUPERVISOR:**

**JOB SITES:**       Work done at personal residence located at 5072 Dixie Hwy., Fairfield, OH 45015.

**CITY, STATE:**    Fairfield              ,   Ohio

**DATE OF JOB:**    1975          -   1985

**JOB LENGTH:**     10 years

**JOB DUTIES:**     brake work on personal vehicles.

**MATERIALS USED ON THIS JOB:**

# EXHIBIT G

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO.  CV-22-960873 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | JUDGE HARRY A. HANNA |
| | ) | |
| AUTOLIV ASP INC., et al., | ) | DEFENDANT DONALD MCKAY |
| | ) | SMITH, INC.'S NOTICE OF |
| Defendants. | ) | APPEARANCE |
| | ) | |
| | ) | |

Notice is given that William D. Bonezzi, Esq. with the law firm of Bonezzi, Switzer, Polito & Hupp Co. L.P.A., hereby enter his appearance as counsel of record in the captioned matter for Defendant Donald McKay Smith, Inc.  In accordance with Ohio R. Civ. P. 1 (C), Cuyahoga County L.R. 16(C), and Cuyahoga County Asbestos Cases, Standing Case Management Order, General Provision B.1 (4),  Donald McKay Smith, Inc. further deems this Notice as a denial of all substantive allegations set forth in the Complaint, reserves its right to assert all applicable Affirmative Defenses, and in fact does so, including, but not limited to and without limitation, failure or insufficiency of process, failure or insufficiency of service of process, failure to properly or timely commence the action and/or failure to timely file the action within the applicable statute of limitation, bar of the applicable statute of repose, lack of personal jurisdiction and lack of subject matter jurisdiction. Donald McKay Smith, Inc. reserves the right to file an Answer herein, when permitted by the Court.

Respectfully submitted,

  /s/ William D. Bonezzi
WILLIAM D. BONEZZI (0018093)
BONEZZI SWITZER
POLITO & HUPP CO., L.P.A.
100 2nd Avenue South, Suite 502-S
St. Petersburg, FL 33701-4313
Phone: (727) 826-0909
FAX: (727) 826-0914
E-Mail: wbonezzi@bsphlaw.com

*Attorney for Defendant*
*Donald McKay Smith, Inc.*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing DEFENDANT DONALD MCKAY SMITH, INC.'S NOTICE OF APPEARANCE was electronically filed via the File & Serve*Xpress* System and deemed served on all parties pursuant to the Cuyahoga County Rules of Court on this 29th day of March, 2022.

  */s/ William D. Bonezzi*
WILLIAM D. BONEZZI (0018093)
*Attorney for Defendant*
*Donald McKay Smith, Inc.*

# EXHIBIT H

# IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **JOSEPH JOHN DOUGHERTY** | ) **CASE NO.: CV-22-960873** |
| | ) |
| **Plaintiff,** | ) |
| | ) **JUDGE HARRY A. HANNA** |
| **vs.** | ) |
| | ) **ASBESTOS DOCKET** |
| **AUTOLIV ASP INC, et al.** | ) |
| | ) **NOTICE OF APPEARANCE** |
| **Defendants.** | ) **OF DEFENDANT RED SEAL** |
| | ) **ELECTRIC COMPANY** |
| | ) |

Please enter the appearance of John A. Kristan, Jr. of the law firm of Kelley Jasons McGowan Spinelli Hanna & Reber, LLP as counsel for Defendant Red Seal Electric Company in the above captioned action.

This Notice of Appearance is filed pursuant to General Personal Injury Asbestos Case Management Order No. 1, issued by Judge Harry A. Hanna and Judge Leo M. Spellacy, as amended January 4, 2002, and Rule 16(C) of the Court of Common Pleas of Cuyahoga County and shall constitute:

1. a denial of all averments of fact in the Complaint;

2. an allegation of all affirmative defenses; and

3. a claim for indemnification and contribution from all other parties.

Respectfully submitted,

/s/ *John A. Kristan, Jr.*
John A. Kristan, Jr. (OH Bar Id. #0073463)
KELLEY JASONS MCGOWAN SPINELLI HANNA & REBER, LLP
1220 West 6th Street
The Bradley Building, Suite 305
Cleveland, OH 44113
Telephone: (216) 902-4444
Facsimile: (216) 902-4447
Email: jkristan@kjmsh.com

Attorney for Defendant
Red Seal Electric Company

2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **Notice of Appearance of Defendant Red Seal**

**Electric Company** was electronically filed on Lexis Nexis File & Serve on March 29, 2022.


<u>/s/ *John A. Kristan, Jr.*</u>
John A. Kristan, Jr. (OH Bar Id. #0073463)

# EXHIBIT I

This document constitutes a ruling of the court and should be treated as such.

**Court Authorizer
Comments:**

Motion to Admit Counsel (Pro Hac Vice) Granted.



**GRANTED**

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | ) | CASE NO. CV 22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| vs. | ) | |
| | ) | |
| AUTOLIV ASP INC., *et al*. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF'S MOTION TO ADMIT COUNSEL *PRO HAC VICE*

Now comes Anthony Gallucci, counsel for Plaintiff in the within matter, and moves this court to admit Daniel C. LaTerra as co-counsel, *pro hac vice*. Counsel states that co-counsel is licensed to practice law in Connecticut, the District of Columbia, New Jersey and New York, is a member in good standing in said states, and that he has never been charged or convicted of any crime or offense in any court, state or federal, in the United States or abroad, as is evidenced by the Affidavit attached and incorporated herein.

For the foregoing reasons, counsel requests this Motion be granted.

Respectfully submitted,

/s/Anthony Gallucci
Anthony Gallucci (0066665)
Christopher J. Hickey (0065416)
Kevin E. McDermott (0027813)
**MCDERMOTT & HICKEY, LLC**
20525 Center Ridge Road, Ste. 200
Rocky River, OH 44113
Telephone: (216) 712-7452
Facsimile: (216) 916-9238
Email: ag@mesohio.com
chip@mesohio.com
kevin@mesohio.com

Attorneys for Plaintiff

**<u>CERTIFICATE OF SERVICE</u>**

A copy of the foregoing Plaintiff's Motion to Admit Counsel *Pro Hac Vice* was filed on this 29th day of March 2022, via LexisNexis File&ServeXpress, and deemed served on all parties.

*/s/Anthony Gallucci*
ANTHONY GALLUCCI (0066665)

Attorney for Plaintiff

# EXHIBIT J

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| Joseph John Dougherty, | : | |
| | : | |
| Plaintiff, | : | Case No. 960873 |
| | : | |
| v. | : | Judge Hanna |
| | : | |
| AUTOLIV ASP Inc. et al., | : | |
| | : | |
| Defendants. | : | |

---

**NOTICE OF APPEARANCE**

---

Please take notice that, pursuant to General Personal Injury Asbestos Case Management Standing Order No. 7, Richard D. Schuster, Esq. and Perry W. Doran, II, Esq. of the law firm of Vorys, Sater, Seymour and Pease LLP hereby enter their appearance as counsel on behalf of Defendants The Scotts Company, LLC and Union Carbide Corporation, in the above-referenced case. Pursuant to General Personal Injury Asbestos Case Management Standing Order No. 7, all defenses are preserved including the defense of lack of personal jurisdiction over Defendants The Scotts Company, LLC and Union Carbide Corporation.

/s/ Richard D. Schuster
_____

Richard D. Schuster (0022813)
Perry W. Doran, II (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-5475
Facsimile: (614) 464-6350
E-mail address: rdschuster@vorys.com
                pdoran@vorys.com

Attorneys for Defendant
The Scotts Company, LLC
Union Carbide Corporation

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 5th day of April, 2022.

/s/ Richard D. Schuster
Richard D. Schuster

# EXHIBIT K

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| Joseph John Dougherty, | : | |
| | : | |
| Plaintiff, | : | Case No. 960873 |
| | : | |
| v. | : | Judge Hanna |
| | : | |
| AUTOLIV ASP Inc. et al., | : | |
| | : | |
| Defendants. | : | |

**ANSWER OF DEFENDANT**
**UNION CARBIDE CORPORATION**
**TO PLAINTIFF'S COMPLAINT**

Now comes the Union Carbide Corporation and for its answer to plaintiff's complaint states the following:

FIRST DEFENSE

1.      Defendant denies generally, specifically and/or for want of knowledge or sufficient information each and every allegation contained in plaintiff's complaint not herein specifically and expressly admitted to be true.

SECOND DEFENSE

2.      The contributory negligence of the plaintiff under the circumstances then and there existing, directly and proximately caused and contributed to the injuries and damages claimed herein.  By reason of said contributory negligence, the action of the plaintiff herein is barred, or, in the alternative, the recovery of the plaintiff herein shall be diminished by an amount proportionately equal to the percentage of the negligence of plaintiff, which contributed to said injuries and damages, pursuant to §2315.33, Revised Code of Ohio.

THIRD DEFENSE

3.      The assumption of risk by plaintiff of the open, obvious and apparent risks and hazards, if any, incident or related to the conditions and circumstances of the alleged exposures described in the

complaint, directly and proximately caused and contributed to the injuries and damages claimed herein. By reason of said assumption of risk, the action of plaintiff is barred, or, in the alternative, the recovery of the plaintiff herein shall be barred or diminished as appropriate, by an amount proportionately equal to the percentage of the assumption of risk by the plaintiff which contributed to said injuries and damages, pursuant to §2307.711, Revised Code of Ohio.

### FOURTH DEFENSE

4.      The complaint fails to state a claim upon which relief can be granted.

### FIFTH DEFENSE

5.      The Court lacks jurisdiction over the person of this answering defendant.

### SIXTH DEFENSE

6.      The Court lacks jurisdiction over the subject matter of this case.

### SEVENTH DEFENSE

7.      Insufficiency of process issued for this answering defendant.

### EIGHTH DEFENSE

8.      Insufficiency of service of process upon this answering defendant.

### NINTH DEFENSE

9.      This action was not brought within the time limit for the commencement of such actions by the governing statute of limitations.

### TENTH DEFENSE

10.     Plaintiff has failed to join necessary or indispensable parties in this action in accordance with the Rules of Civil Procedure.

### ELEVENTH DEFENSE

11.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, this action is barred by reason of the intervening acts or

omissions of other persons which directly and proximately cause the injuries and damages alleged in the complaint.

<div align="center">TWELFTH DEFENSE</div>

12.     Failure of the plaintiff to use available protective equipment, which failure directly and proximately caused and contributed to all or part of the injuries and damages claimed by the plaintiff herein, and which failure bars the right of the plaintiff to recover herein for any such injuries or damages.

<div align="center">THIRTEENTH DEFENSE</div>

13.     This action is barred, in whole or in part, by the unforeseeable misuse and/or abuse of the products, if any, by the plaintiff and/or others under the circumstances then and there existing, which misuse and/or abuse directly and proximately caused and contributed to plaintiff's injuries, if any.

<div align="center">FOURTEENTH DEFENSE</div>

14.     Plaintiff's claims are barred by the doctrine of laches.

<div align="center">FIFTEENTH DEFENSE</div>

15.     Plaintiff has waived their right to assert the claim stated in the complaint.

<div align="center">SIXTEENTH DEFENSE</div>

16.     Plaintiff is estopped to assert and recover on the claim stated in the complaint.

<div align="center">SEVENTEENTH DEFENSE</div>

17.     Venue is not proper in the Court of Common Pleas of Cuyahoga County, Ohio.

<div align="center">EIGHTEENTH DEFENSE</div>

18.     Plaintiff's claims should be dismissed under the doctrine of forum non conveniens.

<div align="center">NINETEENTH DEFENSE</div>

19.     Plaintiff's claims are barred by res judicata, collateral estoppel and the doctrines of preclusion.

## TWENTIETH DEFENSE

20.     The Ohio doctrine of punitive damages violates defendant's rights pursuant to the first, fifth and fourteenth amendments of the United States Constitution and the provisions of the Ohio Constitution.

## TWENTY-FIRST DEFENSE

21.     Plaintiff's claims for punitive damages are barred, in whole or in part, by the provisions of §2307.80, Revised Code of Ohio.

## TWENTY-SECOND DEFENSE

22.     Plaintiff's claims may be preempted in whole or in part by federal and/or state statutes and/or regulations.

## TWENTY-THIRD DEFENSE

23.     At all times material hereto, the state of the medical and industrial art was such that there was no generally accepted or recognized knowledge of any unavoidably unsafe, inherently dangerous, hazardous or defective character, or nature, of asbestos products, when used in the manner and for the purposes intended and in the circumstances of plaintiff's use or exposure, so that there was no duty by the answering defendant to know of such character or nature, or to warn plaintiff or others similarly situated.

## TWENTY-FOURTH DEFENSE

24.     Plaintiff's claims are barred by applicable workers' compensation statutes.

## TWENTY-FIFTH DEFENSE

25.     This action was not brought within the time limit for the commencement of such actions by the governing statute of repose.

## TWENTY-SIXTH DEFENSE

26.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering

defendant specifically denies, then, in that event, the damages shall be limited to those permitted by, and apportioned among all responsible parties pursuant to, §2307.22– §2307.29, Revised Code of Ohio.

### TWENTY-SEVENTH DEFENSE

27.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, economic and non-economic damages shall be limited or barred pursuant to §2315.18, Revised Code of Ohio.

### TWENTY-EIGHTH DEFENSE

28.     This action is barred, in whole or in part, by the provisions of §2307.91 - §2307.93, Revised Code of Ohio.

### TWENTY-NINTH DEFENSE

29.     This action is barred, in whole or in part, by the provisions of §2307.84 - §2307.87, Revised Code of Ohio.

### THIRTIETH DEFENSE

30.     To the extent plaintiff has asserted any common law causes of action that have been abrogated by statute, such actions are barred.

### THIRTY-FIRST DEFENSE

31.     The answering defendant is immune from liability for any conduct performed in conformance with government specifications or private contractual specifications.

### THIRTY-SECOND DEFENSE

32.     The conspiracy claim is not stated with particularity as required by Rule 9 of the Ohio Rules of Civil Procedure.

## ANSWER TO CROSS-CLAIMS

33.     Defendant Union Carbide Corporation specifically denies any and all allegations set forth in any cross-claims which have been or may be asserted.

WHEREFORE, the defendant prays that Plaintiff's complaint be dismissed as to it and that it recovers its costs herein.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
            pdoran@vorys.com

Attorneys for Defendant
Union Carbide Corporation

**JURY DEMAND**

Defendant Union Carbide Corporation demands trial by jury of all issues so triable in this action.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
            pdoran@vorys.com

Attorneys for Defendant
Union Carbide Corporation

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed

with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this

5th day of April, 2022.

/s/ Richard D. Schuster
Richard D. Schuster

# EXHIBIT L

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | Case No. 22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| -vs- | ) | |
| | ) | |
| AUTOLIV ASP INC, et al., | ) | **NOTICE OF APPEARANCE OF** |
| | ) | **DEFENDANT DAP, INC. K/N/A LA** |
| Defendants. | ) | **MIRADA PRODUCTS CO., INC.,** |
| | ) | **IMPROPERLY SERVED AS "DAP** |
| | ) | **PRODUCTS INC."** |
| | ) | |

Pursuant to Standing Order No. 7, Special Docket No. 73958, and Executive Docket No. 142, Defendant DAP, Inc. k/n/a La Mirada Products Co., Inc., improperly served as "Dap Products Inc." hereby enters an appearance in the above-captioned matter.  In accordance with the Court's Standing Order, this appearance constitutes:

(1) a denial of all averments of fact in the Complaint;

(2) an assertion of all applicable affirmative defenses, as if fully set forth herein; and

(3) a reservation of a right to file indemnification/contribution claims.

Respectfully submitted,

*/s/ Brendan P. Kelley*
Laura Kingsley Hong (0033147)
Brendan P. Kelley (0078308)
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Tel:      216.592.5000
Fax:     216.592.5009
E-mail:  laura.hong@tuckerellis.com
          Brendan.kelley@tuckerellis.com

*Attorneys for Defendant DAP, Inc. k/n/a La*
*Mirada Products Co., Inc., improperly served*
*as "Dap Products Inc."*

5494956.1

## PROOF OF SERVICE

I hereby certify that on April 5, 2022 a copy of the foregoing *Notice of Appearance of Defendant DAP, Inc. k/n/a La Mirada Products Co., Inc., improperly served as "Dap Products Inc."* was filed electronically on the LexisNexis File and Serve System, and deemed served on all parties pursuant to the Cuyahoga County Rules of Court.

<div style="margin-left: 50%;">

*/s/ Brendan P. Kelley*
Laura Kingsley Hong (0033147)
Brendan P. Kelley (0078308)
Tucker Ellis LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113-7213
Tel:      216.592.5000
Fax:      216.592.5009
E-mail:   laura.hong@tuckerellis.com
          Brendan.kelley@tuckerellis.com
*Attorneys for Defendant DAP, Inc. k/n/a La Mirada Products Co., Inc., improperly served as "Dap Products Inc."*

</div>

5494956.1

# EXHIBIT M

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| Joseph John Dougherty | : | |
| | : | |
| Plaintiff, | : | Case No. 960873 |
| | : | |
| v. | : | Judge Hanna |
| | : | |
| AUTOLIV ASP Inc. et al., | : | |
| | : | |
| Defendants. | : | |

---

**ANSWER OF DEFENDANT**
**THE SCOTTS COMPANY, LLC**
**TO PLAINTIFF'S COMPLAINT**

---

Now comes the defendant The Scotts Company, LLC, and for its answer to plaintiffs' complaint states the following:

FIRST DEFENSE

1.     Defendant denies generally, specifically and/or for want of knowledge or sufficient information each and every allegation contained in plaintiff's complaint not herein specifically and expressly admitted to be true.

SECOND DEFENSE

2.     The contributory negligence of the plaintiff under the circumstances then and there existing, directly and proximately caused and contributed to the injuries and damages claimed herein.  By reason of said contributory negligence, the action of the plaintiff herein is barred, or, in the alternative, the recovery of the plaintiff herein shall be diminished by an amount proportionately equal to the percentage of the negligence of plaintiff, which contributed to said injuries and damages, pursuant to §2315.33, Revised Code of Ohio.

## THIRD DEFENSE

3.      The assumption of risk by plaintiff of the open, obvious and apparent risks and hazards, if any, incident or related to the conditions and circumstances of the alleged exposures described in the complaint, directly and proximately caused and contributed to the injuries and damages claimed herein.  By reason of said assumption of risk, the action of plaintiff is barred, or, in the alternative, the recovery of the plaintiff herein shall be barred or diminished as appropriate, by an amount proportionately equal to the percentage of the assumption of risk by the plaintiff which contributed to said injuries and damages, pursuant to §2307.711, Revised Code of Ohio.

## FOURTH DEFENSE

4.      The complaint fails to state a claim upon which relief can be granted.

## FIFTH DEFENSE

5.      The Court lacks jurisdiction over the person of this answering defendant.

## SIXTH DEFENSE

6.      The Court lacks jurisdiction over the subject matter of this case.

## SEVENTH DEFENSE

7.      Insufficiency of process issued for this answering defendant.

## EIGHTH DEFENSE

8.      Insufficiency of service of process upon this answering defendant.

## NINTH DEFENSE

9.      This action was not brought within the time limit for the commencement of such actions by the governing statute of limitations.

## TENTH DEFENSE

10.      Plaintiff has failed to join necessary or indispensable parties in this action in accordance with the Rules of Civil Procedure.

ELEVENTH DEFENSE

11.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, this action is barred by reason of the intervening acts or omissions of other persons which directly and proximately cause the injuries and damages alleged in the complaint.

TWELFTH DEFENSE

12.     Failure of the plaintiff to use available protective equipment, which failure directly and proximately caused and contributed to all or part of the injuries and damages claimed by the plaintiff herein, and which failure bars the right of the plaintiff to recover herein for any such injuries or damages.

THIRTEENTH DEFENSE

13.     This action is barred, in whole or in part, by the unforeseeable misuse and/or abuse of the products, if any, by the plaintiff and/or others under the circumstances then and there existing, which misuse and/or abuse directly and proximately caused and contributed to plaintiff's injuries, if any.

FOURTEENTH DEFENSE

14.     Plaintiff's claims are barred by the doctrine of laches.

FIFTEENTH DEFENSE

15.     Plaintiff has waived their right to assert the claim stated in the complaint.

SIXTEENTH DEFENSE

16.     Plaintiff is estopped to assert and recover on the claim stated in the complaint.

SEVENTEENTH DEFENSE

17.     Venue is not proper in the Court of Common Pleas of Cuyahoga County, Ohio.

EIGHTEENTH DEFENSE

18.     Plaintiff's claims should be dismissed under the doctrine of forum non conveniens.

NINETEENTH DEFENSE

19.     Plaintiff's claims are barred by res judicata, collateral estoppel and the doctrines of preclusion.

TWENTIETH DEFENSE

20.     The Ohio doctrine of punitive damages violates defendant's rights pursuant to the first, fifth and fourteenth amendments of the United States Constitution and the provisions of the Ohio Constitution.

TWENTY-FIRST DEFENSE

21.     Plaintiff's claims for punitive damages are barred, in whole or in part, by the provisions of §2307.80, Revised Code of Ohio.

TWENTY-SECOND DEFENSE

22.     Plaintiff's claims may be preempted in whole or in part by federal and/or state statutes and/or regulations.

TWENTY-THIRD DEFENSE

23.     At all times material hereto, the state of the medical and industrial art was such that there was no generally accepted or recognized knowledge of any unavoidably unsafe, inherently dangerous, hazardous or defective character, or nature, of asbestos products, when used in the manner and for the purposes intended and in the circumstances of plaintiff's use or exposure, so that there was no duty by the answering defendant to know of such character or nature, or to warn plaintiff or others similarly situated.

TWENTY-FOURTH DEFENSE

24.     Plaintiff's claims are barred by applicable workers' compensation statutes.

## TWENTY-FIFTH DEFENSE

25.     This action was not brought within the time limit for the commencement of such actions by the governing statute of repose.

## TWENTY-SIXTH DEFENSE

26.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, the damages shall be limited to those permitted by, and apportioned among all responsible parties pursuant to, §2307.22– §2307.29, Revised Code of Ohio.

## TWENTY-SEVENTH DEFENSE

27.     If this answering defendant is negligent, or breached any duty to the plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, economic and non-economic damages shall be limited or barred pursuant to §2315.18, Revised Code of Ohio.

## TWENTY-EIGHTH DEFENSE

28.     This action is barred, in whole or in part, by the provisions of §2307.91 - §2307.93, Revised Code of Ohio.

## TWENTY-NINTH DEFENSE

29.     This action is barred, in whole or in part, by the provisions of §2307.84 - §2307.87, Revised Code of Ohio.

## THIRTIETH DEFENSE

30.     To the extent plaintiff has asserted any common law causes of action that have been abrogated by statute, such actions are barred.

## THIRTY-FIRST DEFENSE

31.     The answering defendant is immune from liability for any conduct performed in conformance with government specifications or private contractual specifications.

<div align="center">THIRTY-SECOND DEFENSE</div>

32.     The conspiracy claim is not stated with particularity as required by Rule 9 of the Ohio Rules of Civil Procedure.

<div align="center">**ANSWER TO CROSS-CLAIMS**</div>

33.     Defendant The Scotts Company, LLC specifically denies any and all allegations set forth in any cross-claims which have been or may be asserted.

WHEREFORE, the defendant prays that Plaintiff's complaint be dismissed as to it and that it recovers its costs herein.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-5475
Facsimile: (614) 464-6350
E-mail: rdschuster@vorys.com
           pdoran@vorys.com

Attorneys for Defendant
The Scotts Company, LLC

## JURY DEMAND

Defendant The Scotts Company, LLC demands trial by jury of all issues so triable in this action.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
          pdoran@vorys.com

Attorneys for Defendant
The Scotts Company, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 5th day of April, 2022.

/s/ Richard D. Schuster
Richard D. Schuster

4/04/2022 41798505

# EXHIBIT N

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, et al. | ) | CASE NO. 960873 |
| | ) | |
| Plaintiffs, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| vs. | ) | |
| | ) | NOTICE OF ENTRY OF APPEARANCE |
| AUTOLIV ASP INC. (fka MORTON | ) | ON BEHALF OF DEFENDANT RHEEM |
| INTERNATIONAL INC., INDIVIDUALLY | ) | MANUFACTURING COMPANY |
| AND AS SUCCESSOR TO GERSHWIN | ) | IMPROPERLY SUED AS RHEEM, INC. |
| ACQUISITION CORP., lka MORTON | ) | |
| ACQUISITION CORP.), et al., | ) | |
| | ) | |

Defendant, Rheem Manufacturing Company, improperly as Rheem, Inc., by and through counsel, hereby gives notice that Matthew C. O'Connell and Nathan F. Studeny of the firm of Sutter O'Connell Co., 1301 East 9th Street, 3600 Erieview Tower, Cleveland, Ohio 44114, enter an appearance as its counsel.

Respectfully submitted,

/s/ Matthew C. O'Connell
Matthew C. O'Connell (0029043)
Nathan F. Studeny (0077864)
Sutter O'Connell Co.
1301 East 9th Street
3600 Erieview Tower
Cleveland, Ohio 44114
(216) 928-2200 phone
(216) 928-4400 facsimile
moconnell@sutter-law.com
nstudeny@sutter-law.com

Attorneys for Defendant
Rheem Manufacturing Company

## CERTIFICATE OF SERVICE

Service of Defendant, Rheem Manufacturing Company's, Notice of Entry of Appearance to all counsel of record via LexisNexis File and Serve this 7th day of April, 2022.

/s/ Matthew C. O'Connell
Matthew C. O'Connell (0029043)

# EXHIBIT O

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | ) | CASE NO. 960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY HANNA |
| | ) | |
| vs. | ) | |
| | ) | |
| AUTOLIV ASP INC. (fka MORTON | ) | SEPARATE ANSWER OF DEFENDANT |
| INTERNATIONAL INC., INDIVIDUALLY | ) | RHEEM MANUFACTURING COMPANY |
| AND AS SUCCESSOR TO GERSHWIN | ) | |
| ACQUISITON CORP., lka MORTON | ) | (Jury Demanded Endorsed Hereon) |
| ACQUISITION CORP.), et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Denying knowledge or information sufficient to form a belief with respect to the allegations concerning any other Defendant, now comes Defendant, Rheem Manufacturing Company, (hereinafter "Defendant"), through counsel, and for its Answer to the Complaint states as follows:

**FIRST AFFIRMATIVE DEFENSE**

1.     Defendant denies generally, specifically, and for want of knowledge or sufficient information each and every allegation contained in the Complaint not herein specifically and expressly admitted to be true.

**SECOND AFFIRMATIVE DEFENSE**

2.     The Complaint fails to state a claim upon which relief can be granted.

**THIRD AFFIRMATIVE DEFENSE**

3.     The Court lacks jurisdiction over the person of this answering defendant.

**FOURTH AFFIRMATIVE DEFENSE**

4.     The Court lacks jurisdiction over the subject matter of this case.

**FIFTH AFFIRMATIVE DEFENSE**

5.     Plaintiffs' claims are barred by the applicable statute of limitations, statute of repose, and/or the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

6.      There is insufficiency of process and/or insufficiency of service of process.

**SEVENTH AFFIRMATIVE DEFENSE**

7.      Plaintiffs' claims are barred because they are not properly venued in this Court.

**EIGHTH AFFIRMATIVE DEFENSE**

8.      Plaintiffs' claims should be dismissed under the doctrine of forum non conveniens.

**NINTH AFFIRMATIVE DEFENSE**

9.      To the extent it is established that Plaintiffs have failed to join all parties necessary for a just adjudication of their claims pursuant to Civ.R. 19 and 19.1, Plaintiffs' claims must be reduced or barred.

**TENTH AFFIRMATIVE DEFENSE**

10.     Plaintiffs have failed to allege special damages with the specificity required by Civ.R. 9(G).

**ELEVENTH AFFIRMATIVE DEFENSE**

11.     Plaintiffs' allegations of fraud, misrepresentation, and conspiracy must be dismissed because Plaintiffs have failed to plead with particularity the allegations with respect to those claims.

**TWELFTH AFFIRMATIVE DEFENSE**

12.     Plaintiffs' claims are barred by virtue of the doctrines of estoppel, laches, and/or waiver.

**THIRTEENTH AFFIRMATIVE DEFENSE**

13.     Plaintiffs' claims are barred by res judicata, collateral estoppel and the doctrines of preclusion.

**FOURTEENTH AFFIRMATIVE DEFENSE**

14.     Insofar as Plaintiffs are not the real party in interest to all or a portion of the claims, Plaintiffs are not entitled to the requested relief.

<div align="center">

**FIFTEENTH AFFIRMATIVE DEFENSE**

</div>

15.     The joinder of all parties in this action constitutes a misjoinder.

<div align="center">

**SIXTEENTH AFFIRMATIVE DEFENSE**

</div>

16.     Plaintiffs have failed to mitigate their damages.

<div align="center">

**SEVENTEENTH AFFIRMATIVE DEFENSE**

</div>

17.     Defendant affirmatively states that Plaintiffs have settled, compromised, released, or otherwise discharged their claims and that Defendant is therefore entitled to set-off.

<div align="center">

**EIGHTEENTH AFFIRMATIVE DEFENSE**

</div>

18.     Plaintiffs' claims are barred by applicable workers' compensation statutes.

<div align="center">

**NINETEENTH AFFIRMATIVE DEFENSE**

</div>

19.     This action is barred, in whole or in part, by the provisions of R.C. 2307.91, R.C. 2307.92, and R.C. 2307.93.

<div align="center">

**TWENTIETH AFFIRMATIVE DEFENSE**

</div>

20.     Plaintiffs have been unable to identify Defendant as the party causing the alleged injuries, and therefore, Plaintiffs have failed to state a cause of action against Defendant.

<div align="center">

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

</div>

21.     The causes of action asserted by Plaintiffs, who admittedly are unable to identify the manufacturer or manufacturers of the alleged injury-causing product or products, fail to state a claim upon which relief can be granted in that, inter alia, Plaintiffs have asserted claims for relief which, if granted, would contravene Defendant's constitutional rights to substantive and procedural due process of law under both the United States and the State of Ohio Constitutions.

<div align="center">

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

</div>

22.     The causes of action asserted by the Plaintiffs, who admittedly are unable to identify the manufacturer of the alleged injury-causing product, fail to state a claim upon which relief can be granted, in that, inter alia, Plaintiffs have asserted claims for relief which, if granted, would constitute a taking of private property for public use, without just compensation, and such

<div align="center">

3

</div>

a taking would contravene Defendant's constitutional rights under both the United States and the State of Ohio Constitutions.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

23.     The causes of action asserted by Plaintiffs, who admittedly are unable to identify the manufacturer or manufacturers of the alleged injury-causing product or products, fails to state a claim upon which relief can be granted in that, inter alia, Plaintiffs have asserted claims for relief which, if granted, would contravene Defendant's constitutional rights to equal protection of the laws under both the United States and the State of Ohio Constitutions.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

24.     The causes of action asserted by Plaintiffs fail to state a claim upon which relief can be granted in that, inter alia, Plaintiffs have asserted claims for relief that, if maintained, would impose an improper, retroactive penalty and impermissible intrusion on interstate commerce and federal laws and regulations and would thereby violate the United States Constitution.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

25.     Plaintiffs' common law product liability claims must be dismissed with prejudice because the Ohio Product Liability Statutes, R.C. 2307.71, et seq., expressly abrogate all such common law claims.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

26.     Defendant asserts all available defenses under the Ohio Product Liability Statutes.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

27.     To the extent it is established that all conduct and activities of Defendant as alleged in the Complaint conform to statutes, government regulations, and industry standards, Plaintiffs' claims against Defendant must be reduced or barred.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

28.     At all relevant times, Defendant's products have conformed to the current state of the art, and any relevant act or omission of Defendant was in conformance with the recognized state of the art at the time thereof.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

29.     Defendant's products are not defective in design or formulation because the harm alleged in the Complaint was caused by an inherent characteristic of the products, recognized by the ordinary person with knowledge common to the community, that could not have be eliminated without substantially compromising the products' usefulness or desirability.

## THIRTIETH AFFIRMATIVE DEFENSE

30.     Defendant's products are not defective in design or formulation because at the time such products left the control of Defendant, if they did, a practical and technically feasible alternative design was not was not available that would have prevented the harm alleged in the Complaint without substantially impairing the usefulness or intended use of the products.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

31.     Defendant's products are not defective due to inadequate warning or instruction because the risk of any such injuries and damages as claimed in the Complaint was open and obvious and/or a matter of common knowledge.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

32.     Defendant affirmatively states that any products it sold were not sold directly to Plaintiffs but to a learned intermediary sophisticated and knowledgeable of the contents and use of said products, and the liability of Defendant, based upon the duty to warn, if any, was terminated upon such sale to said purchaser.

**THIRTY-THIRD AFFIRMATIVE DEFENSE**

33.     To the extent it is established that Plaintiffs did not reasonably rely on any representation, disclaimer, warning, or act or omission by or attributable to Defendant, Plaintiffs' claims against Defendant must be reduced or barred.

**THIRTY-FOURTH AFFIRMATIVE DEFENSE**

34.     Defendant affirmatively states that any malignancy claimed was caused by agents in the environment other than asbestos and/or was caused by genetic or immunity deficiencies or conditions.

**THIRTY-FIFTH AFFIRMATIVE DEFENSE**

35.     With respect to all claims based upon alleged breach of express or implied warranties, there was no privity of contract between Plaintiffs and Defendant.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE**

36.     With respect to all claims based upon alleged breach of express or implied warranties, there was no timely notice of any alleged breach of such warranty given to Defendant.

**THIRTY-SEVENTH AFFIRMATIVE DEFENSE**

37.     Insofar as any warranties were modified and/or disclaimed, Plaintiffs are not entitled to the requested relief.

**THIRTY-EIGHTH AFFIRMATIVE DEFENSE**

38.     If Plaintiffs sustained any injuries or damages as alleged in the Complaint, which allegations are expressly denied, then, to the extent that it is established that those injuries or damages were proximately caused and brought about as a result of the failure to follow instructions regarding, or misuse, abuse, alteration, or modification of, the products referred to in the Complaint by persons, firms, or corporations other than Defendant, Plaintiffs' claims against Defendant must be reduced or barred.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

39.     If Plaintiffs sustained any injuries or damages as alleged in the Complaint, which allegations are expressly denied, then, to the extent that it is established that those injuries or damages were proximately caused and brought about as a result of the contributory negligence of Plaintiffs, the claims against Defendant must be reduced or barred.

## FORTIETH AFFIRMATIVE DEFENSE

40.     If Plaintiffs sustained any injuries or damages as alleged in the Complaint, which allegations are expressly denied, then, to the extent that it is established that Plaintiffs knowingly, voluntarily, and/or impliedly assumed the risk of any such injuries and damages as set forth in the Complaint, Plaintiffs' claims against Defendant must be reduced or barred.

## FORTY-FIRST AFFIRMATIVE DEFENSE

41.     To the extent it is established that any injuries to Plaintiffs were caused by intervening or superseding causes not under the control of Defendant, Plaintiffs' claims against Defendant must be reduced or barred.

## FORTY-SECOND AFFIRMATIVE DEFENSE

42.     If Plaintiffs sustained any injuries or incurred any loss or damages as alleged in the Complaint, the same were caused, in whole or part, by acts and omissions of another or others over whom Defendant exercised no control and had no right to control, for which Defendant is not responsible, and whose conduct Defendant had no reason to anticipate or control.

## FORTY-THIRD AFFIRMATIVE DEFENSE

43.     Pursuant to R.C. 2307.23(C), a specific percentage of the tortious conduct that proximately caused Plaintiffs' alleged injuries is attributable to one or more persons from whom Plaintiffs do not seek recovery in this action.

## FORTY-FOURTH AFFIRMATIVE DEFENSE

44.    If in fact Plaintiffs sustained any injuries or damages as alleged in the Complaint, which allegations are expressly denied, then the amount of damages other than economic damages available to Plaintiffs, if any, is governed by R.C. 2315.18 and R.C. 2315.19.

## FORTY-FIFTH AFFIRMATIVE DEFENSE

45.    If Plaintiffs sustained any injuries or damages as alleged in the Complaint, which allegations are expressly denied, Plaintiffs are not entitled to punitive or exemplary damages pursuant to R.C. 2307.80.

## FORTY-SIXTH AFFIRMATIVE DEFENSE

46.    Plaintiffs' claim for punitive damages violates  the provisions of the United States Constitution, including the Due Process Clause of the Fifth and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, the Excessive Fines Clause of the Eighth Amendment, the Due Course of Law provision contained in Article I, and Section 16 of the Ohio Constitution, and is otherwise barred and or limited by the United States Constitution, the decisions of the United States Supreme Court, and/or is in violation of the Ohio Constitution.

## FORTY-SEVENTH AFFIRMATIVE DEFENSE

47.    Defendant further incorporates herein all affirmative defenses raised by any Co-Defendant, and it reserves the right to amend this Answer and/or add such additional affirmative defenses as may later arise during the litigation of this action.

WHEREFORE, Defendant, Rheem Manufacturing Company demands that the Complaint be dismissed, with prejudice, and that Plaintiffs take nothing thereby; that Defendant be awarded its costs and expenses incurred herein; and that the Court award such other and further relief, legal and equitable, as it shall deem just and proper.

## ANSWER TO ALL PAST, PENDING, OR FUTURE CROSS-CLAIMS

Now comes Defendant, Rheem Manufacturing Company, and denies specifically each and every allegation in all past, present, or future cross-claims filed against it in this action by any

Co-Defendant and incorporates by reference all Affirmative Defenses stated in its Answer to the Complaint that are applicable to such cross-claims.

WHEREFORE, Defendant, Rheem Manufacturing Company respectfully requests that all such cross-claims be dismissed at cross-claimant's costs.

Respectfully submitted,

/s/ Matthew C. O'Connell
Matthew C. O'Connell (0029043)
Nathan F. Studeny (0077864)
Sutter O'Connell Co.
1301 East 9th Street
3600 Erieview Tower
Cleveland, Ohio 44114
(216) 928-2200 phone
(216) 928-4400 facsimile
moconnell@sutter-law.com
nstudeny@sutter-law.com
Attorneys for Defendant
Rheem Manufacturing Company

## JURY DEMAND

Now comes Defendant and hereby submits its demand for trial by jury composed of the maximum number of jurors allowable by law.

/s/ Matthew C. O'Connell
Matthew C. O'Connell (0029043)

## CERTIFICATE OF SERVICE

The undersigned hereby states that a copy of the foregoing was electronically filed via the LexisNexis File & Serve system and deemed served on all parties pursuant to the Cuyahoga County Rules of Court this 7th day of April, 2022.

/s/ Matthew C. O'Connell
Matthew C. O'Connell (0029043)

# EXHIBIT P

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

**CIVIL ACTION – ASBESTOS**

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO. CV-22-960873 |
| | ) | |
| Plaintiff | ) | |
| | ) | JUDGE HARRY A. HANNA |
| vs. | ) | |
| | ) | |
| AUTOLIV ASP INC., et al., | ) | NOTICE OF APPEARANCE ON |
| | ) | BEHALF OF VANDERBILT |
| Defendants | ) | MINERALS, LLC, SUCCESSOR BY |
| | ) | MERGER TO R.T. VANDERBILT |
| | ) | COMPANY, INC. |

Notice is given that James N. Kline and Kurt S. Siegfried of Bonezzi Switzer Polito & Hupp Co. L.P.A., hereby enter their appearance as counsel of record in the captioned matter for Defendant Vanderbilt Minerals, LLC, successor by merger to R.T. Vanderbilt Company, Inc. (improperly and erroneously named and sued as "Vanderbilt Minerals, LLC (individually and as successor to Gouverneru Talc Co. and R.T. Vanderbilt Co.)", which designation it hereby expressly denies). In accordance with Ohio R. Civ. P. 1 (C), Cuyahoga County L.R. 16(C), and Cuyahoga County Asbestos Cases, Standing Case Management Order, General Provision B.1 (4), Vanderbilt Minerals, LLC, successor by merger to R.T. Vanderbilt Company, Inc. further deems this Notice as a denial of all substantive allegations set forth in the Complaint, reserves its right to assert all applicable Affirmative Defenses, and in fact hereby asserts any and all such affirmative defenses, including, but not limited to and without limitation, failure or insufficiency of process, failure or insufficiency of service of process, failure to properly or timely commence the action and/or failure to timely file the action within the applicable statute of limitation, lack of personal jurisdiction and lack of subject matter jurisdiction. Vanderbilt Minerals, LLC, successor by merger

to R.T. Vanderbilt Company, Inc. reserves the right to file an Answer herein, when permitted by the Court.

Respectfully submitted,

/s/ *James N. Kline*
JAMES N. KLINE (0007577)
jkline@bsphlaw.com
KURT S. SIEGFRIED (0063563)
ksiegfried@bsphlaw.com
Bonezzi Switzer Polito & Hupp Co., L.P.A.
1300 East 9th Street, Suite 1950
Cleveland, OH 44114-1501
Telephone: (216) 875-2767
Facsimile: (216) 875-1570

Attorneys for Defendant
Vanderbilt Minerals, LLC, successor by merger to
R.T. Vanderbilt Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Notice of Appearance was electronically filed via the File & Serve system and deemed served on all parties pursuant to Cuyahoga County Rules of Court this 11th day of April, 2022.

/s/ *James N. Kline*
JAMES N. KLINE (0007577)

One of the Attorneys for Defendant
Vanderbilt Minerals, LLC, successor by merger to
R.T. Vanderbilt Company, Inc.

# EXHIBIT Q

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO.  CV22960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| v. | ) | **NOTICE OF APPEARANCE OF** |
| | ) | **SEPARATE DEFENDANT PFIZER** |
| AUTOLIV ASP INC., et al., | ) | **INC.** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

PLEASE TAKE NOTICE that attorney Karen E. Ross of the law firm of Tucker Ellis LLP is entering her appearance as counsel of record for Pfizer Inc.  This Appearance is filed and served in accordance with Loc.R. 16 of the Court of Common Pleas of Cuyahoga County, General Division and Standing Order No. 7, Special Docket No. 73958, and Executive Docket No. 142.

This Appearance thus constitutes:

    (1)     a denial of all averments of fact in the Complaint or Third-Party Complaint,

    (2)     an allegation of all affirmative defenses, and

    (3)     a claim for indemnification and contribution from any other party.

On behalf of Pfizer Inc., please send all further notices, orders, entries, pleadings and/or correspondence directly to Karen E. Ross, Esq., Tucker Ellis LLP, 950 Main Avenue, Suite 1100, Cleveland, Ohio 44113, e-mail address: KRoss@tuckerellis.com.

Respectfully submitted,

*/s/ Karen E. Ross*
KAREN E. ROSS (0074173)
KRoss@tuckerellis.com
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH  44113
Telephone:     (216) 592-5000
Facsimile:     (216) 592-5009

*Attorney for Separate Defendant*
*Pfizer Inc.*

## **CERTIFICATE OF SERVICE**

The foregoing *Notice of Appearance* has been electronically filed with the Court this 14th

day of April 2022.

/s/ *Karen E. Ross*
KAREN E. ROSS (0074173)
*Attorney for Separate Defendant*
*Pfizer Inc.*

**EXHIBIT R**

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO.    22-960873 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE HARRY A. HANNA |
| v. | ) | (Asbestos Docket) |
| | ) | |
| AUTOLIV ASP INC (F/K/A MORTON | ) | **NOTICE OF APPEARANCE** |
| INTERNATIONAL INC., INDIVIDUALLY | ) | **OF DEFENDANT SWENSON** |
| AND AS SUCCESSOR TO GERSHWIN | ) | **TECHNOLOGY, INC.** |
| ACQUISITION CORP., L/K/A MORTON | ) | |
| ACQUISITION CORP.), et al., | ) | |
| | ) | |
| Defendants. | | |

PLEASE TAKE NOTICE that attorney Ryan T. Winkler, Esq., of the law firm of Tucker Ellis LLP is entering his appearance as counsel of record for Defendant, Swenson Technology, Inc.  This Appearance is filed and served in accordance with Standing Order No. 7 Regarding the Filing of Answers in Asbestos Cases, entered on October 28, 1997 by Judge Harry A. Hanna.

This Appearance thus constitutes:

(1)    a denial of all averments of fact in the Complaint or Third-Party Complaint,

(2)    an allegation of all affirmative defenses, and

(3)    a claim for indemnification and contribution from any other party.

On behalf of Defendant, Swenson Technology, Inc., please send all further notices, orders, entries, pleadings and/or correspondence directly to Ryan T. Winkler, Esq., Tucker Ellis LLP, 950 Main Avenue, Suite 1100, Cleveland, Ohio 44113-7213, e-mail address: ryan.winkler@tuckerellis.com.

1

5509780.1

Respectfully submitted,


*/s/ Ryan T. Winkler*
RYAN T. WINKLER (0089591)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, Ohio   44113-7213
Telephone:  216.592.5000
Telefax:  216.592.5009

*Attorney for Defendant Swenson
Technology, Inc.*



**CERTIFICATE OF SERVICE**

The foregoing Notice of Appearance has been electronically filed with the Court this 18th

day of April 2022.

*/s/ Ryan T. Winkler*
*Attorney for Defendant Swenson
Technology, Inc.*

2

# EXHIBIT S

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| Joseph John Dougherty, | ) | Case No. CV – 22-960873 |
| | ) | |
| Plaintiff, | ) | Judge Harry A. Hanna |
| | ) | |
| v. | ) | |
| | ) | **Entry of Appearance of Counsel** |
| Autoliv ASP Inc., et al., | ) | **for R.E. Kramig & Co., Inc.** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

The Court, the clerk and the parties will please take notice that the undersigned enter their appearance as counsel of record for Defendant R.E. Kramig & Co., Inc. at the following address and firm:

David H. Boehm, Esq.
Sean T. Lavin, Esq.
3091 Mayfield Rd., Suite 212
Cleveland, Ohio 44118

Please direct all pleadings, correspondence, and communication to the undersigned counsel at the address set forth above.

Respectfully submitted,

/s/ David H. Boehm
David H. Boehm (0072610)
  david@lavinboehm.com
Sean T. Lavin (0073806)
  sean@lavinboehm.com
Lavin Boehm, LLC
3091 Mayfield Rd., Suite 212
Cleveland, Ohio 44118
216-623-0900 - telephone
Counsel for Defendant R.E. Kramig &
Co., Inc.

## **Certificate of Service**

I hereby certify that a true and correct copy of the foregoing Entry of Appearance of Counsel for Defendant R.E. Kramig & Co., Inc. was electronically filed on LexisNexis File and Serve system on Tuesday, April 19, 2022 and deemed served on all parties pursuant to the Cuyahoga County Rules of Court.

/s/ David H. Boehm
David H. Boehm (0072610)

# EXHIBIT T

IN THE COURT OF COMMON PLEAS OF CUYAHOGA COUNTY, OHIO

JOSEPH JOHN DOUGHERTY,

Plaintiff,

vs.

AUTOLIV ASP, INC., et al.,

Defendants.

CASE NO.:  CV-22-960873

JUDGE HARRY A. HANNA

JURY TRIAL DEMANDED

## NOTICE OF APPEARANCE

To:     Clerk of Court:

Please enter the appearance of the law firm of Willman & Silvaggio on behalf of

HONEYWELL INTERNATIONAL INC. (f/k/a AlliedSignal Inc., f/k/a Allied Corp., successor-

in-interest to Bendix Corporation) in the above-captioned lawsuit.  Pursuant to Amended

Standing Order No. 7, In Re: Asbestos Litigation, this Appearance is deemed to be a denial of all

averments of fact in the Complaint and any Cross Claims that may be asserted and an allegation

of all affirmative defenses.

Respectfully submitted,

By */s/ Steven G. Blackmer*
Steven G. Blackmer, Esquire
Ohio I.D. 0072235
Counsel for Defendant,
HONEYWELL INTERNATIONAL INC.

Willman and Silvaggio, LLP
One Corporate Center
5500 Corporate Drive, Suite 150
Pittsburgh, PA 15237
(412)-366-3333
(412)-366-3462 (Fax)
sblackmer@willmanlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 19th day of April, 2022, a true and correct copy of Honeywell International Inc.'s Notice of Appearance was electronically filed via LexisNexis File & Serve System and deemed served on all parties pursuant to Cuyahoga County Rules of Court.

Respectfully submitted,

By */s/ Steven G. Blackmer*
Steven G. Blackmer, Esquire
Ohio I.D. 0072235
Counsel for Defendant,
Honeywell International Inc.

Willman and Silvaggio, LLP
One Corporate Center
5500 Corporate Drive, Suite 150
Pittsburgh, PA 15237
(412)-366-3333
(412)-366-3462 (Fax)
sblackmer@willmanlaw.com

# EXHIBIT U

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO. CV-22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| v. | ) | (Asbestos Docket) |
| | ) | |
| AUTOLIV ASP, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NOTICE OF APPEARANCE OF DEFENDANT
PNEUMO ABEX LLC, SUCCESSOR-IN-INTEREST TO ABEX CORPORATION**

PLEASE TAKE NOTICE that attorney Christopher J. Caryl of the law firm of Tucker Ellis LLP enters his appearance as counsel of record for Pneumo Abex LLC, Successor-in-Interest to Abex Corporation.  This Appearance is filed and served in accordance with Local Rule 16.0 and Standing Order No. 7 Regarding the Filing of Answers in Asbestos Cases, entered on October 28, 1997 by Judge Harry A. Hanna, and to the Addendum to the Amended Case Management Order filed on January 4, 2002 by Judge Leo M. Spellacy and Judge Harry A. Hanna.  This Appearance thus constitutes:

(1)     a denial of all averments of fact in the Complaint, Amended Complaint, or Third-Party Complaint,

(2)     an allegation of all affirmative defenses, and

(3)     a claim for indemnification, contribution, and apportionment of liability from each and every other party named in the Complaint, whether currently in bankruptcy or not, and from parties against whom the

5512738.1

plaintiff(s) has not sought relief but who may be responsible in whole or in part for the tortious conduct.

On behalf of Pneumo Abex LLC, Successor-in-Interest to Abex Corporation, please send all further notices, orders, entries, pleadings and/or correspondence directly to Christopher J. Caryl, Esq., Tucker Ellis LLP, 950 Main Avenue, Suite 1100, Cleveland, Ohio 44113-7213, e-mail address: christopher.caryl@tuckerellis.com.

Respectfully submitted,

*/s/ Christopher J. Caryl*
Christopher J. Caryl (0069676)
Tucker Ellis LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:            216.592.5000
Fax:           216.592.5009
E-mail:      christopher.caryl@tuckerellis.com

Attorney for Pneumo Abex LLC, Successor-in-Interest to Abex Corporation

- 2 -

## **CERTIFICATE OF SERVICE**

The foregoing was filed electronically on April 22, 2022.  Service of this filing will be made pursuant to Civ.R. 5(B)(2)(f) by operation of the Court's electronic filing system.

/s/ Christopher J. Caryl
*Attorney for Pneumo Abex LLC, Successor-in-Interest to Abex Corporation*

- 3 -

5512738.1

# EXHIBIT V

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO. CV-22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| v. | ) | (ASBESTOS DOCKET) |
| | ) | |
| AUTOLIV ASP, INC., et al., | ) | **ANSWER OF DEFENDANT PNEUMO** |
| | ) | **ABEX LLC TO PLAINTIFF'S** |
| | ) | **COMPLAINT** |
| Defendants. | ) | |
| | ) | |

Now comes Defendant Pneumo Abex LLC, Successor-in-Interest to Abex Corporation, and for its Answer to Plaintiff's Complaint states the following:

## **GENERAL DENIAL**

1.       Pursuant to its Notice of Appearance and Local Rule 16 and Standing Order No. 7 regarding the filing of Answers in asbestos cases, Defendant specifically denies all averments of fact in Plaintiff's Complaint.

## **SEPARATE DEFENSES**

2.       Plaintiff's Complaint fails to state a claim against this Defendant upon which relief can be granted.

3.       This Court lacks personal subject matter jurisdiction over this matter and over the person.

4.       This Court is an improper venue for any resolution of this controversy.

5.       Plaintiff failed to join necessary parties as required by Rule 19 and 19.1 of the Ohio Rules of Civil Procedure and has failed to state such reasons for non-joinder. Thus,

5512821.1

Plaintiff's Complaint must be dismissed as to this Defendant.

6. Accord and satisfaction, arbitration and award, estoppel, laches, payment, release, res judicata, waiver, and any other matter constituting an affirmative defense bar Plaintiff's claims against this Defendant.

7. Plaintiff's claims against this Defendant are barred by the legal doctrine of comparative and contributory negligence.

8. Plaintiff's claims against this Defendant are barred by the legal doctrines of product modification and/or intervening and superseding cause.

9. Plaintiff's claims against this Defendant are barred by the legal doctrine of product misuse.

10. Plaintiff's Complaint against this Defendant must be dismissed for lack of sufficient and proper service of process.

11. Defendant states that if Plaintiff sustained any or all of the damages complained of, then said damages were solely, directly, and proximately caused by the actions of others, including the Plaintiff or Plaintiff's employer(s), over whom Defendant had no control.

12. Defendant states that Plaintiff's claims are barred or otherwise limited by operation of any applicable statute of limitations and/or statute of repose.

13. Defendant states that Plaintiff's claims fail due to lack of evidence of exposure to asbestos from Defendant's products.

14. Defendant states that Plaintiff's claims are barred by the doctrine of res judicata and/or collateral estoppel.

15. Plaintiff's claim for punitive damages is unconstitutional, and, in the event

punitive damages were to be awarded against this Defendant, any such award would violate the United States Constitution and/or the Constitution of the State of Ohio.

16.     The provisions in Section 2307.80 of the Ohio Revised Code bar Plaintiff's claim for punitive damages, in whole or in part.

17.     The provisions in Section 2315.18 of the Ohio Revised Code bar or limit any award for economic or non-economic damages.

18.     Defendant states that Plaintiff's claims are barred by the assumption of risk.

19.     Defendant states that if Plaintiff was injured, that such injury was attributable to one or more parties from whom the Plaintiff does not seek recovery in this action. Any and all damages to which Plaintiff may be entitled must be apportioned among any responsible parties or persons and/or are subject to R.C. 2307.22-2307.29. Defendant hereby asserts its affirmative defense as provided in R.C. 2307.23(C).

20.     Defendant adopts and incorporates by reference any other defenses asserted by any other Defendant or third-party Defendant in this matter.

21.     Defendant expressly asserts the right to add additional defenses as they become apparent through discovery.

WHEREFORE, having fully answered, Defendant Pneumo Abex LLC, Successor-in-Interest to Abex Corporation, asks that Plaintiff's Complaint and any and all claims and causes of action therein be dismissed with prejudice and for such other just and equitable relief as this Court may deem fit.

Respectfully submitted,

*/s/ Christopher J. Caryl*
Christopher J. Caryl (0069676)
Tucker Ellis LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:           216.592.5000
Fax:          216.592.5009
E-mail:      christopher.caryl@tuckerellis.com

Attorney for Pneumo Abex LLC, Successor-
in-Interest to Abex Corporation

- 4 -

5512821.1

## JURY DEMAND

Defendant Pneumo Abex LLC, Successor-in-Interest to Abex Corporation, hereby demands that this matter be tried before a jury with the maximum number of jurors allowable by law.

Respectfully submitted,

*/s/ Christopher J. Caryl*
Christopher J. Caryl (0069676)
Tucker Ellis LLP
950 Main Avenue
Suite 1100
Cleveland, OH 44113-7213
Tel:          216.592.5000
Fax:          216.592.5009
E-mail:          christopher.caryl@tuckerellis.com

Attorney for Pneumo Abex LLC, Successor-in-Interest to Abex Corporation

5512821.1

## CERTIFICATE OF SERVICE

The foregoing Answer with Jury Demand was filed electronically on April 22, 2022. Service of this filing will be made pursuant to Civ.R. 5(B)(2)(f) by operation of the Court's electronic filing system.

*/s/ Christopher J. Caryl*
*Attorney for Pneumo Abex LLC, Successor-in-Interest to Abex Corporation*

5512821.1

# EXHIBIT W

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO
ASBESTOS

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO. CV-22-960873 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ENTRY OF APPEARANCE AND** |
| | ) | **SHORT FORM ANSWER OF KAISER** |
| AUTOLIV ASP INC., et al., | ) | **GYPSUM COMPANY, INC.** |
| | ) | |
| Defendants | ) | |
| | ) | |

The Court will take notice that Attorneys David J. Fagnilli and Linda M. Gorczynski hereby enter an appearance as counsel of record for Defendant, Kaiser Gypsum Company, Inc.

Pursuant to Asbestos Litigation Special Provision Rule 16.0(C) of the Local Rules of Court, Cuyahoga County Common Pleas Court, this Entry of Appearance also constitutes this Defendant's denials of all averments alleged in this complaint, any and all amended complaints, any third-party complaints and/or cross claims asserted by any Plaintiff or Defendant.  This Entry of Appearance also constitutes assertions of all affirmative defenses available to this Defendant in the defense of these matters.

Defendant also reserves the right to seek contribution and/or indemnity against any party and to pursue all rights or remedies available to it.

Respectfully submitted,

MARSHALL DENNEHEY WARNER
COLEMAN & GOGGIN

By: *s/ David J. Fagnilli*

DAVID J. FAGNILLI (0032930)
LINDA M. GORCZYNSKI (0070607)
127 Public Square, Suite 3510
Cleveland, Ohio 44114
Phone:  (216) 912-3800
Fax:  (216) 344-9006
Email:     djfagnilli@mdwcg.com
               lmgorczynski@mdwcg.com
*Counsel for Defendant Kaiser Gypsum Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 27, 2022, a copy of the foregoing was filed electronically.
Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.

By: *s/ David J. Fagnilli*

DAVID J. FAGNILLI (0032930)
*Counsel for Defendant Kaiser Gypsum Company, Inc.*

# EXHIBIT X

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| Joseph John Dougherty, | : | |
| | : | |
| Plaintiff, | : | Case No. 960873 |
| | : | |
| v. | : | Judge Harry Hanna |
| | : | |
| AUTOLIV ASP Inc. et al., | : | |
| | : | |
| Defendants. | : | |

**NOTICE OF APPEARANCE**

Please take notice that, pursuant to General Personal Injury Asbestos Case Management Standing Order No. 7, Richard D. Schuster, Esq. and Perry W. Doran, II, Esq. of the law firm of Vorys, Sater, Seymour and Pease LLP hereby enter their appearance as counsel on behalf of Defendant Morton International, Inc., incorrectly sued as Autoliv ASP Inc., in the above-referenced case.  Pursuant to General Personal Injury Asbestos Case Management Standing Order No. 7, all defenses are preserved including the defense of lack of personal jurisdiction over Defendant Morton International, Inc., incorrectly sued as Autoliv ASP Inc.

Respectfully submitted,

/s/ Perry W. Doran, II
Richard D. Schuster (0022813)
Perry W. Doran, II (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-6400
Facsimile: (614) 464-6350
E-mail address:  rdschuster@vorys.com
                          pdoran@vorys.com

Attorneys for Defendant
Morton International, Inc., incorrectly sued as
Autoliv ASP Inc

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 12th day of May, 2022.

/s/ Perry W. Doran, II
Perry W. Doran, II

# EXHIBIT Y

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

Joseph John Dougherty,        :
                              :
            Plaintiff,        :      Case No. 960873
                              :
            v.               :      Judge Harry Hanna
                              :
AUTOLIV ASP Inc. et al.,      :
                              :
            Defendants.     :

---

**ANSWER OF DEFENDANT MORTON INTERNATIONAL, INC.,**
**INCORRECTLY SUED AS AUTOLIV ASP INC., TO PLAINTIFF'S COMPLAINT**

---

Now comes Defendant Morton International, Inc., incorrectly sued as Autoliv ASP Inc., and for its Answer to Plaintiff's complaint states the following:

**FIRST DEFENSE**

1.     Defendant denies generally, specifically and/or for want of knowledge or sufficient information each and every allegation contained in Plaintiff's complaint not herein specifically and expressly admitted to be true.

**SECOND DEFENSE**

2.     The contributory negligence of Plaintiff under the circumstances then and there existing directly and proximately caused and contributed to the injuries and damages claimed herein.  By reason of said contributory negligence, the action of Plaintiff herein is barred, or, in the alternative, the recovery of Plaintiff herein shall be diminished by an amount proportionately equal to the percentage of the negligence of Plaintiff, which contributed to said injuries and damages, pursuant to §2315.33, Revised Code of Ohio.

**THIRD DEFENSE**

3.     The assumption of risk by Plaintiff of the open, obvious and apparent risks and hazards, if any, incident or related to the conditions and circumstances of the alleged exposures

described in the complaint, directly and proximately caused and contributed to the injuries and damages claimed herein. By reason of said assumption of risk, the action of Plaintiff is barred, or, in the alternative, the recovery of Plaintiff shall be barred or diminished as appropriate by an amount proportionately equal to the percentage of the assumption of risk by Plaintiff which contributed to said injuries and damages, pursuant to §2307.711, Revised Code of Ohio.

## FOURTH DEFENSE

4.      The complaint fails to state a claim upon which relief can be granted.

## FIFTH DEFENSE

5.      The Court lacks jurisdiction over the person of this answering defendant.

## SIXTH DEFENSE

6.      The Court lacks jurisdiction over the subject matter of this case.

## SEVENTH DEFENSE

7.      Insufficiency of process issued for this answering defendant.

## EIGHTH DEFENSE

8.      Insufficiency of service of process upon this answering defendant.

## NINTH DEFENSE

9.      This action was not brought within the time limit for the commencement of such actions by the governing statute of limitations.

## TENTH DEFENSE

10.      Plaintiff has failed to join necessary or indispensable parties in this action in accordance with the Rules of Civil Procedure.

## ELEVENTH DEFENSE

11.      If this answering defendant was negligent, or breached any duty to Plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations

this answering defendant specifically denies, then, in that event, this action is barred by reason of the intervening acts or omissions of other persons which directly and proximately cause the injuries and damages alleged in the complaint.

## TWELFTH DEFENSE

12.     Failure of Plaintiff to use available protective equipment, which failure directly and proximately caused and contributed to all or part of the injuries and damages claimed by Plaintiff, and which failure bars the right of Plaintiff to recover herein for any such injuries or damages.

## THIRTEENTH DEFENSE

13.     This action is barred, in whole or in part, by the unforeseeable misuse and/or abuse of the products, if any, by Plaintiff and/or others under the circumstances then and there existing, which misuse and/or abuse directly and proximately caused and contributed to Plaintiff 's injuries, if any.

## FOURTEENTH DEFENSE

14.     Plaintiff's claims are barred by the doctrine of laches.

## FIFTEENTH DEFENSE

15.     Plaintiff has waived their right to assert the claim stated in the complaint.

## SIXTEENTH DEFENSE

16.     Plaintiff is estopped to assert and recover on the claim stated in the complaint.

## SEVENTEENTH DEFENSE

17.     Venue is not proper in the Court of Common Pleas of Cuyahoga County, Ohio.

## EIGHTEENTH DEFENSE

18.     Plaintiff's claims should be dismissed under the doctrine of forum non conveniens.

## NINETEENTH DEFENSE

19.     Plaintiff's claims are barred by res judicata, collateral estoppel and the doctrines of preclusion.

**TWENTIETH DEFENSE**

20.     The Ohio doctrine of punitive damages violates defendant's rights pursuant to the first, fifth and fourteenth amendments of the United States Constitution and the provisions of the Ohio Constitution.

**TWENTY-FIRST DEFENSE**

21.     Plaintiff's claims for punitive damages are barred, in whole or in part, by the provisions of §2307.80, Revised Code of Ohio.

**TWENTY-SECOND DEFENSE**

22.     Plaintiff's claims may be preempted in whole or in part by federal and/or state statutes and/or regulations.

**TWENTY-THIRD DEFENSE**

23.     At all times material hereto, the state of the medical and industrial art was such that there was no generally accepted or recognized knowledge of any unavoidably unsafe, inherently dangerous, hazardous or defective character, or nature, of asbestos products, when used in the manner and for the purposes intended and in the circumstances of Plaintiff 's use or exposure, so that there was no duty by the answering defendant to know of such character or nature, or to warn plaintiff or others similarly situated.

**TWENTY-FOURTH DEFENSE**

24.     Plaintiff's claims are barred by applicable workers' compensation statutes.

**TWENTY-FIFTH DEFENSE**

25.     This action was not brought within the time limit for the commencement of such actions by the governing statute of repose.

**TWENTY-SIXTH DEFENSE**

26.     If this answering defendant was negligent, or breached any duty to Plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations

this answering defendant specifically denies, then, in that event, the damages shall be limited to those permitted by, and apportioned among all responsible parties pursuant to, §2307.22– §2307.29, Revised Code of Ohio.

## TWENTY-SEVENTH DEFENSE

27.     If this answering defendant was negligent, or breached any duty to Plaintiff, or if any product manufactured, designed, sold and/or installed by it contained any defect which was a direct and proximate cause of the injuries and damages alleged in the complaint, which allegations this answering defendant specifically denies, then, in that event, economic and non-economic damages shall be limited or barred pursuant to §2315.18, Revised Code of Ohio.

## TWENTY-EIGHTH DEFENSE

28.     This action is barred, in whole or in part, by the provisions of §2307.91 - §2307.93, Revised Code of Ohio.

## TWENTY-NINTH DEFENSE

29.     This action is barred, in whole or in part, by the provisions of §2307.84 - §2307.87, Revised Code of Ohio.

## THIRTIETH DEFENSE

30.     To the extent Plaintiff has asserted any common law causes of action that have been abrogated by statute, such actions are barred.

## THIRTY-FIRST DEFENSE

31.     The answering defendant is immune from liability for any conduct performed in conformance with government specifications or private contractual specifications.

## THIRTY-SECOND DEFENSE

32.     The conspiracy claim is not stated with particularity as required by Rule 9 of the Ohio Rules of Civil Procedure.

## ANSWER TO CROSS-CLAIMS

33.     Defendant Morton International, Inc., incorrectly sued as Autoliv ASP Inc., specifically denies any and all allegations set forth in any cross-claims which have been or may be asserted.

WHEREFORE, Defendant prays that Plaintiff's complaint be dismissed as to it and that it recovers its costs herein.

Respectfully submitted,

/s/ Perry W. Doran, II
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
          pdoran@vorys.com

Attorneys for Defendant
Morton International, Inc., incorrectly sued as
Autoliv ASP Inc.

## JURY DEMAND

Defendant Morton International, Inc., incorrectly sued as Autoliv ASP Inc., demands trial by jury of all issues so triable in this action.

Respectfully submitted,

/s/ Perry W. Doran, II
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio 43216-1008
Telephone: (614) 464-6400
Facsimile: (614) 464-6350
E-mail: rdschuster@vorys.com
pdoran@vorys.com

Attorneys for Defendant
Morton International, Inc., incorrectly sued as
Autoliv ASP Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system this 12th day of May, 2022.

/s/ Perry W. Doran, II
Perry W. Doran, II

# EXHIBIT Z

**This document constitutes a ruling of the court and should be treated as such.**

**Court Authorizer**
**Comments:**

Motion for leave to file Granted.



**GRANTED**

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH J. DOUGHERTY, | ) | CASE NO. CV-22-960873 |
| | ) | |
| Plaintiff, | ) | JUDGE HARRY A. HANNA |
| | ) | |
| vs. | ) | |
| | ) | |
| AUTOLIV ASP INC., et al., | ) | **MOTION FOR LEAVE TO FILE** |
| | ) | **AMENDED COMPLAINT TO ADD** |
| Defendants. | ) | **NEW PARTY DEFENDANT** |
| | ) | |

Pursuant to Rules 15 and 20 of the Ohio Rules of Civil Procedure, Plaintiff hereby moves this Honorable Court for leave to file an amended complaint adding new party Defendant WT/HRC Corporation.  Plaintiff filed his original complaint on March 10, 2022.

Rule 15 of the Ohio Rules of Civil Procedure ("Civil Rules") governs the amendment of pleadings and provides in pertinent part as follows:

> ...a party may amend his pleading only by leave of court...[l]eave of court shall be freely given when justice so requires.

Civil Rule 20 allows multiple defendants to be joined in one action where:

> ...there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or succession or series of transactions or occurrence and if any question of law or fact common to all defendants will arise in the action.

The addition of the new party Defendant herein satisfies the above criteria as the right to relief in this case arises from the Plaintiff's development of Mesothelioma due to exposure to the Defendants' asbestos-containing products. A copy of the proposed amended complaint is attached hereto as Exhibit 1.

For all these reasons, Plaintiff respectfully requests this Honorable Court to issue an order granting Plaintiff leave to file an amended complaint adding new party Defendant WT/HRC Corporation

Respectfully submitted,


/s/ Anthony Gallucci
ANTHONY GALLUCCI (0066665)
CHRISTOPHER J. HICKEY (0065416)
KEVIN E. MCDERMOTT (0027813)
McDermott & Hickey, LLC
20525 Center Ridge Road, Ste. 200
Rocky River, OH  44116
Telephone: (216) 712-7452
Facsimile: (216) 916-9238
Email: ag@mesohio.com
            chip@mcsohio.com
            kevin@mesohio.com

## <u>CERTIFICATE OF SERVICE</u>

A copy of the foregoing Motion for Leave to File Amended Complaint to Add New Party Defendant has been served electronically upon all counsel of record via Lexis/Nexis File & Serve this 12th day of May 2022.


*/s/ Anthony Gallucci*
ANTHONY GALLUCCI (0066665)
Attorney for Plaintiff

EXHIBIT 1

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | **)** | CASE NO. CV-22-960873 |
| | **)** | |
| Plaintiff, | **)** | JUDGE HARRY A. HANNA |
| | **)** | |
| vs. | **)** | |
| | **)** | |
| AUTOLIV ASP INC., et al. | **)** | **AMENDED COMPLAINT** |
| | **)** | (Jury Trial Demanded) |
| **NEW PARTY DEFENDANT** | **)** | |
| WT/HRC CORPORATION | **)** | |
| C/O NATIONAL REGISTERED AGENTS | **)** | |
| INC. | **)** | |
| 208 SOUTH LASALLE ST., SUITE 814 | **)** | |
| CHICAGO, IL 60604 | **)** | |
| | **)** | |
| Defendants. | **)** | |

## FACTUAL BACKGROUND

1.    Plaintiff JOSEPH J. DOUGHERTY is a resident of the State of Ohio, who was
diagnosed with malignant mesothelioma by a pathology report dated November 23, 2021.

2.    Plaintiff was employed at the WR Grace Davison Chemical Division Plant on or
near 4775 Paddock Road in Cincinnati, Ohio from approximately 1966 until 1972. Plaintiff was
also employed at the Morton International Facility on or near 2000 West Street in Reading, Ohio
from approximately 1976 until 2005.

3.    At all relevant times while on the aforesaid premises, JOSEPH J. DOUGHERTY
continuously used, worked with and/or around others who used asbestos[1], asbestos-containing

---

[1] Unless indicated otherwise, "asbestos" is used herein, not in a limited regulatory sense, but in a broad, human health-based sense, and includes non-regulated and non-commercial forms of asbestos, all forms of elongate mineral particles, fibrous minerals, fibrous talc, cleavage fragments of amphiboles, individual fibers, bundles, fibrils and transition/transitional fibers. "Asbestiform" and "asbestos" shall also be interpreted broadly and without any single definitional limitation regarding fiber size, length, dimension, ratio, presence of multiple fibers, or geologic origin or "habit." The foregoing notwithstanding, "asbestos" also includes vermiculite and talc, whether or not known or

products and/or machinery requiring the use of asbestos and/or asbestos-containing products. The premises, products and/or machinery required use, maintenance, cleaning, repair, and/or replacement by the Plaintiff and/or individuals who worked in close proximity to the Plaintiff.

4.    Plaintiff JOSEPH J. DOUGHERTY used and/or was exposed to asbestos-containing products while he and/or others in his close proximity engaged in the maintenance, construction, renovation, repair, refurbishment and/or caretaking of personal property.

5.    Defendant, DONALD MCKAY SMITH INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

6.    Defendant, R.E. KRAMIG & CO. INC., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

7.    Defendant, RED SEAL ELECTRIC CO., or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

8.    Defendant, THE SCOTTS COMPANY LLC, or their predecessors-in-interest, are incorporated in the State of Ohio and maintain its principal place of business within the State, and/or have done and are doing business in this County and State.

9.    Defendant corporations and companies or their predecessors-in-interest (hereinafter collectively, "Defendants"), or their predecessors-in-interest reside in this County,

---

acknowledged by defendant(s) to contain asbestiform minerals or other elongate mineral particles. *See, e.g.,* Egilman, et al., Health Effects of Censored Elongated Mineral Particles: A Critical Review, *Detection Limits in Air Quality and Environmental Measurements* (STP 1618, 2019; doi: 10.1520/STP161820180080) (**Exhibit A**)

and/or maintain offices in this County, and/or have agents in this County, and/or have done and are doing business in this County and/or State.

10.     Defendants at all times relevant and pertinent hereto, were or are miners, millers, manufacturers, fabricators, designers, formulators, creators, makers, processors, distributors, importers, converters, compounders, or merchants of asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for the purpose of protecting workers exposed to asbestos.

11.     Defendants, acting through their servants, employees, agents, and representatives, caused asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products be placed in the stream of commerce to which Plaintiff JOSEPH J. DOUGHERTY was exposed.

12.     Plaintiff JOSEPH J. DOUGHERTY continuously used, worked with and/or worked around others and was exposed to the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products mined, manufactured, processed, imported, converted, compounded or sold by Defendants.

13.     During the course of his employment and also during his use of asbestos-containing products, Plaintiff JOSEPH J. DOUGHERTY was exposed to Defendants' asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products and/or equipment allegedly designed for protection from asbestos-containing products, which exposure directly and proximately caused Plaintiff JOSEPH J. DOUGHERTY to contract mesothelioma.

## **COUNT I**

14.     Plaintiff re-alleges paragraphs 1 through 13 above as if fully rewritten herein.

15.     Defendants negligently produced, sold or otherwise put into the stream of commerce asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products, which the Defendants knew or in the exercise of ordinary care, ought to have known, were deleterious and highly harmful to Plaintiff JOSEPH J. DOUGHERTY's health.

16.     As the designer, developer, manufacturer, distributor and seller of the above-described asbestos and asbestos-containing products, and/or machinery requiring the use of asbestos and/or asbestos-containing products, Defendants owed a duty to foreseeable users and handlers of said products, to use ordinary care in designing, manufacturing, marketing and selling said products in such a manner as to render them safe for their intended and foreseeable users.

17.     Defendants negligently gave inadequate warning or instruction during and after the time of marketing in that Defendants knew or in the exercise of reasonable care should have known about the risks associated with its products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

18.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has suffered and continues to suffer the injuries and damages as set forth herein.

## **COUNT II**

19.     Plaintiff re-alleges paragraphs 1 through 18 above as if fully rewritten herein.

20.     Although Defendants knew or in the exercise of ordinary care ought to have known that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos

and/or asbestos-containing products were deleterious, and highly harmful to Plaintiff JOSEPH J.

DOUGHERTY's health, Defendants nonetheless:

a)      Failed to advise or warn Plaintiff JOSEPH J. DOUGHERTY of the dangerous characteristics of their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

b)      Failed to provide Plaintiff JOSEPH J. DOUGHERTY with the knowledge as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if any, to protect Plaintiff from being harmed by exposure to asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products;

c)      Failed to place any warnings on containers of said asbestos and asbestos-containing products alerting Plaintiff JOSEPH J. DOUGHERTY of the dangers to health caused by contact with asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and

d)      Failed to take reasonable precautions or to exercise reasonable care to publish, adopt and enforce a safety plan and/or a safe method of handling and installing asbestos and asbestos-containing products, or utilizing the machinery requiring the use of asbestos and/or asbestos-containing products in a safe manner.

21.     Defendants' products were defective due to inadequate warning or instruction during and after the time of marketing in that Defendants knew, or in the exercise of reasonable care, should have known about the risks associated with their products and failed to provide reasonable and/or adequate warning or instructions in light of the likelihood that the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products would cause serious physical harm to Plaintiff JOSEPH J. DOUGHERTY.

22.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and Plaintiff has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for its failure to warn at common law and pursuant to R.C. 2307.71 et seq.

## COUNT III

23.     Plaintiff re-alleges paragraphs 1 through 22 above as if fully rewritten herein.

24.     Defendants failed to design, manufacture, market, distribute, and sell asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable uses.  By way of example and not limitation, Defendants:

> a)     Failed to design, develop, manufacture and test the asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products in such a manner as to render them safe for their intended and foreseeable users, when Defendants knew or should have known that the foreseeable use or intended purpose of its products was by persons, specifically Plaintiff JOSEPH J. DOUGHERTY, who worked with and around said products;

> b)     Marketed and sold said products while the same was in an inherently and unreasonably dangerous and defective condition, presenting an ultra-hazardous risk to Plaintiff JOSEPH J. DOUGHERTY's well-being;

> c)     Failed to recall or attempt to repair the defective products when Defendants were and had been aware of the propensity of said products to injure Plaintiff JOSEPH J. DOUGHERTY; and

> d)     Failed to properly test said products to ensure that they were reasonably safe for use throughout their product lifetime.

25.     Defendants violated the requirements of §402(A) of the Restatement of Torts, 2d, as adopted by the Supreme Court of the State of Ohio, all of which proximately resulted in Plaintiff JOSEPH J. DOUGHERTY's asbestos-related disease.

26.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein and Defendants are, therefore, liable, to Plaintiff in strict liability for defective design and manufacture and/or marketing, distributing and selling a defective product at common law and pursuant to R.C. 2307.71 et seq.

## COUNT IV

27.     Plaintiff re-alleges paragraphs 1 through 26 above as if fully rewritten herein.

28.     Defendants impliedly warranted that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of good and merchantable quality and fit for the ordinary purposes for which the products are used.

29.     Plaintiff JOSEPH J. DOUGHERTY used and/or worked in close proximity to the asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products of the Defendants, and Plaintiff JOSEPH J. DOUGHERTY's presence was known, or ought to have reasonably been anticipated by the Defendants.

30.     The implied warranty made by the Defendants that their asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products were of merchantable quality and fit for their particular intended use was breached in that certain harmful matter was given off into the atmosphere where Plaintiff JOSEPH J. DOUGHERTY worked and/or used the aforesaid products.

31.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT V

32.     Plaintiff re-alleges paragraphs 1 through 31 above as if fully rewritten herein.

33.     Defendants, since 1929 have possessed medical and scientific data which clearly indicates that asbestos fibers and asbestos-containing products are hazardous to one's health. Defendants, prompted by pecuniary motives, individually and collectively, ignored and intentionally failed to act upon said medical and scientific data and conspired with other asbestos

2193214                                          7

manufacturers, miners, distributors and sellers to deprive the public, and particularly the users of their products, including Plaintiff JOSEPH J. DOUGHERTY of said medical and scientific data, and therefore deprived Plaintiff of the opportunity of free choice as to whether or not to expose himself to Defendants' asbestos and asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products; and further, Defendants willfully, intentionally and wantonly failed to warn Plaintiff of the serious bodily harm which would result from the inhalation of the asbestos fibers and the dust from their products.

34.    Plaintiff JOSEPH J. DOUGHERTY reasonably and in good faith relied upon the false and fraudulent representations, omissions and concealments made by the Defendants regarding the nature of their asbestos, asbestos-containing products and/or machinery requiring the use of asbestos and/or asbestos-containing products.

35.    The award for this Count should be in such an amount as would act as a deterrent to Defendants and others from the future commission of like offenses and wrongs.

36.    Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VI

37.    Plaintiff re-alleges paragraphs 1 through 36 above as if fully rewritten herein.

38.    Defendants' actions, as stated herein, constitute a flagrant disregard for the rights and safety of Plaintiff JOSEPH J. DOUGHERTY and by engaging in such actions, Defendants acted with fraud, recklessness, willfulness, wantonness and/or malice and should be held liable in punitive and exemplary damages to Plaintiff.

39.     Plaintiff JOSEPH J. DOUGHERTY, as a direct and proximate result of Defendants' conduct, has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VII

40.     Plaintiff re-alleges paragraphs 1 through 39 above, as if fully rewritten herein.

41.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY incurred expenses for medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined.

42.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY suffered lost wages, a progressive loss of earning capacity, and other economic damages during his lifetime.

43.     As a direct and proximate result of the acts and omissions of Defendants complained of herein, Plaintiff JOSEPH J. DOUGHERTY has contracted mesothelioma and has suffered and continues to suffer the injuries and damages as set forth herein.

## COUNT VIII

44.     Plaintiff re-alleges paragraphs 1 through 431 above, as if fully rewritten herein.

45.     Plaintiff JOSEPH J. DOUGHERTY worked at the premises owned by Defendant AUTOLIV ASP INC (F/K/A MORTON INTERNATIONAL INC.) ("Premises Defendant") from approximately 1976 through 2005, including, but not limited to the Morton International Facility plant on or near 2000 West Street in Reading, Ohio, at which he was exposed to asbestos products and dust from asbestos products; all of which were within the care, custody and control of the Premises Defendant.

46.    At all times mentioned herein, the Premises Defendant, owned, leased, maintained, managed and controlled the premises when Plaintiff was present.

47.    While present at premises owned and/or operated by the above Premises Defendant, Plaintiff JOSEPH J. DOUGHERTY was continuously exposed to asbestos and asbestos-containing dust without the provision of appropriate safeguards by Premises Defendant, who had the responsibility for such, and further, the exposure to the Plaintiff regularly exceeded the threshold limit values adopted by this State and that the Premises Defendant allowed that condition to persist in violation of safety standards.

48.    Plaintiff's injuries, illness, and disabilities were the result of intentional acts and omissions and negligence and gross negligence in the use of asbestos at premises owned by Premise Defendants. The Premise Defendants failed to properly remove and abate said asbestos at these facilities and/or provide adequate and reasonable safeguards during asbestos abatement at the time Plaintiff JOSEPH J. DOUGHERTY was working there.

49.    Premises Defendant was negligent, grossly negligent, and committed certain intentional acts, all of which were the proximate cause of the disease and injuries resulting in Plaintiff JOSEPH J. DOUGHERTY's mesothelioma from exposure to asbestos.

50.    In particular, Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff, and that such intentional acts and omissions proximately caused Plaintiff's asbestos-related injuries and disabilities.

51.    Specific intentional acts and acts constituting negligence and gross negligence committed by Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities include:

(a)     Failing to timely and adequately warn Plaintiff of the dangerous characteristics and serious health hazards associated with exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(b)     Failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect Plaintiff from being harmed and disabled by exposure to asbestos, and/or asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products;

(c)     Requiring Plaintiff JOSEPH J. DOUGHERTY to work in close proximity to and/or with, install, cut, fit, manipulate, remove, and/or clean debris released by asbestos-containing products, and/or equipment requiring and/or calling for the use of asbestos and/or asbestos-containing products in the workplace without taking adequate precautions for the protection of Plaintiff, workers in the vicinity of such work activities performed by others, and/or on the premises generally;

(d)     Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

(e)     Failure to provide safe equipment for Plaintiff to use;

(f)     Failure to provide adequate safety measures and protection against deadly and life-threatening asbestos dust, all despite Premises Defendant's knowledge of the extreme risk of harm inherent to asbestos exposure;

(g)     Failure to adequately warn Plaintiff of the inherent dangers of asbestos contamination;

(h)     Failure to provide Plaintiff a safe place to work by failing to maintain the ambient and environmental conditions of Defendant's premises in proper and safe condition;

(i)     Failure to follow and adhere to various state and U.S. Governmental statutes, regulations and guidelines pertaining to asbestos and the exposure to asbestos of employees and others. Such failure constituted negligence *per se* at a minimum. Plaintiff is not making claims for damages under Federal Law.

52.     Premises Defendant intentionally, knowingly, and due to negligence and gross negligence, failed to ensure that individuals such as Plaintiff were protected from the inhalation of

asbestos and asbestos fibers. Such actions proximately caused Plaintiff JOSEPH J. DOUGHERTY's asbestos-related injuries and disabilities.

53.     Additionally, specific actions or omissions on the part of Premises Defendant that proximately caused Plaintiff's asbestos-related injuries and disabilities were:

> (a)     Attempting to remove asbestos dust in the workplace while Plaintiff was present and without taking adequate precautions for the protection of workers, including Plaintiff, in the vicinity of same and/or in the premises generally;

> (b)     Failing to provide proper protective gear for individuals exposed to asbestos;

> (c)     Failing to provide adequate ventilation to ensure that individuals in the vicinity were not exposed to asbestos;

> (d)     Failing to provide a proper and safe method for the use of asbestos and asbestos fibers;

> (e)     Failing to adhere to industry safe standards and other established measures to protect workers from harm;

> (f)     Failing to adequately warn of the extreme risk of danger of inherent to asbestos exposure.

54.     Premises Defendant demonstrated such an entire want of care as to establish that their acts and omissions alleged above were the result of actual conscious indifference to the rights, safety, and welfare of Plaintiff JOSEPH J. DOUGHERTY.

## COUNT IX

55.     Plaintiff re-alleges paragraphs 1 through 54 above as if fully rewritten herein.

56.     Defendants were the supplier and seller of asbestos-containing products manufactured by entities that have asserted insolvency.

57.     As prescribed by Ohio Revised Code Section 2307.78, Defendants as suppliers, sellers or distributors of asbestos-containing products manufactured by an entity that has asserted insolvency, are liable to Plaintiff JOSEPH J. DOUGHERTY based upon product liability claims

under Ohio Revised Code Sections 2307.71 to 2307.77, as if they were the manufacturer of asbestos-containing products and for negligence.

WHEREFORE, Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered and will continue to suffer great pain and severe mental anguish.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has incurred expenses for his medical, and/or hospital, and/or pharmaceutical, and/or surgical care and/or other expenses in an amount not yet determined, and will continue to incur such expenses into the future.

Plaintiff, as a direct and proximate result of the negligent and intentional conduct of Defendants, has suffered economic damages and will continue to suffer them throughout his lifetime.

The aforesaid acts and/or omissions of Defendants were wanton and willful and in reckless disregard of the safety of Plaintiff.

Plaintiff demands judgment against Defendants, jointly and severally, in an amount in excess of Twenty-five Thousand Dollars ($25,000.00) and an amount for punitive damages, plus interest, costs and such further relief to which Plaintiff may be entitled.

A trial by jury is hereby demanded as to all counts.

Respectfully submitted,

*/s/Anthony Gallucci*
Anthony Gallucci (0066665)
Christopher J. Hickey (0065416)
Kevin E. McDermott (0027813)
**MCDERMOTT & HICKEY, LLC**
20525 Center Ridge Road, Ste. 200
Rocky River, OH 44113
Telephone: (216) 712-7452
Facsimile: (216) 916-9238
Email: ag@mesohio.com
        chip@mesohio.com
        kevin@mesohio.com

-and-

*/s/ Daniel C. LaTerra*
Daniel C. LaTerra, *(PHV 25834-2022)*
R. Austin Taylor *pro hac vice pending*
**THE LANIER LAW FIRM, P.C.**
126 E. 56th Street, 6th Floor
New York, New York 10022
Telephone: 212-421-2800
Facsimile: 713-659-2204
Email: daniel.laterra@lanierlawfirm.com
austin.taylor@lanierlawfirm.com

***Attorneys for Plaintiff***

<u>**CASE BROCHURE**</u>

**NAME: JOSEPH J. DOUGHERTY**

**DATE OF BIRTH:** ▮▮▮▮▮▮

**SOCIAL SECURITY NUMBER: XXX-XX-2454**

**DIAGNOSIS: MESOTHELIOMA**

**DATE OF DIAGNOSIS:    CONFIRMED BY PATHOLOGY REPORT DATED NOVEMBER 23, 2021**

**JOB SITES:  WR GRACE DAVISON CHEMICAL DIVISION PLANT (1966-1972)**
**4775 PADDOCK ROAD**
**CINCINNATI, OHIO**

**MORTON INTERNATIONAL FACILITY (1976-2005)**
**2000 WEST STREET**
**READING, OHIO**

**DISCOVERY IS ONGOING.  PLAINTIFF RESERVES THE RIGHT TO SUPPLEMENT THIS INFORMATION.**

# EXHIBIT AA

| This document constitutes a ruling of the court and should be treated as such. |
| --- |
| |
| **Court Authorizer**<br>       **Comments:** |
| So Ordered; |



# GRANTED

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

Joseph John Dougherty,       )
                                )
          Plaintiff,        )
                                )    Case No. 960873
vs.                       )
                                )    Judge Harry A. Hanna
AUTOLIV ASP Inc., *et al*.,     )
                                )
         Defendants.     )

### <u>ORDER</u>

This matter being brought before this Court by Vorys, Sater, Seymour and Pease, LLP, attorneys for The Scotts Company, LLC, on a Motion for Admission of Emily Mordecai, *Pro Hac Vice*, and the Court having duly considered the matter and for good cause showing,

It is hereby ORDERED, that the Motion for Admission of Emily Mordecai be and hereby is granted.

SO ORDERED.

Dated: _____, 2022.

_____
Judge Harry Hanna

Prepared by:
Perry W. Doran, II (0071757)
Vorys, Sater, Seymour and Pease LLP
P.O. Box 1008
52 East Gay Street
Columbus, OH  43216-1008
(614) 464-6400

*Attorney for Defendant The Scotts Company, LLC*

# EXHIBIT BB

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

Joseph John Dougherty           :
                                 :
              Plaintiff,         :      Case No. 960873
                                 :
         v.                     :      Judge Hanna
                                 :
AUTOLIV ASP Inc. et al.,      :
                                 :
             Defendants.      :

---

**ANSWER OF DEFENDANT**
**THE SCOTTS COMPANY, LLC**
**TO PLAINTIFF'S AMENDED COMPLAINT**

---

In response to the Amended Complaint, Defendant The Scotts Company, LLC incorporates herein each and every denial, affirmative defense, and other response made in their Answer to the original Complaint, as if fully recopied herein.

WHEREFORE, this Defendant prays that plaintiff's Amended Complaint be dismissed as to them and that they recover their costs herein.

          /s/ Richard D. Schuster
          Richard D. Schuster (0022813)
          Perry W. Doran (0071757)
          VORYS, SATER, SEYMOUR and PEASE LLP
          52 East Gay Street
          P. O. Box 1008
          Columbus, Ohio  43216-1008
          Telephone:  (614) 464-5475
          Facsimile:  (614) 464-6350
          E-mail:  rdschuster@vorys.com
                   pdoran@vorys.com

          Attorneys for Defendant
          The Scotts Company, LLC

**JURY DEMAND**

Defendant The Scotts Company, LLC demands trial by jury of all issues so triable in this action.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
            pdoran@vorys.com

Attorneys for Defendant
The Scotts Company, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 23rd day of May, 2022.

/s/ Richard D. Schuster
Richard D. Schuster

5/23/2022 42265647

# EXHIBIT CC

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

| | | |
|---|---|---|
| Joseph John Dougherty | : | |
| | : | |
| Plaintiff, | : | Case No. 960873 |
| | : | |
| v. | : | Judge Hanna |
| | : | |
| AUTOLIV ASP Inc. et al., | : | |
| | : | |
| Defendants. | : | |

---

**ANSWER OF DEFENDANT MORTON INTERNATIONAL, INC.,**
**INCORRECTLY SUED AS AUTOLIV ASP INC.,**
**TO PLAINTIFF'S AMENDED COMPLAINT**

---

In response to the Amended Complaint, Defendant Morton International, Inc., Incorrectly Sued as Autoliv ASP Inc. incorporates herein each and every denial, affirmative defense, and other response made in their Answer to the original Complaint, as if fully recopied herein.

WHEREFORE, this Defendant prays that plaintiff's Amended Complaint be dismissed as to them and that they recover their costs herein.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
         pdoran@vorys.com

Attorneys for Defendant
Morton International, Inc., Incorrectly Sued as Autoliv
ASP Inc.

## JURY DEMAND

Defendant Morton International, Inc., Incorrectly Sued as Autoliv ASP Inc. demands trial by jury of all issues so triable in this action.

/s/ Richard D. Schuster
Richard D. Schuster (0022813)
Perry W. Doran (0071757)
VORYS, SATER, SEYMOUR and PEASE LLP
52 East Gay Street
P. O. Box 1008
Columbus, Ohio  43216-1008
Telephone:  (614) 464-5475
Facsimile:  (614) 464-6350
E-mail:  rdschuster@vorys.com
               pdoran@vorys.com

Attorneys for Defendant
Morton International, Inc., Incorrectly Sued as Autoliv ASP Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 23rd day of May, 2022.

/s/ Richard D. Schuster
Richard D. Schuster

# EXHIBIT DD

**IN THE COURT OF COMMON PLEAS**
**CUYAHOGA COUNTY, OHIO**

Joseph John Dougherty                :
                                       :

                Plaintiff,        :     Case No. 960873
                                       :

      v.                       :     Judge Hanna
                                       :

AUTOLIV ASP Inc. et al.,          :
                                       :

             Defendants.    :

---

**ANSWER OF DEFENDANT**
**UNION CARBIDE CORPORATION**
**TO PLAINTIFF'S AMENDED COMPLAINT**

---

      In response to the Amended Complaint, Defendant Union Carbide Corporation incorporates herein each and every denial, affirmative defense, and other response made in their Answer to the original Complaint, as if fully recopied herein.

      WHEREFORE, this Defendant prays that plaintiff's Amended Complaint be dismissed as to them and that they recover their costs herein.

                          /s/ Richard D. Schuster
                          Richard D. Schuster (0022813)
                          Perry W. Doran (0071757)
                          VORYS, SATER, SEYMOUR and PEASE LLP
                          52 East Gay Street
                          P. O. Box 1008
                          Columbus, Ohio  43216-1008
                          Telephone:  (614) 464-5475
                          Facsimile:  (614) 464-6350
                          E-mail:  rdschuster@vorys.com
                                       pdoran@vorys.com

                          Attorneys for Defendant
                          Union Carbide Corporation

**JURY DEMAND**

   Defendant Union Carbide Corporation demands trial by jury of all issues so triable in this action.

         /s/ Richard D. Schuster
         Richard D. Schuster (0022813)
         Perry W. Doran (0071757)
         VORYS, SATER, SEYMOUR and PEASE LLP
         52 East Gay Street
         P. O. Box 1008
         Columbus, Ohio  43216-1008
         Telephone:  (614) 464-5475
         Facsimile:  (614) 464-6350
         E-mail:  rdschuster@vorys.com
              pdoran@vorys.com

         Attorneys for Defendant
         Union Carbide Corporation

**CERTIFICATE OF SERVICE**

   I hereby certify that a true and correct copy of the foregoing pleading was electronically filed with the Court and served upon all parties of record pursuant to the Court's electronic filing system, this 23rd day of May, 2022.

         /s/ Richard D. Schuster
         Richard D. Schuster

# EXHIBIT EE

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO

| | | |
|---|---|---|
| JOSEPH JOHN DOUGHERTY, | ) | CASE NO.   22-960873 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE HARRY A. HANNA |
| v. | ) | (Asbestos Docket) |
| | ) | |
| AUTOLIV ASP INC (F/K/A MORTON | ) | |
| INTERNATIONAL INC., INDIVIDUALLY | ) | **NOTICE OF APPEARANCE** |
| AND AS SUCCESSOR TO GERSHWIN | ) | **OF DEFENDANT WT/HRC** |
| ACQUISITION CORP., L/K/A MORTON | ) | **CORPORATION** |
| ACQUISITION CORP.), et al., | ) | |
| | ) | |
| Defendants. | | |

PLEASE TAKE NOTICE that attorney Ryan T. Winkler, Esq., of the law firm of Tucker Ellis LLP is entering his appearance as counsel of record for Defendant, WT/HRC Corporation. This Appearance is filed and served in accordance with Standing Order No. 7 Regarding the Filing of Answers in Asbestos Cases, entered on October 28, 1997 by Judge Harry A. Hanna.

This Appearance thus constitutes:

(1)    a denial of all averments of fact in the Amended Complaint or Third-Party Complaint,

(2)    an allegation of all affirmative defenses, and

(3)    a claim for indemnification and contribution from any other party.

On behalf of Defendant, WT/HRC Corporation, please send all further notices, orders, entries, pleadings and/or correspondence directly to Ryan T. Winkler, Esq., Tucker Ellis LLP, 950 Main Avenue, Suite 1100, Cleveland, Ohio 44113-7213, e-mail address:

ryan.winkler@tuckerellis.com.

1

5558850.1

Respectfully submitted,


*/s/ Ryan T. Winkler*
RYAN T. WINKLER (0089591)
TUCKER ELLIS LLP
950 Main Avenue
Suite 1100
Cleveland, Ohio 44113-7213
Telephone: 216.592.5000
Telefax: 216.592.5009

*Attorney for Defendant WT/HRC*
*Corporation*


## CERTIFICATE OF SERVICE

The foregoing Notice of Appearance has been electronically filed with the Court this 2nd

day of June 2022.

*/s/ Ryan T. Winkler*
*Attorney for Defendant WT/HRC*
*Corporation*

2

5558850.1